**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BLIX INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 19-1869-LPS |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| APPLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**
**PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

OF COUNSEL:

Daniel G. Swanson
Jason C. Lo
Jennifer J. Rho
Raymond A. LaMagna
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Tel:  (213) 229-7000

Cynthia E. Richman
Amalia Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Tel:  (202) 995-8500

H. Mark Lyon
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
Tel:  (650) 849-5300

Chris Whittaker
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612
Tel:  (949) 451-3800

Dated:  February 12, 2020
6572608 / 49651

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Tracey E. Timlin (#6469)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
ttimlin@potteranderson.com

*Attorneys for Defendant Apple Inc.*

## <u>TABLE OF CONTENTS</u>

Page

I.  NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.  INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 1

III.  STATEMENT OF FACTS ............................................................................................. 3

A.  Apple's App Stores and "Sign in with Apple" Feature ........................................ 3

B.  Blix's '284 Patent and BlueMail App................................................................... 5

C.  Blix's Claims ........................................................................................................ 6

IV.  LEGAL STANDARD..................................................................................................... 6

V.  COUNT 1 (PATENT INFRINGEMENT)....................................................................... 6

A.  Patent Claims ........................................................................................................ 6

B.  The Asserted Claims Are Ineligible...................................................................... 9

1.  *Alice* Step 1—The Asserted Claims Are Directed to an Abstract Idea.... 11

2.  *Alice* Step 2—The Claims Do Not Contain Any Inventive Concepts ..... 17

VI.  COUNTS 2 AND 3 (ALLEGED MONOPOLIZATION)............................................. 21

A.  Plaintiff Has Not Pled Plausible Monopolization Claims Under Section 2......... 21

1.  Plaintiff Has Not Pled Apple Has Monopoly Power in Any Relevant Market .................................................................................................... 21

2.  Blix Has Failed to Allege Any Anticompetitive Conduct ....................... 28

VII.  CONCLUSION............................................................................................................. 35

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Abid v. Google LLC*,
    2018 WL 3458546 (N.D. Cal. July 18, 2018) .........................................................................24

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014) .............................................................................................30, 31

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    4 F. Supp. 3d 1123 (D. Ariz. 2014), *aff'd by Aerotec Int'l*, 836 F.3d 1171 (9th
    Cir. 2016) .......................................................................................................................31

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ...................................................................................30, 31, 33

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016) .......................................................................................12, 14

*Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*,
    826 F.2d 1235 (3d Cir. 1987) ...............................................................................................32

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) .............................................................................................. *passim*

*Apple, Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ..................................................................................26

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ......................................................................................................30, 33

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ...........................................................................................................35

*In re Beauregard*,
    53 F.3d 1583 (Fed. Cir. 1995) ................................................................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................................6

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007) .............................................................................................29, 30

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ...........................................................................................................35

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018)................................................................................17

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019)................................................................................10

*Christy Sports, LLC v. Deer Valley Resort Co.*,
  555 F.3d 1188 (10th Cir. 2009) ............................................................................30

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
  776 F.3d 1343 (Fed. Cir. 2014)..............................................................................11

*Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*,
  159 F.3d 129 (3d Cir. 1998)....................................................................................24

*Doe v. Abbott Labs.*,
  571 F.3d 930 (9th Cir. 2009) ..................................................................................30

*Elec. Power Grp. v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016)........................................................................17, 19

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007).....................................................................................30

*Fineman v. Armstrong World Indus., Inc.*,
  980 F.2d 171 (3d Cir. 1992)..............................................................................23, 34

*Goplin v. WeConnect, Inc.*,
  893 F.3d 488 (7th Cir. 2018) ...................................................................................2

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
  423 F.3d 374 (3d Cir. 2005)........................................................................... *passim*

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ....................................................................24, 25, 28

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir. 2015)....................................................................12, 13, 18

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
  850 F.3d 1332 (Fed. Cir. 2017)....................................................................12, 13, 18

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
  850 F.3d 1315 (Fed. Cir. 2017)..............................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Intellectual Ventures I LLC v. Symantec Corp.*,
  234 F. Supp. 3d 601 (D. Del. 2017)................................................................12, 14

*Intellectual Ventures I LLC v. Symantec Corp.*,
  100 F. Supp. 3d 371 (D. Del. 2015)................................................................13, 15

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016)..............................................................13, 15, 18

*Intergraph Corp. v. Intel Corp.*,
  195 F.3d 1346 (Fed. Cir. 1999)................................................................34, 35

*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008) ....................................................................30

*Matthews v. Nat'l Football League Mgmt. Council*,
  688 F.3d 1107 (9th Cir. 2012) ..........................................................................2

*Mayer v. Belichick*,
  605 F.3d 223 (3d Cir. 2010)..............................................................................3

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
  811 F.3d 1314 (Fed. Cir. 2016)................................................................13, 14

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ......................................................................32

*Nw. Power Prods., Inc. v. Omark Indus., Inc.*,
  576 F.2d 83 (5th Cir. 1978) .............................................................................35

*O'Toole v. Northrop Grumman Corp.*,
  499 F.3d 1218 (10th Cir. 2007) ........................................................................2

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ..........................................................................32

*Pa. Dental Ass'n v. Medical Serv. Ass'n of Pa.*,
  745 F.2d 248 (3d Cir. 1984)............................................................................23

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
  555 U.S. 438 (2009) .............................................................................. *passim*

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
  886 F.3d 332 (3d Cir. 2018)............................................................................35

**TABLE OF AUTHORITIES**

(continued)

Page(s)

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)................................................................24, 25, 26, 28

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010)...........................................................................21, 32

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...............................................................................22

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017)...............................................................13, 17, 21

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
  842 F.3d 883 (5th Cir. 2016) ...............................................................................34

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018)...........................................................................19

*Search & Social Media Partners v. Facebook, Inc.*,
  2019 WL 581616 (D. Del. Feb. 13, 2019) ...........................................................18

*Synopsis, Inc. v. Mentor Graphics Corp.*,
  839 F.3d 1138 (Fed. Cir. 2016)...........................................................................17

*In re TLI Commc'ns LLC Patent Litig.*,
  823 F.3d 607 (Fed. Cir. 2016)..............................................................................14

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017)...............................................................13, 17, 19, 20

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956)..........................................................................................25, 26

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
  2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ......................................................33

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).................................................................................... *passim*

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
  793 F.3d 1306 (Fed. Cir. 2015)........................................................................18, 19

*Viacom Int'l, Inc. v. Time Inc.*,
  785 F. Supp. 371 (S.D.N.Y. 1992) ......................................................................34

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Victaulic Co. v. Tieman*,
499 F.3d 227 (3d Cir. 2007)...........................................................................2

*Walker Digital, LLC v. Google*,
66 F. Supp. 3d 501 (D. Del. 2014) ................................................ *passim*

*ZF Meritor, LLC v. Eaton*,
696 F.3d 254 (3d Cir. 2012)..........................................................................35

**Treatises**

3A Areeda & Hovenkamp, ANTITRUST LAW ¶ 771c (4th ed. 2015)...........................................33

**Rules**

Fed. R. Civ. P. 12(b)(6)...........................................................................6

Fed. R. Evid. 201(b)(2) ...........................................................................2

## I.      NATURE AND STAGE OF THE PROCEEDINGS

On December 20, 2019, Plaintiff Blix Inc. ("Blix" or "Plaintiff") filed an Amended

Complaint ("Complaint") (D.I. 13) asserting three claims against Apple Inc. ("Apple"): alleged

infringement of U.S. Patent 9,749,284 ('284 patent) and two counts of alleged monopolization

under 15 U.S.C. § 2.  The Court granted the parties' joint stipulation for an orderly briefing

schedule for this motion to dismiss (D.I. 9).  Apple now moves to dismiss Blix's Amended

Complaint under Rule 12(b)(6).

## II.     INTRODUCTION AND SUMMARY OF ARGUMENT

Blix's Complaint seeks to transform its ordinary business disagreements with Apple into

federal claims for patent infringement and monopolization.  Its Complaint is deficient on its face

and should be dismissed with prejudice.

First, Plaintiff cannot state a patent infringement claim because the '284 patent purports

to cover subject matter that is ineligible under 35 U.S.C. § 101.  The patent claims recite the

abstract idea of relaying communications anonymously using a go-between (*i.e.*, an

intermediary)—a routine process in human communication that is not new (but centuries-old),

and that can be easily performed by a human being using pen and paper.  Indeed, the claims do

not purport to solve any technological problem in the prior art. And they utilize a computer only

to perform known processes faster. It is well established that merely adding "do it on a

computer" to an otherwise ineligible patent claim does not render it eligible.  And here, the

claims add no technological, much less inventive, concept.

Blix's antitrust claims fare no better; they are riddled with contradiction and cannot be

reconciled with the antitrust laws they purport to advance.  Blix claims that Apple has

monopolized alleged markets for "email client" software applications for its MacOS and iOS

operating systems, respectively.  Even accepting the validity of its (deeply flawed) market definitions, Blix's Complaint fails to allege that Apple has monopoly power in either market.  To the contrary, Blix admits that Apple faces "substantial competition" from other providers of email client apps—including large and vigorous competitors like Google, Microsoft, and Yahoo.  There is no allegation that Apple restricted output or charged any prices, much less supracompetitive prices, in Blix's gerrymandered email client app markets.  Nor does Blix attempt to plead a market share held by Apple that would support an inference of monopoly power.  Thus, the face of the Complaint undermines any suggestion that Apple holds a dominant position.  Moreover, Blix's balkanized approach to market definition is legally untenable as it ignores obvious competition from other email apps and among different operating systems.

Nor does Blix plausibly allege that Apple has engaged in anticompetitive or exclusionary conduct—a necessary element of a monopolization claim.  Blix cannot plausibly allege an anticompetitive refusal to deal on the basis that Apple removed the BlueMail app from the MacOS App Store.  First, there is no refusal.  Blix acknowledges, as it must, that Apple has continuously distributed the BlueMail App through the iOS App Store.  Additionally, on February 7, 2020, Blix submitted a new version of its MacOS BlueMail app to Apple, which Apple reinstated on February 10, 2020.  *See* Declaration of Ray LaMagna, Ex. 1.[1]

In any event, Blix's claims cannot give rise to a duty to deal because there is no alleged

---

[1] The Court can take judicial notice of BlueMail's availability on the MacOS App Store.  *See* Fed. R. Evid. 201(b)(2); *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007) (requiring authentication of a website when judicial notice is sought); *see also Goplin v. WeConnect, Inc.*, 893 F.3d 488, 491 (7th Cir. 2018) (finding district court properly took judicial notice of defendant's website); *Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1110 n.5 (9th Cir. 2012) (granting request for judicial notice of statistics available on the NFL's website); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224–25 (10th Cir. 2007) (finding district court should take judicial notice of information on Northrop Grumman's website).

profit sacrifice by Apple.  Where, as here, there is no duty to deal, there is "no obligation to deal under terms and conditions favorable to competitors."  *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450 (2009).  This is fatal to Blix's effort to manufacture an antitrust claim out of design decisions that purportedly "stack[] the deck against competitors."  Am. Compl. ¶ 70. There is ample authority in the Third Circuit and beyond confirming that Blix's grievances, even if well-founded (which they are not), cannot suffice to allege an antitrust violation.

## III.    STATEMENT OF FACTS

### A.    Apple's App Stores and "Sign in with Apple" Feature

In 2007, Apple introduced the iPhone, "a revolutionary mobile phone, a widescreen iPod with touch controls, and a breakthrough Internet communications device with desktop-class email, web browsing, searching and maps."  Am. Compl. ¶ 94.  Apple's native email client[2] Apple Mail, along with several other innovative apps, was preinstalled on the phone.  *Id.* ¶¶ 93, 95; *id.* Ex. 17.[3]  In 2008, Apple introduced the iOS App Store to give consumers more choices for applications designed to run on the iOS operating system.  *Id.* ¶¶ 71, 74.  To distribute an app through the App Store, developers submit it to Apple to ensure compliance with the App Store Guidelines.  *Id.* ¶ 77.  Since the iOS App Store was introduced, millions of third-party apps have been made available to the public, including major email client apps such as Yahoo Mail, Gmail,

---

[2] An "email client" is "a computer program used to access and manage a user's email." *Email Client*, WIKIPEDIA, https://en.wikipedia.org/wiki/Email_client.  This is different than a "mail service provider," which is "a provider of email hosting" that "implements email servers to send, receive, accept, and store email for other organizations or end users." *Mailbox Provider*, WIKIPEDIA, https://en.wikipedia.org/wiki/Mailbox_provider.

[3] The Court may consider this and other exhibits referenced in the Complaint because Plaintiffs rely on them to support their claims.  *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (holding courts may consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents").

and Outlook.  *Id.* ¶ 133; *id.* Ex. 1.

In 2011, Apple introduced the App Store for Mac computers to provide consumers access to more options for secure software that is compatible with the MacOS operating system.  *Id.* ¶ 138.  As with the iPhone, certain applications are preinstalled on Mac computers, including Apple Mail.[4]  *Id.* ¶ 158.  Consumers can download applications for their Macs through the MacOS App Store, the Internet, or directly from software developers.  *Id.* ¶140; *id.* Ex. 11.  The MacOS App Store is the best way for consumers to ensure they are downloading "secure software applications," *id.* ¶ 141, but developers can also apply to have their applications certified by Apple so that even if consumers download the app from a different source, they can be sure the app "passed a security check before it was distributed,"  *id.* Ex. 11.  Mac users can voluntarily choose a security setting that will allow them to install apps only from the MacOS App Store; if they do so, they still may bypass their chosen security settings to download applications from other sources.  *Id.* ¶¶ 144–46; *id.* Ex. 11.

As another facet of its longtime focus on "protect[ing] privacy and security," in June 2019, Apple launched a new feature for its operating systems called "Sign in with Apple."  *Id.* ¶ 48; *id.* Ex. 4.  This feature allows consumers to engage with third-party applications and websites without sacrificing their privacy.  *Id.* ¶¶ 52, 54, 56; *id.* Ex. 14.  "Sign in with Apple" facilitates account set-up, sign-in, and communication between an iPhone or Mac user and participating third-party apps and websites while minimizing the personal information shared.  *Id.* ¶¶ 49, 60.  "Sign in with Apple" is not a feature of Apple Mail.  *Id.* Ex. 14.

---

[4] Blix does not allege, nor could it, that preinstallation of Apple Mail on any Apple device prevents a user from downloading and using her preferred email client.

B.      **Blix's '284 Patent and BlueMail App**

Blix is the owner by assignment of the '284 patent.  Am. Compl. ¶ 44.  Blix contends that the '284 patent claims "recite a specific solution" for "anonymously communicating across a communications network." *Id.* ¶ 46.

In 2014, Blix released BlueMail, an email client that allows users to manage multiple email accounts from different providers.[5]  *Id.* ¶¶ 25, 35, 45; LaMagna Decl., Ex. 1.  BlueMail has been available in the iOS App Store since at least 2017.  Am. Compl. ¶ 5.  Blix claims that BlueMail is "one of the world's leading email clients," and that it "became one of the top three email applications on Android" and "achieved similar success on the 'iOS App Store' in terms of user satisfaction."  *Id.* ¶¶ 5, 35.  In 2018, BlueMail added a feature called "Share Email," which allows consumers to use public email addresses when engaging with businesses, as opposed to their private, personal email addresses.  *Id.* ¶¶ 6, 37, 43–46.

BlueMail was made available to consumers in the MacOS App Store in May 2019.  Although it remained available to MacOS users through other channels, it was subsequently removed from the MacOS App Store for non-compliance with the App Store Guidelines.  *Id.* ¶¶ 168, 171, 189.  Thereafter, Apple explained to Blix the steps necessary to have BlueMail restored to the MacOS App Store.  *Id.* ¶¶ 171, 175–76, 198.  Blix submitted a new version of its MacOS app on February 7, 2020.  This version corrected earlier-identified problems with guideline compliance, including guidelines designed to preserve basic data security protections that guard against exposing users' computers to malware that can harm their Macs and threaten their privacy. Apple approved the updated version, and the app has been

---

[5] Blix is also the name of a combination email and messaging service for companies that launched in September 2019.  Am. Compl. ¶¶ 38, 40.  None of Plaintiff Blix's allegations about Apple's conduct relate to the Blix service.

available on the MacOS App Store since February 10, 2020.  *See* LaMagna Decl., Ex. 1.

### C.      Blix's Claims

Blix's Complaint brings two sets of legal claims against Apple.  First, Blix alleges that "Sign in with Apple" infringes "patented techniques in the '284 patent."  Am. Compl. ¶ 62.  Second, Blix further alleges that Apple has monopolized the alleged markets for iOS and MacOS email clients in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

## IV.    LEGAL STANDARD

The Court must dismiss a cause of action that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  Plaintiff is required to plead "enough *facts* to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Id.* at 555.

## V.     COUNT 1 (PATENT INFRINGEMENT)

### A.      Patent Claims

The '284 patent contains 38 claims.  Claims 1, 17, and 27 are independent claims.  Although Blix asserts "at least" 24 claims in its Complaint (Nos. 1–5, 7–10, 12–13, 17–18, 21–22, 26–30, 33–34, and 36–37, Am. Compl. ¶ 115), its allegations focus almost entirely on claim 17 (*id.* ¶¶ 117–125, 131), with passing reference made to dependent claim 26 (*id.* ¶¶ 126–127).

Representative **claim 17** recites a "method of performing a controlled pre-interaction" (*i.e.*, setting up communication) between two parties.  The specification defines a "controlled pre-interaction" as "determining," or identifying, addresses to communicate with, including

6

"optionally" by "browsing, . . . searching, looking for friends, synchronizing contacts, viewing a profile and/or content" on websites like "Facebook or LinkedIn." Am. Compl. Ex. 3 at 2:32–40. Claim 17 describes steps to organize address data (*e.g.* email addresses) for later communication in such a way that at least one side remains anonymous. The claim has two facets:

First, claim 17 describes using an ***intermediary to relay communications*** (which permits anonymity). A private party that desires to engage in anonymous communications is assigned a public address that is different from their private address. The method of claim 17 naturally requires a "record" of the relation between the two addresses so that the public address can be linked to the private address. *See* (a) to (c) below. Although claim 17 is silent on the use of this intermediary address, other claims explain that using an intermediary address helps preserve anonymity because the outsider message recipient sees only the public address, and not the user's private address (*see* claim 1, Am. Compl. Ex. 3 at 22:4–6).

Second, claim 17 describes establishing ***a list of approved outside addresses*** from which communication may be accepted. Although claim 17 itself is silent on the intent of this list, the patent suggests that use of an approved list prevents the user's public address from receiving unsolicited communications. *See, e.g.*, Am. Compl. Ex. 3 at 18:65–19:10, 19:40–48. Thus, different private parties may have individualized choices as to the entities from whom they receive messages (e.g., one party may receive messages from certain LinkedIn or Facebook users, while another will not). *See id.* at 19:49–20:10. The approved outside address entries are therefore "associated" with a specific first party—the '284 patent refers to this set of records as a "reverse list." *See* (d) below. The patent also requires that the outside address of the outside party be "obtainable" from other "third party" or "external" sources. *See* (f) below. Before such a message is attempted, the patent includes steps for determining whether the outside sending

party (i.e., the Facebook user) is on the "approved" list of the private party. *See* (e) and (f)

below. The entries in this reverse list can be synchronized, or updated, from time to time.[6]

These two concepts can be illustrated as follows:

| **Patent Claim (Am. Compl. Ex. 3 at 24:30–58)** | **Action Performed:** |
|---|---|
| **17**. A method of performing controlled pre-interaction, between a first party and at least one second party, said method comprises: <br> (a) providing at least one private interaction address of said first party; <br> (b) defining at least one manageable public interaction address for said first party; <br> (c) forming a record, wherein said manageable public interaction address is associated with said private inter-action address for said first party; <br> said method is characterized by: <br> (d) generating a reverse list, wherein an interaction address of said second party is associated at least with said manageable public interaction address of said first party; <br> (e) performing at least one pre-interaction act, said pre-interaction act comprises: <br> (I) accessing said reverse list; <br> (II) identifying said interaction address of said second party in said reverse list; <br> (f) determining that said manageable public interaction address of said first party is associated, at said reverse list, with said interaction address of said second party; wherein said interaction address of said second party is obtainable from a third party or external services provider, wherein said at least one reverse list entry is formed by synchronizing said interaction address of said second party with said manageable public inter-action address. | (a, b) identifying both a private address for someone's correspondence and a public address for them; <br><br> (c) making note that the two addresses are associated with each other; <br><br> (d) making note of the address of someone else with whom the first person might communicate; <br><br> (e) before communicating, checking (*e.g.*, one's notes or thoughts) to confirm the second person's address; <br><br> (f) confirm the second person's address is noted as one with which the first person might communicate; <br><br> (wherein the second person's address is also obtainable from other sources); <br><br> wherein an address on the list of those with whom the first person might communicate was identified by synching their address with a publicly obtainable address for the second person. |

The patentee does not claim to have invented any of the components listed in claim 17

(*e.g.*, "interaction" addresses, records, reverse lists, etc.), nor of any other claim. And the

patentee does not claim to use any of the components in a novel manner. Rather, all '284 patent

claims either recite existing conventional elements or otherwise define limitations in the

specification by reference to known, conventional elements.

---

[6] The last element of claim 17 recites "said at least one reverse list," which lacks an antecedent.

The only other claim specifically discussed in the Complaint, dependent **claim 26**, adds

no substance to claim 17.  Claim 26 is a *Beauregard* claim, *see In re Beauregard*, 53 F.3d 1583

(Fed. Cir. 1995), which notes that the computer instructions for carrying out claim 17 can be

stored on "computer media."  Claim 26 does not describe the code or otherwise shed light on

programming, algorithms, or technical solutions that might be needed to carry out claim 17.

The remaining independent claims are substantially similar to claim 17.  Independent

**claim 27** recites a "system" for performing "a controlled pre-interaction" as described in claim

17.  That is, claim 27 takes the elements of claim 17 and overlays generic physical components

such as a "user interface, input device, [or] computer networking terminal," "storage memory,"

and "at least one microprocessor," each stated in functional terms to be "configured for" the

elements of claim 17.  Independent **claim 1** recites a "method of performing [the] controlled

reciprocating communication" itself—*i.e.*, the communication for which claim 17 is the set up.

Claim 1 generally mirrors the elements of claim 17, appending elements to address "receiving an

incoming communication" and then "performing an outgoing communication."  *See* Am. Compl.

Ex. 3 at 21:31–47, 21:62–22:6.

Because Plaintiff uses claim 17 as a representative claim, and because claim 17 is the

core of the claims, with all other claims sharing its elements, Apple likewise uses claim 17 here

as a representative claim.

## B.    The Asserted Claims Are Ineligible

A two-step "framework" distinguishes patents that claim ineligible abstract ideas.  *Alice

Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).  At step one, the Court determines if the

claims are directed to an abstract idea.  *Id.*  If so, at step two, the Court determines if the claims

contain an "inventive concept" that "transform[s] the nature of the claim" to be patent-eligible.

*Id*. To succeed, this concept must be "sufficient to ensure that the patent in practice amounts to significantly more than a patent" on just the abstract idea. *Id*. at 217–18. The "inventive concept" must be more than "well-understood, routine, conventional activities." *Id*. at 225.

Section 101 eligibility of patent claims can be decided on a motion to dismiss when "there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *ChargePoint, Inc. v. SemaConnect, Inc*., 920 F.3d 759, 765 (Fed. Cir. 2019).

The ideas of anonymous communications and the use of a proxy to facilitate anonymous communications are age-old. From the Federalist Papers to the Hardy Boys and Nancy Drew, authors have employed pseudonyms and proxy go-betweens to distance themselves from their public communications. Mary Shelley, Jane Austen, and the Brontë sisters, for example, all published under pseudonyms—while their editors, who served as proxies to relay communications, knew their private identities, the public did not. No doubt their editors kept record of the "association" between identities as the '284 patent now requires. Likewise, the use of "reverse" lists (*i.e.*, a look-up table) is not a new means of correlating data, much less to facilitate anonymity. It is simply maintaining a "list" of those for whom the proxy will relay communications. Being "on the list," whether to have your correspondence forwarded to the Brontës or to get into a private party, is not new. Nor is the use of proxies or go-betweens, which are scène à faire for proxy relays and facilitating anonymous communications.

Here, the '284 patent adds no inventive concept over the abstract idea of facilitating anonymous communications via a proxy/go-between. The claims recite nothing more than what humans can do (and have done) with paper and pen (if not quill). No technological problem is solved; no ***un***conventional elements or steps are added. Rather, generic steps, often stated in abstract functional terms, are used to carry out age-old abstract ideas in an electronic era.

10

1.      ***Alice* Step 1—The Asserted Claims Are Directed to an Abstract Idea**[7]

a)      *The Claims Recite Only the Abstract Idea of Relaying
Communications Anonymously Using a Proxy*

The '284 patent does little to pretend that it is directed to anything more than an abstract

idea: using a go-between (*i.e.*, a proxy) to relay communications, thus facilitating anonymity.

Although the '284 patent cloaks with jargon the known tools it borrows to facilitate anonymity

("reverse lists," "reverse tables," "correlation records," and lists of "second party" contacts), the

use of those well-known, conventional tools hardly removes the claims from the abstract.  For

example, a "reverse list" is defined merely as a list with "at least one reverse list entry" which

can be "*any entry in a database,* row and/or column in a table *or any other type of record* for this

matter, listing at least one interaction address of a [second party] participant alongside a public

interaction address of the [first party] user, as well as association there between."  Am. Compl.

Ex. 3 at 2:41–47 (emphasis added).  Two columns on an Excel table, or even a sheet of paper,

could be a "reverse list."  *See id.*  "Interaction addresses," although sounding technical, are

likewise just phone numbers, email addresses, or other conventional addresses.  *Id.* at 2:1–26.[8]

Nor does it help that the patent is limited to "electronic communication."  *See* Am.

Compl. Ex. 3 at 1:48–53 (limiting "communication" to "electronic," versus "physical").[9]  "An

---

[7] Analyzing each patent claim is unnecessary where, like here, the claims are "substantially similar and linked to the same abstract idea."  *E.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

[8] The patent defines an "interaction address" broadly as "any string of alphanumeric and/or other characters, which is uniquely associated to a party of communication" including a "telephone number, … IM contact or screen name, e-mail address, presence screen name … [on] e.g. Facebook or Twitter ID," or any other "user identifier."  Am. Compl. Ex. 3 at 2:1–26.

[9] Eligibility under Rule 12(b)(6) is assessed using claim construction most favorable to the patentee.  *Content Extraction*, 776 F.3d at 1349.  Here, no claim construction is needed, because most claim elements are defined in the patent specification.  Regardless, no construction is needed because, under any plausible construction, the claims still convey only "an abstract idea."  *See id.*

abstract idea does not become nonabstract by limiting [it] to a particular field of use or technological environment, such as the Internet." *Intellectual Ventures I LLC v. Capital One Bank (USA)* ("*Capital One I*"), 792 F.3d 1363, 1366 (Fed. Cir. 2015).

With computer-implemented claims, courts ask at step one if they "are directed to an improvement in the functioning of a computer or merely adding conventional computer components to well-known business practices." *Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1270 (Fed. Cir. 2016) (quotes omitted). As in *Alice*, the '284 patent fails this test—nowhere does it "purport to improve the functioning of [a] computer" versus reciting an abstract idea using "a generic computer to perform generic computer functions." 573 U.S. at 225; *see, e.g.*, *Intellectual Ventures I LLC v. Symantec Corp.*, 234 F. Supp. 3d 601, 607 (D. Del. 2017).

At step one, courts also "evaluate the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed" to an abstract idea. *Intellectual Ventures I LLC v. Capital One Fin. Corp.* ("*Capital One II*"), 850 F.3d 1332, 1338 (Fed. Cir. 2017) (quotes omitted). Nowhere in the '284 patent, its claims, or prosecution history, did the supposed inventor disclose what advance is made or what problem in the prior art is solved. Rather, the claims recite (albeit verbosely) a list of routine elements historically used to relay communications by proxy. The '284 patent reflects no technical advance—it only echoes the abstract idea of anonymous communication.

This Court already has rejected a similar patent for a system to anonymous communications for exactly this reason. In *Walker Digital, LLC v. Google*, 66 F. Supp. 3d 501, 504 (D. Del. 2014), the patent recited methods of using set "rules" to "facilitate an exchange" between "two anonymous parties." *Id.* at 507 ('270 patent); *see also id.* at 510–11 (similar for

'272 patent).  As with the '284 method claims here, Walker Digital's claims allowed a "first

party" to remain anonymous, with the method operator relaying information to "a second party"

based on preset criteria.  *Id*.  This Court found that "the claim limitations simply lay out an

interaction whereby two parties share demands with [an intermediary], where one of the

demands" is to maintain anonymity based on set rules, *id*. at 509, and concluded that "[t]here is

nothing 'inventive' about any of the listed rules or any other steps of the claims," *id*.  Thus, the

Court held the claims were ineligible for patent protection because they were directed to

"nothing more than the abstract idea" as "none of [the patent's] limitations add anything

meaningful to the basic concept of controlled exchange of information" which people have

"historically practiced."  *Id*. at 508.

This Court's decision in *Walker Digital* was—and remains—entirely consistent with

Federal Circuit decisions post-*Alice*.  *E.g.*, *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,

811 F.3d 1314, 1324 (Fed. Cir. 2016) (relaying "anonymous" communications while shopping

for loans was abstract idea); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307,

1313–17 (Fed. Cir. 2016) (same for "filtering" and "distributing" email); *see also Intellectual

Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 385, 391 (D. Del. 2015) (ruling that the

same claims were abstract), *aff'd in part and rev'd in part by Symantec*, 838 F.3d 1307.[10]

Highlighting the deficiency, the '284 patent "predominately describes the system and methods in

---

[10] For similar examples of claims drawn to abstract ideas, *see Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) ("sending information," "directing the sent information," "monitoring the receipt of the sent information," and keeping related records); *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) ("encoding and decoding" data to transmit information); *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (creating a data "index" in a database and "organizing and accessing records"); *Capital One II*, 850 F.3d at 1341 ("collecting," "organizing," and "manipulating" data); *Capital One I*, 792 F.3d at 1367 (storing profiles "keyed to a user identity" to "track transactions associated with said user").

purely functional terms" with "tangible components" serving "merely [as] a conduit for the abstract idea." *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016); *see also Affinity Labs*, 838 F.3d at 1271 (claims "written in largely functional terms" were abstract); *Symantec*, 234 F. Supp. 3d at 607 ("The claims simply rely on functional language . . . .").

As claim 17 shows by example, required addresses are "*any* string of . . . characters . . . uniquely associated to a party"—anything that *functions* as an identifier. Am. Compl. Ex. 3 at 2:1–4 (emphasis added). "Records" and "lists" of addresses may be just that—no specific format is required, anything that *functions* as a record or list is claimed so long as the required data is "associated." *See, e.g.*, *id.* at 2:41–44 (a reverse list entry is "any entry in a database, row and/or column in a table *or any other type of record for this matter* . . . ." (emphasis added)). Public and private addresses are also "associated" with each other in *functional* terms. No specific means of "association" is required—any means of connecting the data that serves the function of "associating" it is claimed. *Id.* at 24:33–44. The claim's remaining elements of "accessing," "identifying," and "determining" are stated with equal abstraction, attempting to cover any means of performing those *functions*. *Id.* at 24:45–58.

"In short, each step does no more than require a generic computer to perform generic computer functions." *Alice*, 573 U.S. at 225. "The claims do not provide any concrete details that limit the claimed invention to a specific solution to [a] problem" in the prior art, and hence, as a matter of law, are drawn solely to an abstract idea. *Symantec*, 234 F. Supp. 3d at 607.

        b)     *Plaintiff's Abstract Idea Can Readily Be Performed by Humans*

While not needed to show that claims are directed to an abstract idea, courts find it useful to ask if the "steps covered by the asserted claims . . . could all be performed by humans without a computer." *Mortg. Grader*, 811 F.3d at 1324. Claims may well be drawn to "well-known and

abstract" matter if, "with the exception of computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper." *Symantec*, 838 F.3d at 1318*; see also Symantec*, 100 F. Supp. 3d at 383–84, 391–93.

As this Court found in *Walker Digital*, "the basic concept of controlled exchange of information" is an abstract idea that has long been practiced by, for example, "matchmakers and [job] headhunters" (among others).  66 F. Supp. 3d at 508–10.  As noted above, the claims here are no different—people have long communicated through proxies, limited communications to parties on a "list," and used reverse lists or lookup tables to correlate identities.

For example, this abstract idea—anonymous proxy communications—can readily be performed by lawyers representing a client in, for example, anonymously shopping a transaction:

| **Patent Claim (Am. Compl. Ex. 3 at 24:30–58)** | **Human Example:** |
|---|---|
| 17. A method of performing controlled pre-interaction, between a first party and at least one second party, said method comprises:<br>(a) providing at least one private interaction address of said first party;<br>(b) defining at least one manageable public interaction address for said first party;<br>(c) forming a record, wherein said manageable public interaction address is associated with said private interaction address for said first party;<br>said method is characterized by:<br>(d) generating a reverse list, wherein an interaction address of said second party is associated at least with said manageable public interaction address of said first party;<br>(e) performing at least one pre-interaction act, said pre-interaction act comprises:<br>(I) accessing said reverse list;<br>(II) identifying said interaction address of said second party in said reverse list;<br>(f) determining that said manageable public interaction address of said first party is associated, at said reverse list, with said interaction address of said second party; wherein said interaction address of said second party is obtainable from a third party or external services provider, wherein said at least one reverse list entry is formed by synchronizing said interaction address of said second party with said manageable public interaction address. | (a) lawyer identifies Gertrude Vanderbilt who wants to anonymously sell some art;<br><br>(b) lawyer "defines" a "public" name for his new client, *e.g.*, "Madame X";<br><br>(c) lawyer writes down that Madame X is the public name to use for Vanderbilt;<br><br>(d) lawyer creates an address list of likely buyers to whom he will offer the art under the header: "For Madame X";<br><br>(e) before communicating, lawyer checks his list to see if a likely buyer is on it;<br><br>(f) lawyer confirms that he is looking at the list associated with Madame X and that the likely buyer to contact is on it.<br><br>(wherein the likely buyer's address is also obtainable from other sources);<br><br>wherein at least one address of a buyer for Madame X's art was put on the list by "synchronizing" the buyer's publicly obtainable address with Madame X. |

As suggested in the patent, claim 17 can be "optionally performed" by the lawyer finding buyer contact addresses by "browsing" on "LinkedIn."  Am. Compl. Ex. 3 at 2:35–40. Presumably, other websites would work just as well.  **Claim 1** also could be performed by the lawyer—it recites "performing" the "controlled" communication, using the above elements from claim 17, plus:

> "(d) receiving an incoming communication . . ." from a likely buyer to Madame X;
>
> "(e) identifying . . ." that the communication was addressed to Madame X;
>
> "(f) accessing" the lawyer's records to determine Ms. Vanderbilt's private address;
>
> "(i) performing an outgoing communication" back to the buyer for Ms. Vanderbilt;
>
> "(j) said outgoing communication" is sent from "Madame X" not Ms. Vanderbilt; and the

buyer is "exposed merely" to Madame X's address, not Ms. Vanderbilt's private address.

The remaining independent claim, **claim 27**, merely recites a "system" for performing the steps of claim 17, adding generic, conventional computer components like a "user interface," "storage memory," and "at least one microprocessor"—none of which lift the claim from the abstract.  *See, e..g*., *Alice*, 573 U.S. at 226.  Nor, as discussed below, do any dependent claims yield a different result as they also only add either generic computer components (e.g., claim 29) or further abstract notions (*e.g.*, claim 4, which adds to claim 1 that the communication fails).

Dispositive of this inquiry, the "Examples" listed in the '284 patent themselves confirm that the claims can readily be performed by humans using conventional means.  For example, the patent teaches that a "landlord renting a house" might use "a manageable public telephone number, for the purposes of communicating with potential tenants" by generating "reverse list entries" for the tenants' numbers "whilst keeping the private telephone number of landlord . . .discreet from tenants."  Am. Compl. Ex. 3 at 18:64–19:10.  Likewise, the patent explains that "a

popular person" might "defin[e] a manageable public telephone number" to communicate with selected "supporters or followers."  *Id.* at 19:40–48.  The patent thus openly claims methods that can be performed by humans using conventional telephone numbers and pen-and-paper lists.

In sum, the claims of the '284 patent recite nothing but the timeworn abstract idea of relaying communications by proxy.

### 2.     *Alice* Step 2—The Claims Do Not Contain Any Inventive Concepts

At step two, it must be determined whether the claims contain "an inventive concept sufficient to transform the [above] claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (quotes omitted).  It does not require a deep look at the '284 patent claims (either individually or as an ordered combination) to conclude that they lack any such invention.

#### a)     *The Claims Recite Only Conventional Steps and Components*

"To save a patent at step two, an inventive concept must be evident ***in the claims***." *RecogniCorp LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) (emphasis added).[11]  Use of the ineligible abstract concept itself "cannot supply the inventive concept." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018).  And "appending conventional steps, specified at a high level of generality, [is] not *enough*." *Alice*, 573 U.S. at 222 (quotes omitted).

But, "[t]he claims in this case do not [] require a new source or type of information or new techniques for analyzing it."  *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016).  "[T]hey do not require an arguably inventive set of components . . . that would

---

[11] *See also Alice*, 573 U.S. at 221 ("[W]e must examine the elements of the claim to determine whether it contains an 'inventive concept.'"); *Synopsis, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves."); *Two-Way Media*, 874 F.3d at 1338 ("The main problem that [the patentee] cannot overcome is that the *claim*—as opposed to something purportedly described in the specification—is missing the inventive concept.").

generate new data" nor "invoke any assertedly inventive programming."  *Id.*  And none of the claims purport to "improve some existing technological process or solve some technological problem."  *See Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1334 (Fed. Cir. 2015). Nor do the limitations, "taken individually or in combination" recite "specific programming, tailored software, or meaningful guidance for implementing the abstract combination."  *See Capital One II*, 850 F.3d at 1342.[12]

Rather, "entry of data into a computer database, the breakdown and organization of that entered data according to some criteria . . . and the transmission of information derived from that entered data . . . all through the use of conventional computer components such as a database and processors, operating in a conventional manner" do not "confer patent eligibility."  *Capital One I*, 792 F.3d at 1371 (quotes omitted).  There is nothing in '284 patent that falls outside of this.

For example, independent **claims 1 and 17** require providing and defining addresses, forming records and generating lists with those addresses, accessing the lists, and "determining" and responding to communication based on set rules.  But "arranging, storing, retrieving, sorting, eliminating, [and] determining" information are all "conventional, routine, and well-known." *Versata*, 793 F.3d at 1335.  Such steps that "merely describe the functions of the abstract idea itself" are "not enough under step two" despite being "technical sounding."  *Capital One II*, 850 F.3d at 1341.  And processing communications according to set "rules" also remains ineligibly abstract.  *Symantec*, 838 F.3d at 1317 (upholding this Court's ruling that the '142 patent's

---

[12] This is not changed because Plaintiff added in its Amended Complaint conclusory statements that the '284 patent offers an "innovative improvement" and "solution" using "specific private and public interaction addresses in a communications network," etc.  Am. Compl. ¶ 46.  "Under *Twombly*, *Iqbal*, and *Berkheimer*, pleadings, as to the inventiveness of the claims[,] are not entitled to the assumption of truth where they are conclusory or contradict the intrinsic evidence."  *Search & Social Media Partners v. Facebook, Inc.*, 2019 WL 581616, at *4 (D. Del. Feb. 13, 2019) (brackets standardized).

processing email according set "rules" was ineligible); *Walker Dig.*, 66 F. Supp. 3d at 507–09 (ruling that '270 patent's method of communicating "between two anonymous parties" according to the parties' "rules" lacked inventive concept).

The remaining independent claim, **claim 27**, and its progeny fare no better, drafted as system claims and adding only generic elements of "a graphical user interface, input device [or] computer networking terminal," "computer storage memory," and "at least one microprocessor." "[M]ere recitation of a generic computer" does not transform an abstract idea into a patentable invention. *Alice*, 573 U.S. at 223.  Thus, "invocations of computers and networks that are not even arguably inventive are insufficient." *Elec. Power*, 830 F.3d at 1355 (quotes omitted). Rather, the claims must recite something "*other than* conventional computer and network components operating according to their ordinary function." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1341 (Fed. Cir. 2017) (emphasis added); *see also SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1170 (Fed. Cir. 2018) (reciting "already available" computer components is "not enough").  Here they categorically do not.

Thus, as in *Alice*, "the system claims are no different from the method claims," and both are ineligible.  573 U.S. at 226 ("functional and generic" components do not confer eligibility). As such, no '284 patent claim recites any ***un***conventional step or component that conveys eligibility.

      b)    *No Ordered Combination or Dependent Claim Adds Invention*

The '284 patent steps follow a conventional time order—first identify addresses for the first party, then record them, then generate a list of second party addresses, associate these with the first party's address, confirm the association, and respond to communications per set rules. The combination therefore recites nothing more than the abstract idea itself and "add[s] nothing that is not already present when the steps are considered separately."  *Versata*, 793 F.3d at 1334;

*see also Alice*, 573 U.S. at 225.  A "conventional ordering of steps" with only "conventional technology" does not convey eligibility.  *Two-Way Media*, 874 F.3d at 1339.

Nor is this patent saved by its dependent claims, which merely add more abstract limits:

**Claim 2**—requires defining the "identity" of the first party in addition to their address.

**Claim 3**—requires the second party address also be "associated" with the first's *identity*.

**Claim 4**—requires that the communication also ends up failing.

**Claim 5**—requires addresses to be in a conventional form like a phone number or email.

**Claim 6**—requires "wildcards" to cover multiple individuals with related addresses.

**Claim 7**—requires forwarding data about an incoming message to the private address.

**Claim 8**—requires storing additional metadata or identity information in the data list.

**Claim 9**—limits who can generate the "reverse list" to various persons.

**Claim 10**—limits the way the "reverse list" can be generated (*e.g.*, "manually").

**Claim 11**—requires the "reverse list" to contain some confidential information.

**Claim 12**—requires outgoing communication be automatic or "by prompting."

**Claims 13, 21, 22**—require responses be performed by "at least one predefined rule."

**Claims 14, 15, 16, 23, 24, 25**—require adding a "default communication preference."

**Claims 18, 30**—require use of the method/system not be followed by a communication.

**Claims 19, 31**—require a communication to a different type of second-party address.

**Claims 20, 32**—require several second-party addresses of different types be obtained.

**Claim 26**—requires "computer readable media" having code to perform claim 17.

**Claim 28**—requires the system terminal be able to, *inter alia*, send outgoing messages.

**Claim 29**—adds generic, abstract functional requirements of the network terminal.

**Claims 33, 34**—require the system's processor to be able to execute "predefined rules."

**Claims 35, 37, 38**—require memory that stores a "default communication preference."

**Claim 36**—requires memory configured to store "preset content."

None of these limitations solve any technical problem implicating computerized proxy services.  Instead, they just add more abstract elements to the pyre.  "Adding one abstract idea to another abstract idea does not render the claim non-abstract."  *RecogniCorp*, 855 F.3d at 1327.

\* \* \*

In sum, patent claims must contain an "inventive concept sufficient to transform [a] claimed abstract idea into a patent-eligible application."  *Alice*, 573 U.S. at 221.  While the '284 claims may be drafted to "sound technical," they lack this requirement and are thus ineligible.

## VI.     COUNTS 2 AND 3 (ALLEGED MONOPOLIZATION)

### A.     Plaintiff Has Not Pled Plausible Monopolization Claims Under Section 2

To state a claim for monopolization under Section 2, Plaintiff must plead "(1) the possession of monopoly power in the relevant market" and (2) anticompetitive conduct, that is "the willful acquisition or maintenance of that power." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010) (quotes omitted).  Plaintiff has done neither.

#### 1.     Plaintiff Has Not Pled Apple Has Monopoly Power in Any Relevant Market

Blix alleges that the relevant markets in this case are email client applications for Apple's MacOS and iOS operating systems, respectively.[13]  Am. Compl. ¶¶ 88, 153, 234, 266.  Even accepting these contrived market definitions, *arguendo*, Blix fails to plead a plausible basis for the conclusion that Apple has monopoly power in either alleged market.  Rather, the Complaint's allegations refute that conclusion.  In any event, Blix's proposed markets are too narrow and

---

[13] Blix also makes allegations regarding the supposed markets "for MacOS application distribution" (Am. Compl. ¶ 256) and "iOS app distribution" (*id*. ¶ 268) but does not claim that these alleged markets are *relevant* ones.

inherently implausible because they ignore competition from other email client applications.

a)      *Plaintiff Does Not Plead that Apple Possesses Monopoly Power in the Alleged Email Client Markets*

"Monopoly power is defined as the power to control prices or exclude competition,"  but "[m]ore precisely, it is the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (quotes omitted).  Thus, "direct evidence" of monopoly power requires "evidence of restricted output and supracompetitive prices."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *accord Harrison Aire,* 423 F.3d at 381.  Absent such evidence, a plaintiff can plead a circumstantial case showing that the defendant has a "dominant share of the relevant market that is protected by entry barriers." *Harrison Aire*, 423 F.3d at 381 (quotes omitted).  Blix pleads neither a direct nor circumstantial basis for the conclusion that Apple has monopoly power.

Blix claims to have "direct evidence" of monopoly power, alleging that Apple has the "ability to exclude competition in the MacOS Email Client Market," Am. Compl. ¶ 233, and in "the market for iOS Mail Clients," *id*. ¶ 270, but this merely asserts a legal *conclusion*.  Direct evidence would be evidence of restricted output and supracompetitive prices but Blix pleads neither.  Blix makes no factual allegation that Apple is charging or could charge a higher-than-competitive price for its Mail application or, indeed, that Apple charges *any* price for it at all.  And rather than alleging that Apple has restricted output, the Complaint makes clear that Apple's App Stores have only *expanded* the availability and output of email applications.  As Blix alleges, in 2007, Apple's email client was the *only* one on the iPhone (Am. Compl. ¶ 94)—yet

since then options have exploded.[14]  "Apple has approved myriad email applications," and the Complaint discloses that dozens are available.  *Id.* ¶¶ 125, 133, 185.  A search in the App Store for "email" can yield well over 100 apps (and according to Blix, users will readily select from the first 20-25 search results).  *Id.* ¶¶ 114, 119.  In sum, there is simply no basis for a claim that Blix has pled direct evidence of restricted output or supracompetitive prices.

Blix also provides no circumstantial basis to infer monopoly power.  In a circumstantial case, "monopoly power is inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers."  *Harrison Aire*, 423 F.3d at 381 (quotes omitted). The "starting point" for such an inference "must be to determine [the defendant's] market share." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201 (3d Cir. 1992) (citing *Pa. Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984) ("[T]he size of market share is a primary determinant of whether monopoly power exists.")).  Blix's Complaint, however, is tellingly silent on Apple's share of the alleged markets.  Blix merely offers the conclusory allegation that Apple holds a "dominant position" because it preinstalls Apple Mail on Apple devices.  Am. Compl. ¶¶ 93, 159.  But Blix does not (and cannot) allege that preinstallation of Apple Mail requires anyone to *use* the Apple Mail app.  Nor is there any claim that preinstallation of Apple Mail affects the ability of a user to download and use another email client.  The Complaint makes clear that scores of alternatives exist, including those offered by household names such as Google, Microsoft and Yahoo.  *Id.* ¶ 133.  Blix itself confesses that Apple "face[s] substantial competition from . . . a known group of existing entrants."  *Id.* ¶ 101. Blix's own allegations fatally undermine its claim that Apple holds a "dominant" position.  *See*,

---

[14] Similarly, the opening of the MacOS App Store in 2011, Am. Compl. ¶ 138, only *expanded* the preexisting options for adding email client apps.

*e.g.*, *Abid v. Google LLC*, 2018 WL 3458546, at *5 (N.D. Cal. July 18, 2018) ("Plaintiff undermines his own allegation by alleging that Google maintains a 'near monopoly' while elsewhere acknowledging various other on-line advertising platforms, such as 'Microsoft Bing' and 'Facebook ads.'").  It is thus no surprise that Apple's share of the alleged market is omitted from the Complaint.  Because Blix fails "to allege such necessary facts as defendant's market share in the markets in which plaintiff is a competitor," its claim must be dismissed.  *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998) (quotes omitted).

Dismissal is independently mandated by Blix's inability to plead that stiff entry barriers protect the alleged email client markets.  *See Harrison Aire*, 423 F.3d at 381 (plaintiffs "must plead" not just "the alleged monopolist's dominant share of [the relevant] market" but also "high barriers to entry").  Evidence of comprehensive ease of entry is manifest throughout the Complaint.  While Blix makes the conclusory allegation that "Apple's complete control over the MacOS App Store imposes a significant barrier to entry in the market for MacOS email clients," Am. Compl. ¶ 238, this assertion is belied by the *facts* outlined above and Blix's flat admission that "entrants" provide "substantial competition" to Apple's Mail app, *id.* ¶ 101.

In short, Blix has failed to plead that Apple has monopoly power in either of the two alleged markets that Plaintiff claims are relevant in this case.  This failure is fatal to Blix's Section 2 claims.

> b)      *Plaintiff's Alleged Email Client Markets Are Legally Untenable*

Blix's Section 2 claims fail for an independent reason: its "relevant markets" are implausibly narrow and thus facially unsustainable.  In an antitrust case, the plaintiff bears the burden of pleading a plausible definition of the relevant antitrust market.  *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997); *Hicks v. PGA Tour,*

*Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018).  An antitrust market consists of products "that have reasonable interchangeability for the purposes for which they are produced," such that customers would switch from one product to another if faced with a price increase.  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).  Dismissal is appropriate when a plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products."  *Queen City*, 124 F.3d at 436–37 (citing cases); *see also, e.g.*, *Hicks*, 897 F.3d at 1121.

Here, Blix admits that the products at issue are applications "used to send and receive electronic mail," Am. Compl. ¶¶ 88, 153, but argues that the "existence of email clients for operating systems other than iOS [or MacOS] is irrelevant to the analysis of the relevant market at issue" because "those applications are not reasonably interchangeable substitutes," *id.* ¶¶ 92, 157.  On that basis, Blix excludes from its alleged market email client applications for other operating systems, web-based email client applications, and email client applications that can be downloaded on Mac devices outside of the MacOS App Store.  But "interchangeability" means that "one product is roughly equivalent to another for the use to which it is put," *Queen City Pizza*, 124 F.3d at 437 (quotes omitted), and consumers use email applications to send and receive email regardless of the device utilized, the operating system on that device, or how the application was installed.  That is, by drawing market lines based on operating systems, Blix improperly ignores the extent to which email client apps can substitute for one another.  Blix's approach to market definition impermissibly "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability."  *Id.* at 436.

First, Blix excludes email client applications used on other operating systems based on the argument that a given user is locked into a particular operating system for a particular device,

and thus the "aftermarkets" for email client apps that run on Apple operating systems are relevant antitrust markets.[15] But this argument is foreclosed by Third Circuit authority. The test for a relevant market "is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" *Queen City Pizza*, 124 F.3d at 438 (quoting *du Pont*, 351 U.S. at 395); *see also, e.g.*, *Harrison Aire*, 423 F.3d at 381–84 (discussing aftermarket principles); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (rejecting MacOS software market as a matter of law).

Even if aftermarket products could, in certain circumstances, constitute a relevant market, the allegations in this Complaint preclude such a conclusion because Blix makes clear that users are not, in fact, locked in to the Apple operating systems. As alleged in the Complaint, Apple must provide high-quality apps to compete with other operating systems. *See* Am. Compl. ¶¶ 17 ("users will opt for more open mobile platforms" absent choice), 69 (denial of choice would put Apple at "serious competitive disadvantage"), 71 (Apple permitted competitors to create programs for Macs "because it needed to in order to compete with PCs"), 72 (Apple uses "availability of third-party applications to fuel the demand for iPhones and for its iOS platform"), 73 (Apple "has been highly successful in using third-party applications to drive demand for its iOS products"). Thus, any exploitation of "aftermarket" customers for email clients on a given operating system will be "a short-run game" that pushes users to "shop

---

[15] Plaintiff has attempted to obscure this approach in its Amended Complaint by deleting all of the many "aftermarket" references in its original complaint. *See* Original Compl. ¶¶ 62–64, 68–70, 145, 149. For example, Blix previously alleged that the "existence of competition in the market for operating systems, such as competition between Microsoft's Windows operating system and Apple's MacOS, is irrelevant to relevant market analysis in a Section 2 Sherman Act aftermarket monopolization case, in which the existence or lack of competition in the aftermarket at issue is the only economically meaningful inquiry." *Id.* ¶ 64. As discussed above, competition between operating systems cannot be disregarded.

elsewhere" for a different system.  *Harrison Aire*, 423 F.3d at 382 ("[A]ftermarket behavior

generally is disciplined by competition in the primary product market.").  In other words,

customers may switch to competing operating systems offering other email client applications.

For that reason, those email client apps must be included in the relevant market.

The ability to access substitute email applications by switching between operating

systems is not limited to situations where a consumer buys a new device.  To the contrary, Blix

acknowledges that most consumers *already* own or have access to multiple devices running

different operating systems.  *See, e.g.*, Am. Compl. ¶ 69 (consumers use their apps on "laptops,

smartphones and other computing devices").  In particular, Blix alleges an Apple "ecosystem"

where consumers possess devices for both the iOS and MacOS operating systems.  *See, e.g.*, *id.*

¶ 80.  But this alone refutes Blix's attempt to define *separate* markets for email for those devices.

That is, if email apps on Macs are subject to monopolistic exploitation, there is nothing that stops

users from turning to email apps on iOS devices.  Similarly, users who own or have access to

devices running the Android operating system can turn to email apps on those devices.  *See, e.g.*,

*id.* ¶ 41 (company employees have access to "a variety of OS platforms").  Indeed, Blix's

BlueMail app was continuously available in the iOS App Store and on Android devices even

during the 8-month period that it was not available in the MacOS App store.  And since

BlueMail was available to iOS and Android device users and "achieved success" for *years* before

it was even submitted to the MacOS App Store, *see id.* ¶¶ 5, 166, it is plain that users find an

email client on a mobile platform to be a reasonable substitute product.

Second, Blix excludes web-based email software from the relevant market, claiming

these apps "typically cannot operate locally when a device is not online," *id.* ¶¶ 88, 153, but this

proves too much since when a device is offline every email app fails to perform the core function

of the "relevant" product.  *See id.* ¶¶ 88, 153 (relevant product is software "used to send and receive electronic mail").  Third, Plaintiff excludes email apps that can be downloaded onto Mac devices outside the MacOS App Store, claiming that there are "separate software markets" for such apps because "software applications downloaded from the Internet" are "not reasonable substitutes."  *Id.* ¶ 142.  But Blix points to no difference in use or functionality with respect to such apps and relies merely on download security warnings that users can ignore and that developers can obviate by having their applications certified by Apple.  Am. Compl. Ex. 11 at 1.

In short, Blix has impermissibly drawn up artificial markets contorted to meet its litigation needs.  *See Hicks*, 897 F.3d at 1121.  Its alleged relevant markets "clearly do[] not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor."  *Queen City Pizza*, 124 F.3d at 436.  As such, those markets are "legally insufficient and a motion to dismiss may be granted."  *Id.*

### 2.      Blix Has Failed to Allege Any Anticompetitive Conduct

The Complaint must also be dismissed because Blix fails to allege any anticompetitive conduct.  "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  Blix's Complaint is brimming with accusations related to Apple's conduct, including the removal of the BlueMail App from the MacOS App Store (Am. Compl. ¶ 225), "Apple's ecosystem design" that allows Apple to "dictat[e] the terms under which app developers may offer their apps to iOS users," (*id.* ¶ 80), "Apple's refusal to permit alternative iOS app distribution channels," (*id.* ¶ 83), its preinstallation of Apple Mail on all iOS devices, (*id.* ¶ 93), its elimination of rankings for its own applications, (*id.* ¶ 126), its App Store design that "increases user search costs," (*id.* ¶

127), and Apple's purported "manipulation of search rankings," (*id.* ¶ 111). But Blix's critiques—whether considered individually or in the aggregate—allege nothing more than that Apple refused to deal with Blix on its preferred terms and conditions. Such complaints are not actionable under the antitrust laws.

a) *The Complaint Fails to Allege an Anticompetitive Refusal to Deal with Blix*

Blix alleges that "Apple has anticompetitively refused to deal with Blix and other competitors" by removing the BlueMail app from the MacOS App Store. Am. Compl. ¶ 255. This claim runs headlong into well-settled case law holding that the Sherman Act generally "does not restrict the long recognized right of [a] trader or manufacturer . . . freely to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 408 (quotes omitted).

Blix, having branded itself a competitor of Apple's, must overcome deeply entrenched law holding that "[a] firm is generally under no obligation to cooperate with its rivals." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 316 (3d Cir. 2007). Where there is no antitrust duty to deal, the law imposes "no obligation to deal under terms and conditions favorable to" competitors. *Trinko*, 540 U.S. at 450–51; *see also id.* at 451 ("If AT&T had simply stopped providing DSL transport service to the plaintiffs, it would not have run afoul of the Sherman Act. Under these circumstances, AT&T was not required to offer this service at the wholesale prices the plaintiffs would have preferred."). Exceptions to "this broad principle" must be approached with "considerable caution" because the Supreme Court has warned that "compelled sharing of the resources generating a competitive advantage undermines the purpose of antitrust law by reducing incentives to invest in those resources," "puts federal courts in the role of central planners despite their being ill-equipped to assume this role," and "may actually

29

provide opportunities for collusion." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016).

In fact, the Supreme Court has recognized only a "limited exception" to this general rule. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the Court concluded that "the decision of a defendant *who possessed monopoly power* to terminate a voluntary agreement with a smaller rival evidenced the defendant's willingness to forego short-run profits for anticompetitive purposes." *Broadcom Corp.*, 501 F.3d at 316 (emphasis added).[16]  The Court has since "refused to expand the exception," *id.*, and has characterized *Aspen Skiing* as falling "at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409.  Courts routinely dismiss refusal to deal claims on the pleadings that do not meet the narrow requirements of *Aspen Skiing*. *See Trinko*, 540 U.S. at 410 (district court was correct to dismiss Section 2 refusal-to-deal claim where no duty to deal existed); *Linkline*, 555 U.S. at 448 (same); *Doe v. Abbott Labs.*, 571 F.3d 930, 935 (9th Cir. 2009) (reversing failure to grant summary judgment and to dismiss Section 2 insufficient assistance claim where no duty to deal existed); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133–36 (2d Cir. 2014) (affirming dismissal of refusal-to-deal claim for failure to state a claim where no duty to deal existed); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556–58 (9th Cir. 2008) (same); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1196–99 (10th Cir. 2009) (same); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52–54 (2d Cir. 2007) (per curiam) (same).

Here, there is no need for fine distinctions: Blix's refusal-to-deal claims fall far outside the outer boundary established by *Aspen Skiing*.  As a threshold matter, Blix cannot "sidestep the

---

[16]A duty to deal "requires a showing of monopoly power," *Linkline*, 555 U.S. at 448 n.2, and thus, for the reasons described, Blix's liability theory cannot make it out of the starting gate.

reality that there was no actual refusal to deal." *Aerotec Int'l*, 836 F.3d at 1183.  Blix's

Complaint makes clear that BlueMail remains available on the iOS App Store.  And, regardless,

Apple reinstated the app to the MacOS App Store after Blix submitted a revised version for

approval.  *See, e.g.*, Am. Compl. ¶ 114; LaMagna Decl., Ex. 1.  There has been no abrupt

termination of a business relationship as in *Aspen Skiing*.  Apple has dealt and continues to deal

with Blix.  The Second Circuit rejected a duty to deal claim where the defendant "did not

completely cut off supply" to the plaintiffs.  *In re Adderall XR Antitrust Litigation*, 754 F.3d at

135 (quotes omitted).  There, the court found dispositive that defendant "did not terminate any

prior course of dealing—let alone a 'presumably profitable' one."  *Id.*  Also instructive is

*Aerotec International, Inc. v. Honeywell International, Inc.*, in which the Ninth Circuit upheld

the district court's rejection of a Section 2 claim premised on refusal to deal where it was

"undisputed that [defendant] Honeywell does in fact, sell parts" to the plaintiff.  *Aerotec Int'l,*

*Inc. v. Honeywell Int'l, Inc.*, 4 F. Supp. 3d 1123, 1138 (D. Ariz. 2014), *aff'd by Aerotec Int'l*, 836

F.3d at 1185.

These holdings apply with equal force here.  Instead of a "refusal to deal," Blix's claims

are more accurately described as "alleged insufficient assistance in the provision of service to

rivals."  *Trinko*, 540 U.S. at 410.  The Supreme Court has twice ordered dismissal of such claims

as a matter of law when they did "not fit within the limited exception recognized in *Aspen*

*Skiing*."  *Id.* at 409; *see also Linkline*, 555 U.S. at 457.

Apple denies the factual accuracy of Blix's allegations of anticompetitive conduct,

including the assertions of result-stacking and efforts to "raise rivals costs" through design

decisions and the enforcement of the rules and policies that it established to govern the MacOS

and iOS App Stores.[17]  Am. Compl. ¶¶ 118, 127.  But even if credited as true, the antitrust laws do not compel Apple to make business decisions to advance the interests of purported rivals, like Blix.  Absent a duty to deal, developers have no right to demand that Apple provide more favorable terms to rivals.  *Linkline*, 555 U.S. at 450–51 ("[A] firm with no duty to deal . . . has no obligation to deal under terms and conditions favorable to its competitors.").  Apple *does*, in fact, promote its competitors through the iOS app search algorithm, (Am. Compl. ¶ 111), augment its search interface to "lead users" to BlueMail or other competitive apps, (*id.* ¶ 132), and otherwise uses its marketing tools, like "Stories," to provide free advertisement for competitors' products, (*id.* ¶ 133).  But this is not required by Section 2.  Apple, "having created and nurtured new competition," has no obligation to provide "special assistance rendered gratis to competitors" because "there is no more duty to give or continue to give such assistance than there is to lend money to a competitor."  *See Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375, 377 (7th Cir. 1986).  Instead, Apple has the right to "establish[] an infrastructure that renders [it] uniquely suited to service [its] customers."  *Trinko*, 540 U.S. at 407.

Blix's refusal-to-deal claims also fail because they do not allege any profit sacrifice by Apple.  An actionable refusal-to-deal claim "require[s] proof not just that the monopolist decided to forsake short-term profits," but also that "the monopolist's conduct [is] irrational but for its anticompetitive effect."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013);

---

[17] Blix lacks standing to complain of alleged conduct to the extent it harms only *other* competitors.  "This is not . . . a suit instituted by the government for the benefit of society as a whole, but a claim brought by a private litigant—a competitor of defendant."  *Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1239 (3d Cir. 1987).  The courts have "imposed limitations designed to discourage plaintiffs other than those most apt to carry out the purposes of the statutes," and "have carefully scrutinized enforcement efforts by competitors because their interests are not necessarily congruent with the consumer's stake in competition."  *Id.; see also Race Tires Am.*, 614 F.3d at 76 (establishing antitrust injury requires "an injury to the *plaintiff*" (emphasis added)).

*see also Aerotec Int'l*, 836 F.3d at 1184 ("[T]here is only a duty not to refrain from dealing where the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." (quotes omitted)).  The plaintiff in *Aspen Skiing* managed to satisfy the profit-sacrifice test, but only because it flatly refused to deal with a competitor even though doing so "would have provided it with immediate benefits, and would have satisfied its potential customers." 472 U.S. at 610.  It even refused an offer to deal at full retail prices, *id*. at 593 & n.14, supporting an "inference that [defendant] was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill" in a deliberate effort to harm a competitor, *id*. at 610–11.  *See also VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *7–8 (N.D. Ill. Sept. 28, 2015).

Blix's wholly conclusory allegation that Apple has "show[n] a willingness to forsake short-term profits (i.e., full price for distribution of the applications or any in-app purchases)," Am. Compl. ¶ 255, does not satisfy the *Aspen Skiing* test.  The Complaint does not contain a single factual allegation to support this assertion.  There is no claim that Apple collected a cent for distributing BlueMail through either the iOS App Store or the MacOS App Store, much less that Apple sacrificed profit through the course of conduct described in the Complaint.

   b)  *Blix Has Failed to Allege Any Other Anticompetitive Conduct*

Blix also claims that Apple leveraged its supposed monopoly over app distribution— which Blix terms an "essential facility"—to monopolize the markets for email client applications by "den[ying] Blix and other competitors access to the essential facility on reasonable terms." Am. Compl. ¶ 253; *see also id.* ¶¶ 251, 283.  The Supreme Court has never adopted the essential facilities doctrine and the theory has been heavily criticized.  *See, e.g.*, 3A Areeda & Hovenkamp, ANTITRUST LAW ¶ 771c, at 173 (4th ed. 2015) ("[T]he essential facility doctrine is both harmful and unnecessary and should be abandoned.").  And while the essential facilities

33

label has been used by lower courts to analyze a monopoly claim, it does not relieve the plaintiff of any "burden they would otherwise bear." *Viacom Int'l, Inc. v. Time Inc.*, 785 F. Supp. 371, 376 n.12 (S.D.N.Y. 1992).

Blix's essential-facilities allegations are nothing more than refashioned refusal-to-deal claims, *i.e.*, that "Apple has denied Blix and other competitors access to the essential facility on reasonable terms." Am. Compl. ¶ 253. As such, they should be dismissed for the reasons outlined above. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1352–60 (Fed. Cir. 1999); *see also id.* at 1357 ("The courts have well understood that the essential facility theory is not an invitation to demand access to the property or privileges of another, on pain of antitrust penalties and compulsion . . . .").

Likewise, a "monopoly leveraging" allegation "presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim." *Trinko*, 540 U.S. at 415 n.4. "An integrated business does not offend the Sherman Act by drawing on its competitive advantages of efficiency, experience, or reduced transaction costs, in entering new fields." *Intergraph*, 195 F.3d at 1360. Moreover, a monopoly leveraging claim requires proof of monopoly power in a properly defined market and Blix's Complaint fails to clear that bar. *See* Section VI.A.1.a, *infra*. This is fatal to Blix's leveraging theory. *See Fineman*, 980 F.2d at 204–06 (holding that a leveraging claim requires the use of monopoly power in the second market and that a mere attempt to gain a competitive advantage is insufficient as a matter of law).

Apple's alleged "misappropriation of Blix's patent ideas," Am. Compl. ¶ 16, also cannot form the basis of a Section 2 claim. "By definition, patent infringement invades the patentee's monopoly rights, causes competing products to enter the market, and thereby increases competition." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 893 (5th Cir.

2016); *Nw. Power Prods., Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 88–89 (5th Cir. 1978)

("[P]atent infringement is not an injury cognizable under the Sherman Act.").  This is consistent

with Third Circuit and Supreme Court precedent requiring an antitrust plaintiff to allege an

injury that "corresponds to the rationale for finding a violation of the antitrust laws in the first

place."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990); *see also Phila. Taxi*

*Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 345 (3d Cir. 2018).  In *Philadelphia Taxi Ass'n*,

for example, the Third Circuit, upholding dismissal by the district court, rejected the plaintiffs'

efforts to recast a violation of a state regulation as an antitrust claim. 886 F.3d at 345.

Although Blix purports to be aggrieved by alleged conduct it considers "unfair," Am.

Compl. ¶¶ 13, 17, 21, the antitrust laws "do not create a federal law of unfair competition."

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993).  Blix's

litany of accusations do not, either individually or in the aggregate, amount to a viable antitrust

claim.  *ZF Meritor, LLC v. Eaton*, 696 F.3d 254, 280 (3d Cir. 2012) (although courts may

consider the totality of factual allegations, a plaintiff may not "combine . . . non-cognizable

claims into a new form of antitrust liability"); *see also Linkline*, 555 U.S. at 457 (refusing to

recognize claims the plaintiffs tried to "alchemize . . . into a new form of antitrust liability," and

holding that "[t]wo wrong claims do not make one that is right"); *Intergraph*, 195 F.3d at 1367

("[W]e reject the notion that if there is a fraction of validity to each of the basic claims and the

sum of the fractions is one or more, the plaintiffs have proved a violation of . . . section 2 of the

Sherman Act." (quotes omitted)).  Blix has already, and unsuccessfully, attempted to amend its

claims to state a cause of action.  Its Section 2 claims should now be dismissed with prejudice.

## VII.    CONCLUSION

For the foregoing reasons, Blix's Amended Complaint should be dismissed in its entirety.

OF COUNSEL:

Daniel G. Swanson
Jason C. Lo
Jennifer J. Rho
Raymond A. LaMagna
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Tel:  (213) 229-7000

Cynthia E. Richman
Amalia Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Tel:  (202) 995-8500

H. Mark Lyon
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
Tel:  (650) 849-5300

Chris Whittaker
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612
Tel:  (949) 451-3800

Dated:  February 12, 2020
6572608 / 49651

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:  */s/ David E. Moore*_____
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Tracey E. Timlin (#6469)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    ttimlin@potteranderson.com

*Attorneys for Defendant Apple Inc.*