IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BLIX INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-1869-LPS |
| | ) | |
| APPLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Plaintiff*

OF COUNSEL:
Steven C. Cherny
Stephen R. Neuwirth
Patrick D. Curran
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, New York 10010
(212) 849-7000

Adam Wolfson
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
 865 S Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Dated: March 11, 2020

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

STATEMENT OF FACTS ......................................................................................... 3

I.  By Design, Apple Has Absolute Power Over Apps Written For MacOS and iOS Via Its Control Over The App Stores For Those OSes ......................................... 3

II.  Mail Client Apps Are A Distinct Type Of Product In Their Own Relevant Markets ................................................................................................................... 4

III.  Blix Is A Mail Client App Developer With A Revolutionary Approach To Inter-Platform Email Solutions ...................................................................................... 4

IV.  After Deciding It Wanted To Use Blix's Innovations Without Permission, Apple Kicked Blix Off The MacOS App Store ................................................................. 5

V.  Apple Has Put Its Thumb On Competition In Both Mail Client Markets ........... 6

LEGAL STANDARD ................................................................................................ 7

ARGUMENT .............................................................................................................. 7

I.  Apple Has Not Shown That Any Asserted Claim Is Invalid Under 35 U.S.C. § 101 ....................................................................................................................... 7

    A.  Apple Faces A Heavy Burden: Clear and Convincing Evidence ........................... 8

    B.  The '284 Patent's Claims Are Not Directed To An Abstract Idea ......................... 9

        1.  Apple fails to address the vast majority of asserted claims, which differ materially from claim 17 ................................................................... 9

        2.  Apple's proposed "abstract idea" is untethered to the claim language, and therefore deficient as a matter of law ............................................... 10

        3.  The asserted claims are directed to improvements in the operation of electronic communications networks ..................................................... 10

    C.  The Complaint Plausibly Alleges the '284 Patent Recites an Inventive Concept ................................................................................................................ 13

        1.  Under Rule 12(b)(6), Apple cannot ask this Court to ignore Blix's well-pled inventiveness allegations ......................................................... 13

        2.  The patent and file history confirm that the ordered combination of elements in the independent claims supplies an inventive concept .......... 14

        3.  Apple fails to address the dependent claims' inventive concepts ............. 17

II.  Blix Has More Than Adequately Pled Two Separate Counts Of Monopolization ........... 18

A.     MacOS and iOS Email Clients Are Each Plausible Relevant Markets ................18

     1.     Apps written for another OS are not reasonably interchangeable with MacOS or iOS apps ...........................................................................19

     2.     Mail client apps are complements to webmail services, not substitutes, and therefore are not in the same relevant market .................21

     3.     Apple confuses allegations regarding its monopoly power over MacOS apps with relevant market definition ............................................23

B.     Apple, as the Purveyor of the App Stores, Has Absolute Dominance Over MacOS and iOS Apps .........................................................................................23

C.     Apple's Efforts to Dominate the Mail Client Markets Constitute Illegal Anticompetitive Conduct .........................................................................................26

     1.     Abusing power over key distribution channels in order to maintain monopoly power is anticompetitive...........................................................26

     2.     Denying access to an essential facility is anticompetitive conduct ...........27

     3.     Changing aftermarket policies over locked-in consumers in order to maintain monopoly power is illegal...........................................................29

     4.     Leveraging monopoly power via anticompetitive acts is illegal ..............31

     5.     Refusing to deal with competitors under the facts alleged in the Complaint is illegal ...............................................................................31

III.     Apple Cannot Meet Its Burden On Reply ........................................................35

CONCLUSION........................................................................................................................35

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*3G Licensing, S.A. v. HTC Corp.*,
   2019 WL 2904670, at *2 (D. Del. July 5, 2019) ................................... 10

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018)................................................... 8, 9, 13

*Abid v. Google LLC*,
   2018 WL 3458546 (N.D. Cal. July 18, 2018) ...................................... 25

*In re Adderall XR Antitrust Litig.*,
   754 F.3d 128 (2d Cir. 2014)........................................................ 33

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ..................................................... 35

*In re Air Passenger Comput. Reservations Sys. Antitrust Litig.*,
   694 F. Supp. 1443 (C.D. Cal. 1988) ............................................... 28

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
   948 F.2d 536 (9th Cir. 1991) ...................................................... 28

*Alice Corp. v. CLS Bank Int'l.*,
   573 U.S. 208 (2014)................................................................. 7

*Align Tech., Inc. v. 3Shape A/S*,
   339 F. Supp. 3d 435, 440 (D. Del. 2018) ........................................... 7

*Apartment Source of Penn., L.P. v. Philadelphia Newspapers, Inc.*,
   1999 WL 191649 (E.D. Pa. 1999) ................................................. 29

*Apple, Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................................ 19, 21

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)........................................................ 32, 33, 34

*Avaya Inc., RP v. Telecom Labs, Inc.*,
   838 F.3d 354 (3d Cir. 2016)....................................................... 30

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016)................................................. 8, 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................ 7

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)................................................... 8, 9

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007).............................. 18, 23, 25, 26, 32

*BroadSoft, Inc. v. CallWave Commc'ns, LLC,*
   282 F. Supp. 3d 771 (D. Del. 2017).........................................................................8

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962)...............................................................................................18

*Cellspin Soft, Inc. v. Fitbit, Inc. is,*
   927 F.3d 1306 (Fed. Cir. 2019).......................................................................13, 14

*Core Wireless Licensing v. LG Elecs., Inc.,*
   880 F.3d 1356 (Fed. Cir. 2018)..............................................................................12

*Covad Commc'ns Co. v. Bell Atl. Corp.,*
   398 F.3d 666 (D.C. Cir. 2005)................................................................................35

*Cronos Techs., LLC v. Expedia, Inc.,*
   2015 WL 5234040 (D. Del. Sept. 8, 2015)............................................................8, 9

*Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.,*
   159 F.3d 129 (3d Cir. 1998)...................................................................................25

*Data Engine Techs. LLC v. Google LLC,*
   906 F.3d 999 (Fed. Cir. 2018).........................................................................10, 12

*Datel Holdings Ltd. v. Microsoft Corp.,*
   712 F. Supp. 2d 974 (N.D. Cal. 2010)...................................................................21

*DeJohn v. Temple Univ.,*
   537 F.3d 301 (3d Cir. 2008)...................................................................................29

*United States v. Dentsply Int'l, Inc.,*
   399 F.3d 181 (3d Cir. 2005)...................................................................................27

*Digidyne Corp. v. Data Gen. Corp.,*
   734 F.2d 1336 (9th Cir. 1984)...............................................................................23

*United States v. E. I. du Pont de Nemours & Co.,*
   351 U.S. 377 (1956).........................................................................................20, 23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
   504 U.S. 451 (1992).................................................................20, 21, 29, 30, 33

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016)..............................................................................11

*Enzo Biochem, Inc. v. Gen–Probe Inc.,*
   424 F.3d 1276 (Fed. Cir. 2005)................................................................................8

*Evonik Degussa GmbH v. Materia Inc.,*
   2012 WL 4503771 (D. Del. Oct. 1, 2012)...............................................................7

*Fed. Election Comm'n v. O'Donnell,*
   209 F. Supp. 3d 727 (D. Del. 2016)........................................................................35

*Fineman v. Armstrong World Indus., Inc.,*
   980 F.2d 171 (3d Cir. 1992)...................................................................................25

*Groove Digital, Inc. v. Jam City, Inc.*,
  2019 WL 351254 (D. Del. Jan. 29, 2019)........................................................... 10

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
  423 F.3d 374 (3d Cir. 2005).......................................................... 21, 23, 25

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*,
  90 F.3d 737 (3d Cir. 1996).......................................................................... 28

*Idexx Labs., Inc. v. Charles River Labs., Inc.*,
  2016 WL 3647971 (D. Del. July 7, 2016) ........................................................ 8

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
  547 U.S. 28 (2006)........................................................................................ 22

*IQVIA Inc. v. Veeva Sys., Inc.*,
  2018 WL 4815547 (D.N.J. Oct. 3, 2018).......................................................... 31

*Ironworks Patents, LLC v. Apple Inc.*,
  2018 WL 2944475 (D. Del. June 12, 2018)........................................................ 9

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984).......................................................................................... 22

*Kerwin v. Parx Casino*,
  2019 WL 1098949 (E.D. Pa. Mar. 8, 2019)...................................................... 28

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003)……………………………………………………26, 27

*LG Display Co. v. AU Optronics Corp.*,
  2010 WL 5463305 (D. Del. Dec. 29, 2010)...................................................... 35

*Licensing, S.A. v. HTC Corp.*,
  2019 WL 2904670 (D. Del. July 5, 2019) ........................................................ 10

*Lifewatch Servs. Inc. v. Highmark Inc.*,
  902 F.3d 323 (3d Cir. 2018)........................................................................... 18

*United States v. Microsoft*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................ 19, 20, 23, 27, 34

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Co.*,
  838 F.3d 421 (3d Cir. 2016)........................................................................... 18

*Mod Stack LLC v. Aculab, Inc.*,
  2019 WL 3532185 (D. Del. Aug. 2, 2019) ....................................................... 10

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ....................................................................... 21

*Novell, Inc. v. Microsoft Corp.*,
  505 F.3d 302 (4th Cir. 2007) .................................................................... 24, 27

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ..................................................................... 34

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)..................................................................... 20, 22

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*,
797 F.2d 370 (7th Cir. 1986)............................................................... 35

*Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pennsylvania*,
745 F.2d 248 (3d Cir. 1984).................................................................. 26

*Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*,
886 F.3d 332 (3d Cir. 2018).................................................................. 31

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)............................................................. 18, 21

*Research Corp. Techs., Inc. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010)................................................................ 8

*RICPI Commc'ns LLC v. JPS Interoperability Sols., Inc.*,
2019 WL 1244077 (D. Del. Mar. 18, 2019) ............................................... 8

*Simon & Simon, PC v. Align Tech., Inc.*,
2019 WL 5191068 (D. Del. Oct. 15, 2019) .............................................. 31

*Spruill v. Gillis*,
372 F.3d 218 (3d Cir. 2004).................................................................. 7

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019)............................................................. 13

*United Access Techs., LLC v. Frontier Comm'ns Corp.*,
2016 WL 5746640 (D. Del. Sept. 30, 2016) .............................................. 7

*Upaid Sys., Ltd. v. Alliance Laundry Sys. LLC*,
2020 WL 58538 (D. Del. Jan. 6, 2020)................................................... 10

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)................................................................. 32, 33, 34

*Viamedia, Inc. v. Comcast Corp.*,
2020 WL 879396 (7th Cir. Feb. 24, 2020) ........................................ 32, 33, 34, 35

*United States v. Visa U.S.A., Inc.*,
344 F.3d 229 (2d Cir. 2003)................................................................ 23

*Ward v. Apple Inc.*,
2017 WL 1075049 (N.D. Cal. Mar. 22, 2017)............................................ 31

*Xtreme Caged Combat v. Cage Fury Fighting Championships*,
2015 WL 3444274 (E.D. Pa. May 29, 2015) ............................................ 29

## Statutory Authorities

35 U.S.C. § 101.......................................................... 1, 7, 8, 9, 3, 14, 17

35 U.S.C. § 282(a) ....................................................................... 17

**Rules and Regulations**

Fed. R. Civ. P. 12(b)(6)..................................................................................... 1, 7, 8, 13

D. Del. L.R. 7.1.3(c)(2) ……………………………………………………………..35

**Additional Authorities**

Jacob Kastrenakes, *Apple now lets apps send ads in push notifications, The Verge*,
   https://www.theverge.com/2020/3/4/21165087/ios-apple-push-notification-
   advertising-marketing-now-allowed-app-store (Mar. 4, 2020) ................................... 6

P. Areeda & H. Hovenkamp, Antitrust Law (4th ed. 2013)………………………………….20

Plaintiff Blix, Inc. ("Blix") hereby submits this answering brief in opposition to Defendant Apple Inc.'s ("Apple") motion to dismiss (D.I. 17, hereafter "Mot.") the Amended Complaint (D.I. 13, hereafter "Complaint" or "FAC") pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Apple's motion to dismiss relies heavily on attorney argument, but little on actual deficiencies in the pleadings. It should therefore be denied in its entirety.

First, Apple's Section 101 arguments against U.S. Patent No. 9,749,284 ("the '284 Patent") completely misconstrue the patent's claims and language, and therefore identify no reason under the clear and convincing standard to invalidate the patent. Initially, Apple's argument that claim 17 is representative of *all* asserted claims is both demonstrably false and a clear attempt to dodge Apple's burden to establish representativeness. This failure to acknowledge the actual claim language is further evident in Apple's arguments under *Alice* step 1. Apple's proposed abstract idea—"using a go-between to relay communications"— ignores clear improvements in the operation of electronic communications networks that the claims provide. The Court therefore need not address *Alice* step 2. Even if it does, however, the claims are valid under step 2:  Blix plausibly and specifically alleges how the claims and their elements, whether considered individually or particularly as an ordered combination, are inventive. Such allegations, which are supported by the claims and file history, preclude dismissal.

Apple's arguments against Blix's antitrust claims fare no better. As an initial matter, in attacking the relevant market definitions, Apple simply ignores reality by arguing that apps written for different operating systems ("OSes") are reasonably interchangeable with each other. As the well-pleaded factual allegations (and simple everyday experience) make clear, a consumer can only use apps written for their computing device's OS—it is literally impossible for a consumer to

use apps written for Android on an iOS device, and vice versa.

Apple's second relevant market sin is to confuse complements and substitutes. The former are products or services whose demand goes hand in hand, but are not substitutes for each other, and therefore not in the same relevant market. In the context of this case, examples of complements include an OS and software written for that OS, or a mail client and the email service that mail client utilizes to send and receive emails. Apple's argument that the Court should ignore well-pled factual allegations demonstrating the complementary, but not substitutable, nature of these products asks the Court to commit legal and factual error.

Apple's third relevant market failure is to argue that Blix excludes products from the relevant markets that it does not actually exclude; specifically, apps from non-App Store sources. What Blix alleges is there is a *de minimis* number of such apps, because (a) Apple has made it so iOS users cannot download apps from any other source than the iOS App Store, and (b) Mac users have very limited options to obtain apps from non-App Store sources due to the roadblocks Apple has erected around such purchases and downloads. Moreover, the allegations Apple cites for this argument relate to Apple's monopoly power, not relevant market definition.

With respect to monopoly power, Apple's protestations that it lacks such power contradict long-held law and undisputed factual allegations. As the Supreme Court, Third Circuit, and myriad other courts recognize, evidence of monopoly power includes the ability to exclude competitors from a market. The complaint alleges that Apple can exclude whomever it wants from the Mail Client Markets due to its absolute and pervasive control over the distribution channels into those markets (the App Stores). Such power, by law, defines a monopolist.

Finally, Apple's attempt to recast this dispute as one about a mere refusal to deal with Blix contradicts the well-pled allegations and is incorrect as a matter of law. Blix alleges a variety of

anticompetitive acts the law makes clear are not analyzed under *Aspen Skiing*'s refusal to deal standard. These include Apple's efforts to lock up and abuse the key distribution channels for iOS and MacOS apps (including by, *inter alia*, abusing its control over the App Store search algorithms to make its highest-quality competitors effectively invisible to consumers), its denial of access to essential facilities (the App Stores), its unanticipated changes in policy to exploit locked-in iOS and MacOS users, and its monopoly leveraging based on all of these acts. Moreover, even under the unilateral refusal to deal standard, it is clear the Complaint alleges that Apple ceased a voluntary and profitable course of dealing with a sacrifice in short-term profits, and for anticompetitive purposes and effect. Apple's antitrust dismissal arguments therefore fail.

## STATEMENT OF FACTS

### I.     By Design, Apple Has Absolute Power Over Apps Written For MacOS and iOS Via Its Control Over The App Stores For Those OSes

An OS is the software that supports a computer's basic functions. Apple uses two main OSes for the devices at issue in this case:  MacOS, for Mac devices; and iOS, for iPhone devices. First Amended Complaint ("FAC") ¶¶ 26, 137. OS manufacturers compete with each other through various means, including by encouraging and advertising a robust number of apps written for that OS, such as work productivity, mail clients, web browsers, music software, etc. *See, e.g., id.* ¶¶ 17, 69-73. This is because consumers have a strong preference for choice regarding the apps they use on their computing devices. *Id.* ¶ 69. Apps written for one OS do not work on other OSes. *See id.* ¶¶ 74, 140, 154.

Once a consumer chooses a computing device, they are locked into that device due to high switching costs, including the hard cost of purchasing another device, as well as the transaction costs of switching OSes and apps in the future. *Id.* ¶¶ 76, 78, 136, 141, 277. For this reason, consumers typically stick with the same OS across multiple device purchases. *Id.* ¶ 165.

In 2007, Apple released the first iPhone and, a year later, created the iOS App Store. *Id.* ¶ 71. By technological design, the only way iPhone users may obtain apps is through the iOS App Store. *Id.* ¶ 75. Apple has long advertised the supposed choice the iOS App Store provides, but it preinstalls iPhones with its own default apps and, as discussed below, only provides the illusion of choice to its consumers, while throttling true competition. *Id.* ¶ 95.

In 2011, after seeing the control the iOS App Store provided, Apple created the MacOS App Store. *Id.* ¶ 138. Although not technologically mandated in the same way as the iOS App Store, Apple created a number of "security" and other technological roadblocks to obtaining MacOS apps through any means but the MacOS App Store. *Id.* ¶ 141. These roadblocks had the effect of making the MacOS App Store the main distribution channel for MacOS apps. *Id.*

Apple has absolute control over which apps are permitted in each App Store, and it asserts the unfettered ability to decide when and how to make that determination. *Id.* ¶¶ 139, 238, 273.

## II.     Mail Client Apps Are A Distinct Type Of Product In Their Own Relevant Markets

Mail clients are "software application[s] used to send and receive electronic mail." *Id.* ¶ 88. They connect a user to an email service (*e.g.*, iCloud, Gmail, Yahoo, Microsoft Exchange) to actually send and receive emails. *Id.* ¶ 158. Mail client apps have broad functionality and, unlike web-based email interfaces, can be operated offline. *Id.* ¶¶ 153, 155. Consumers of mail clients desire and need that added functionality. *Id.* Moreover, because mail clients have unique functionality, they are not interchangeable with other types of apps, nor with mail clients written for other OSes. *Id.* ¶ 154. Accordingly, MacOS and iOS mail clients each operate in their own relevant markets (respectively, the "MacOS Mail Client Market" and "iOS Mail Client Market").

## III.    Blix Is A Mail Client App Developer With A Revolutionary Approach To Inter-Platform Email Solutions

BlueMail, first released in 2014, is a universal mail client app capable of managing an

unlimited number of email accounts from various providers while enabling personalization across accounts. *Id.* ¶¶ 4-5. In 2018, BlueMail added a "Share Email" feature that allowed users to post emails to social media platforms, and then engage in secure private messaging. *Id.* ¶¶ 6, 37.

In September 2019, Blix released a new service (also named Blix) that was an evolutionary step forward in secure messaging. *Id.* ¶¶ 38, 40*.* This new service is a combined email and messaging platform for enterprises that allows employees to internally interact via a chat service, while interacting with the outside world over email. *Id.* Key to this service is the Messaging Bridge, which allows company employees to communicate with visitors to their company website through anonymous interactions, without revealing either side's real email addresses. *Id.* ¶ 39.

The '284 Patent covers this revolutionary approach to inter-platform email solutions. *Id.* ¶¶ 42-47. The methods and systems claimed by the '284 Patent describe an innovative improvement to the operation of communications networks, and specifically, to the ability to manage interactions on communications networks, making it possible for companies and their employees to engage customers in a private and secure way. *Id.* ¶¶ 39, 46.

## IV. After Deciding It Wanted To Use Blix's Innovations Without Permission, Apple Kicked Blix Off The MacOS App Store

BlueMail was first made available for public download on the MacOS App Store on May 8, 2019. *Id.* ¶ 168. It quickly became one of the top-ranked email clients. *Id.* ¶ 169. On May 21, however, Apple sent Blix a notice that BlueMail, a pioneering email application, was "Spam," because it supposedly duplicated another app already on the App Store. *Id.* ¶ 171. Blix uploaded a new version of the app as requested and asked Apple to elaborate on which apps it found similar, so Blix could take appropriate action. *Id.* ¶ 174. Apple denied the new version less than two hours later, declining to explain its reasoning, and reiterated its denial on June 3. *Id.* ¶¶ 175-76. After a back-and-forth where Apple offered pretextual reasons for its denial, Apple officially kicked Blix

off of the MacOS App Store on June 7, 2019. *Id.* ¶¶ 177-96.

The reason for Apple's denial, however, soon became clear. On June 3, 2019, Apple unveiled the "Sign In With Apple" service, which plainly infringes the '284 Patent. *Id.* ¶ 48. Apple described the service as "the fast, easy way to sign in without all of the tracking[,]" *id.* ¶ 49, and explained that the service works by assigning random facing public addresses for the user to interact with in order to facilitate a user's ability to manage interactions with applications. *Id.* ¶ 50. Apple's claimed purpose for "Sign In With Apple" was also the exact same as BlueMail: addressing privacy concerns associated with sharing electronic address information, while still enabling easy-to-access electronic communication. *Id.* ¶¶ 52-56.[1]

## V.     Apple Has Put Its Thumb On Competition In Both Mail Client Markets

Apple has taken a number of different steps to stymie competition in the Mail Client Markets, based on its power to exclude competitors from each market. First, as discussed above, Apple excluded BlueMail from the MacOS App Store, as part of a broader scheme to exclude its highest-quality competitors from that market. *See id.* ¶¶ 233-64. In the iOS Mail Client Market, Apple used its control over the iOS App Store search algorithm to (a) place Apple's default apps at the top of search results, (b) fill user screens with low-quality alternatives, and (c) push down the highest-quality apps to lower search rankings, so they were effectively invisible. *Id.* ¶¶ 265-95. In each instance, Apple's conduct had the effect of preventing competition and reducing consumer choice for competing mail client apps, and it did so while sacrificing short-term benefits in a manner different than all other computing device manufacturers (*e.g.*, Android and Windows).

---

[1]     Apple recently mandated that developers use "Sign In With Apple," thus forcing them to infringe the '284 Patent. *See* Jacob Kastrenakes, *Apple now lets apps send ads in push notifications*, The Verge (Mar. 4, 2020), https://www.theverge.com/2020/3/4/21165087/ios-apple-push-notification-advertising-marketing-now-allowed-app-store (last visited March 11, 2020).

## LEGAL STANDARD

Evaluating a motion to dismiss under Rule 12(b)(6) "requires the Court to accept as true all material allegations of the complaint." *Align Tech., Inc. v. 3Shape A/S*, 339 F. Supp. 3d 435, 440 (D. Del. 2018) (citing *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004)). The court must "accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Evonik Degussa GmbH v. Materia Inc.*, 2012 WL 4503771, at *2 (D. Del. Oct. 1, 2012). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *United Access Techs., LLC v. Frontier Comm'ns Corp.*, 2016 WL 5746640, at *1 (D. Del. Sept. 30, 2016). Even if a movant contends allegations are "doubtful in fact," Rule 12 motions must be denied wherever the allegations "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

### I.  Apple Has Not Shown That Any Asserted Claim Is Invalid Under 35 U.S.C. § 101

Apple's invalidity arguments as to the '284 Patent fail on multiple levels. First, Apple cannot show that any asserted claim is directed to an abstract idea and, for claim 17 (the only claim Apple bothers to actually address), Apple strips away the actual limitations of the claim to attack a straw man: the notion of "a go-between to relay communications." This is not what the claims address. This disconnect from the claims dooms Apple's motion under step 1 of the test set forth in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014). *Alice* step 2 similarly precludes the motion; Apple offers only analogy and rhetoric, rather than evidence, to assert there is no inventive concept in the asserted claims. As a matter of law bare attorney argument cannot meet Apple's clear and convincing burden. In any event, Apple never even attempts to demonstrate that the ordered *combination* of elements in the claims was conventional. The Federal Circuit has

emphasized that a novel combination of known elements can and does provide an inventive concept. Apple thus has not met its burden under step 2.

### A.     Apple Faces A Heavy Burden: Clear and Convincing Evidence

"A patent is presumed valid and the party asserting invalidity has the burden of persuasion to show the contrary by clear and convincing evidence." *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 870 (Fed. Cir. 2010). This burden applies on a claim-by-claim basis for all challenged claims, including dependent claims. *See, e.g., Cronos Techs., LLC v. Expedia, Inc.*, 2015 WL 5234040, at *3 (D. Del. Sept. 8, 2015) (denying motion where defendants did not meaningfully analyze each challenged claim). Evidence is necessary; attorney argument does not suffice. *See BroadSoft, Inc. v. CallWave Commc'ns, LLC*, 282 F. Supp. 3d 771, 783 (D. Del. 2017), *aff'd* 739 F. App'x 985 (Fed. Cir. 2018); *see also Enzo Biochem, Inc. v. Gen–Probe Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.").

To invalidate claims under Section 101, the moving party must do more than show, by clear and convincing evidence, that each claim element, *by itself*, was known in the art. "[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). This is a question of fact, subject to clear and convincing proof. *Berkheimer*, F.3d 1360, 1368 (Fed. Cir. 2018) (citation omitted). Moreover, "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126-27 (Fed. Cir. 2018).[2]

---

[2]   *See also RICPI Commc'ns LLC v. JPS Interoperability Sols., Inc.*, 2019 WL 1244077, at *5 (D. Del. Mar. 18, 2019) (denying motion because "[w]hile the specification clearly concedes that the individual claim elements are themselves conventional, the arrangement of the claim elements is not"); *Idexx Labs., Inc. v. Charles River Labs., Inc.*, 2016 WL 3647971, at *5 (D. Del. July 7, 2016) (denying motion where claims, although directed to abstract idea, "describe[d] a

**B.    The '284 Patent's Claims Are Not Directed To An Abstract Idea**

Apple argues the '284 Patent is directed to an abstract idea; *i.e.*, "using a go-between to relay communications." This, however, is incorrect for a variety of independent reasons.

**1.    Apple fails to address the vast majority of asserted claims, which differ materially from claim 17**

Apple's initial problem is that its abstract idea arguments depend entirely on the false assumption that independent claim 17 is representative of *all* asserted claims. Mot. at 9. But "[a] claim is not representative simply because it is an independent claim," *Berkheimer v. HP Inc.*, 881 at 1365, and a Section 101 motion to dismiss fails where a defendant does not meaningfully analyze each of the challenged claims. *See, e.g., Cronos Techs.*, 2015 WL 5234040, at *3.

Blix identifies claim 17 as one of *many* asserted claims—25 in total—but never alleges claim 17 is representative of all others. *See* FAC ¶¶ 208-218. In fact, the other independent claims contain different elements, which Apple simply ignores. For example, Apple contends (at 7) that "[c]laim 1 generally mirrors the elements of claim 17." However, as **Appendix A** makes clear, this is plainly not true. Claim 17 recites "a method of performing controlled *pre-interaction*," whereas claim 1 recites "a method of performing controlled *reciprocating communication*." Extended portions of claim 1 also materially differ from claim 17. *See* **Appendix A**. Apple does not address these differences and distinctions, which carry through multiple claim limitations.

So too for independent claim 27. Unlike claim 17, claim 27 recites a tangible ***system*** for performing a controlled pre-interaction, regardless of whether that system is used, or in what fashion. "[C]laims to tangible systems are typically patent eligible." *Ironworks Patents, LLC v. Apple Inc.*, 2018 WL 2944475, at *3 (D. Del. June 12, 2018) (citing *Aatrix*, 882 F.3d at 1125).

---

specific solution to a problem which afflicted the field of the invention")

Apple's attack on the dependent claims fares no better. It wildly oversimplifies those claims, ignoring the actual claim language to wash away inventive features, as demonstrated in **Appendix B**. This does not identify any patentability issues, and therefore fails.

### 2.   Apple's proposed "abstract idea" is untethered to the claim language, and therefore deficient as a matter of law

Apple's proposed abstract idea also fails on its terms because it is untethered to the claim language. "It is not enough [ ] to merely trace the invention to some real-world analogy." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018). Yet that is all Apple does, analogizing claim 17 (without analyzing its actual language) to a "lawyer[] representing a client in … anonymously shopping a transaction." Mot. at 15. Apple also prefaces this context-less analogy by arguing that the "steps covered by the asserted claims … could all be performed by humans without a computer." Mot. at 14. That is incorrect. The '284 Patent defines "communication" as "any type of *electronic* communication, having an identifiable opponent and/or participant." D.I. 13-3 ("'284 Patent") at 1:48-50 (emphasis added). This is no small point; as explained below, the claims are directed to specific improvements in the operation of *electronic* communication networks, yet Apple ignores this key claim element. Courts in this District routinely dismiss motions that similarly propose abstract ideas untethered to the claim language.[3]

### 3.   The asserted claims are directed to improvements in the operation of electronic communications networks

An improvement in a particular area of technology, that does not attempt to monopolize a mathematical algorithm, an economic practice, or a pre-computer business practice, qualifies for

---

[3]   *See, e.g., Upaid Sys., Ltd. v. Alliance Laundry Sys. LLC*, 2020 WL 58538, at *4 (D. Del. Jan. 6, 2020); *Mod Stack LLC v. Aculab, Inc.*, 2019 WL 3532185, at *3-4 (D. Del. Aug. 2, 2019); *3G Licensing, S.A. v. HTC Corp.*, 2019 WL 2904670, at *2 (D. Del. July 5, 2019); *Groove Digital, Inc. v. Jam City, Inc.*, 2019 WL 351254, at *3 (D. Del. Jan. 29, 2019).

patent protection. *See, e.g., Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016). The asserted claims are directed to exactly such patentable improvements, including a specific architecture to make private and secure electronic communications easier to manage.

The techniques in the '284 Patent improve the operation of communications networks and advance "the ability to manage interactions on communications networks" by disclosing "a specific architecture to manage interactions employing both private and public interaction addresses." FAC ¶ 46. This improvement in the field of communications networks relies on "implementation details that offer an innovative solution to the problems of privacy and security in modern communications networks." *Id*. Those improvements are implemented using a unique combination of elements, including "the use of specific private and public interaction addresses in a communications network; records and reverse lists stored in non-transitory computer storage to associate addresses in a specific manner, to facilitate their management; and specific logic to create, manage, and synchronize address information in a variety of interactions and pre-interactions." *Id*. Blix's combination of these techniques, which was not previously used in the field, "improves the ability of prior art communications systems to facilitate anonymous and easy-to-manage methods of communication." *Id*. Thus, far from simply reciting "the mere desired result of anonymously communicating across a communications network in an easy-to-manage method," the claims disclose "a specific solution for accomplishing that goal." *Id*. ¶ 47.

These facts are adequately pled, and more than plausible: Apple *admits* electronic communications networks face unique challenges for both privacy and security, *id*. ¶¶ 56, 97, 164, and Apple is now using Blix's patented techniques to solve those problems, *id*. ¶¶ 206-232. People cannot communicate electronically without an electronic device and communications network. Yet Apple's proposed abstract idea ignores electronic communications entirely, and strips away

multiple claim limitations directed to specific improvements for those networks.

The Federal Circuit has cautioned against similar attempts to over-simplify claims. In *Data Engines*, the defendant "fail[ed] to appreciate the functional improvement achieved by the specifically recited [elements] in the claimed methods [and systems]." 906 F.3d at 1011. So too here. Blix's invention is not the basic idea of anonymous communication; it is a specific architecture to improve on known systems of electronic communication, addressing privacy problems in those communications networks, while also making them more manageable. *See, e.g.*, '284 Patent at 21:19-22:11. These improvements are eligible for patent protection. *See, e.g.*, *Core Wireless Licensing v. LG Elecs., Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018) ("Although the generic idea of summarizing information certainly existed prior to the invention, these claims are directed to a particular manner of summarizing and presenting information in electronic devices.").

Apple's proposed abstract idea does not account for these improvements. Claim 17, which Apple wrongly claims is representative of all other asserted claims, *see supra*, is directed to a specific method for "performing controlled pre-interaction." '284 Patent at 24:30.  Pre-interaction is a step *before* communication; it is not relaying an anonymous communication, and in fact is designed to ensure privacy in electronic communication networks. *Id.* at 12:17-18 ("the method of performing controlled pre-interaction is primary aimed at safeguarding the privacy of the user"); *id.* at 20:7-9 (system is designed to "ensure that information of party B exposed to A, matches party B privacy requirements"). Claim 17 recites a specific and detailed method for this pre-interaction; it is not directed to ***all*** forms of anonymous communication. The dependent claims confirm this distinction. Indeed, claim 18 recites "[t]he method of performing controlled pre-interaction, as set forth in claim 17, wherein said method is ***not*** followed by a communication." *Id.* at 24:59-61 (emphasis added). The patent's novel pre-interaction architecture is a specific solution

to problems in electronic communication – not the basic idea of an anonymous go-between. FAC ¶¶ 46-47.

These claims are analogous to claims found patent-eligible in *SRI Int'l, Inc. v. Cisco Sys., Inc.* 930 F.3d 1295 (Fed. Cir. 2019). There, the Federal Circuit held that claims directed to "[a] computer-automated method of hierarchical event monitoring and analysis within an enterprise network" were not abstract under *Alice* step 1. *Id.* at 1301. Those claims were patent-eligible because they were "directed to using a specific technique … to solve a technological problem arising in computer networks: identifying hackers or potential intruders into the network." *Id.* at 1303. The asserted claims here similarly claim architectures for "controlled pre-interaction" and "controlled reciprocal communication," and recite specific techniques to solve a technological problem arising in communication networks: improving security and privacy in the realm of electronic communications.  '284 Patent at 24:30, 59-61.[4]

### C.    The Complaint Plausibly Alleges the '284 Patent Recites an Inventive Concept

### 1.    Under Rule 12(b)(6), Apple cannot ask this Court to ignore Blix's well-pled inventiveness allegations

"[P]atentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix*, 882 F.3d at 1126-27. This is not a high bar, and Apple's request to dismiss in the face of such allegations regarding inventiveness invites reversal.

The Federal Circuit's decision in *Cellspin Soft, Inc. v. Fitbit, Inc.* is particularly instructive. 927 F.3d 1306 (Fed. Cir. 2019). In *Cellspin*, the Federal Circuit reversed an order granting a motion

---

[4]   The file history confirms the asserted claims are patent-eligible. During prosecution, the Examiner carefully examined the claims, including an analysis under Section 101. Pursuant to that analysis, the Examiner *rejected* some claims under Section 101, but **allowed the claims that Blix now asserts**, finding no eligibility problems. *See* Ex. A (2017-02-10 Non-Final Rejection) at 1. This careful, claim-by-claim analysis, conducted nearly three years after the Supreme Court's *Alice* decision, is strong evidence supporting patent eligibility with which Apple never grapples.

to dismiss under § 101. The patents-in-suit in *Cellspin* recited methods for connecting data capture devices to mobile devices to allow users to automatically publish content from the data capture device to a website. *Id.* at 1310. In determining the patents' eligibility under § 101, the Federal Circuit agreed with the District Court that the claims were directed to the abstract idea of capturing and transmitting data from one device to another. *Id.* at 1316. Yet the Federal Circuit reversed because the District Court had been required to accept as true the "specific, plausible factual allegations about why aspects of its claimed inventions were not conventional." *Id.* at 1317–18.

The facts here are virtually identical to *Cellspin* (although, unlike *Cellspin*, the claims are not directed to an abstract idea). Just as in *Cellspin*, the Complaint provides "specific, plausible factual allegations about why aspects of its claimed inventions were not conventional" and were instead an inventive improvement that addressed problems in the prior art. *See* FAC ¶¶ 46-47 (explaining, in detail, how the '284 Patent provided a novel approach that was "an innovative improvement to the operation of communication networks" that "improves the ability of prior art communications systems to facilitate anonymous and easy-to-manage methods of communication," using "a specific architecture to manage interactions employing both private and public interaction addresses"). This "innovative solution[] to the problems of privacy and security in modern communication networks" relied on a novel combination of "implementation details" in the claims. *Id.* (providing details of same). This combination of claim elements "improves the ability of prior art communications systems to facilitate anonymous and easy-to-manage methods of communication." *Id.* Apple cannot show on this motion—and has not—that this combination of elements was well-known or conventional. Any contention otherwise is factual in nature.

### 2. The patent and file history confirm that the ordered combination of elements in the independent claims supplies an inventive concept

Even if Blix did not specifically allege inventiveness, the claims themselves plainly recite

an inventive concept when considered as an ordered combination addressing specific needs in the field. The '284 Patent explains that its novel techniques improved on known forms of electronic communications, pointing to several prior art references that described the state of the art. *See* '284 Patent at 1:23-40. This prior art explained there was a need to improve electronic communication systems in order to protect users' privacy.[5]

The claimed invention recites a novel and specific combination of elements to implement an easy-to-manage anonymous electronic communication platform that solves these problems. For example, claim 1 recites steps to perform controlled reciprocating communication using a first party's private interaction address and manageable public interaction address. '284 Patent at 21:24-27. A record is formed to associate these two addresses electronically, *id.* at 21:28-30, and incoming communications to the manageable public interaction address are then received, identified, and analyzed by the system, including accessing records to determine the identity associated with the manageable public interaction address and determine the private interaction address then associated with the manageable public interaction address. *Id.* at 21:31-37. To accomplish this, the patent utilizes a reverse list wherein the interaction address of the second party is associated with the public interaction address of the first party. *Id.* at 21:48-61. After this pre-interaction act, the first party sends an outgoing communication to the second party, and the second party only is exposed to the first party's *public* interaction address. *Id.* at 21:62-22:11.

---

[5]   *See, e.g.*, Ex. B at 1:50-62 (explaining that a need exists to protect privacy in electronic voice communication, such as to ensure the caller's privacy when calling from certain locations); Ex. C at 1:8-38 (explaining need "for preventing a leakage of personal information such as a telephone number while establishing a telephone call quickly and efficiently," including when using "a provisional telephone number corresponding to a regular telephone number"); Ex. D at 1:20-23 (explaining "[t]here are particular situations wherein a person would like to make their private phone number available to the other party for only a limited time, or reserve the ability to block future phone calls from a specific person altogether").

The other independent claims likewise demonstrate their inventiveness. Claim 17 recites a specific implementation for performing controlled *pre*-interaction that requires particular implementation details, which are employed in a particular manner to improve upon the problems associated with prior art electronic communications. Claim 27 requires, *inter alia*, specific computer non-transitory storage memory, *Id.* at 26:4-13, and recites specific claim limitations; *e.g.*, "graphical user interface[s]," "input device[s]," and multiple "microprocessors." *Id.* at 25:63-67, 26:15-23. The arrangement of these limitations creates an innovative system to improve communication networks and solve known problems in electronic communication. *Id.*

Apple has not shown by clear and convincing evidence that this combination of elements lacks any inventive concept.  Nor could it; the file history confirms the combination of elements in each independent claim is inventive, rather than a conventional arrangement of prior art elements. During prosecution, the Examiner carefully compared the proposed claims to multiple prior art references. *See, e.g.*, Ex. E (May 5, 2016 Office Action) (identifying 24 patents and patent applications considered by the Examiner as prior art). The prior art included Sprint patents "for masquerading the identity of a communication device returning a missed call" (*id*. at 5-6, discussing U.S. Patent No. 7,995,730 to Zhang) and Fujitsu patents for managing "a provisional telephone number corresponding to the regular telephone number" (*id*., discussing U.S. Patent App. Pub. No. 2006/0233551 to Oshika). The Examiner allowed the claims over this and other prior art, noting that combination of elements was, in fact, inventive. Ex. F, at 2-3 (Sept. 28, 2016 Notice of Allowance and Fees Due). As the Examiner further noted, "[n]one of the prior art of record disclose, teach, suggest and/or render obvious the above features to achieve ***the claimed invention in combination with the independent claims as a whole***." *Id*. at 3 (emphasis added).

Apple never addresses the claims "as a whole," and certainly does not show by clear and convincing evidence that the Patent Office erred by concluding this collection of elements, "as a whole," described an innovative advance over the prior art. Instead, Apple simply ignores the evidence, which requires denying the motion since "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom*, 827 F.3d at 1350. Furthermore, Apple shows no error in the Examiner's conclusion—it simply offers attorney argument. That is insufficient to meet Apple's clear and convincing burden.

### 3.    Apple fails to address the dependent claims' inventive concepts

Apple also fails to meaningfully address whether the dependent claims supply an inventive concept. Tellingly, Apple devotes a mere page to nominally addressing the dependent claims at *Alice* step 2, paraphrasing the dependent claims using vague, untethered descriptions. *See* Mot. at 20. There is no support for Apple's contention that "[n]one of these limitations solve any technical problem implicating computerized proxy services." *Id.* at 21.

Contrary to this step 2 non-argument, the dependent claims clearly limit the specific architecture for manageable anonymous electronic communication in various ways, as detailed in Appendix B. Apple has thus failed to meet its burden under the clear and convincing standard to show that *all* of the dependent claims fail to recite an inventive concept when considered individually or as an ordered combination. Apple's only argument is pure rhetoric; *i.e.*, that they supposedly "just add more abstract elements to the pyre." Mot. at 21.   Apple does not explain substantively how the dependent claims supposedly fail to limit the independent claims in an inventive way. Thus, even if Apple established at least one independent claim was ineligible under Section 101—which it has not—its motion fails with respect to the dependent claims. *See* 35 U.S.C. § 282(a) (dependent claims are "presumed valid even though dependent upon an invalid claim.").

## II.   Blix Has More Than Adequately Pled Two Separate Counts Of Monopolization

Apple's attacks on Blix's antitrust claims largely amount to ignoring the well-pled factual allegations and attempting to recast the claims into shapes that Apple more prefers. In each instance, Apple fails to identify any real deficiency in Blix's claims, whether with respect to allegations regarding market definition, monopoly power, or anticompetitive conduct.

### A.   MacOS and iOS Email Clients Are Each Plausible Relevant Markets

"The scope of the market is a question of fact[.]" *Mylan Pharm. Inc. v. Warner Chilcott Pub. Co.*, 838 F.3d 421, 435 (3d Cir. 2016) (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007)). "Ultimately the relevant market must 'both correspond to the commercial realities of the industry and be economically significant.'" *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962)). "That is why, 'in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities ….'" *Id.* (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

Courts will dismiss a complaint on market definition grounds only if the plaintiff "defines the relevant market without reference to interchangeability or cross-elasticity of demand or if it 'alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor.'" *Id.* (quoting *Queen City Pizza*, 124 F.3d at 436). "[A]bsent [] obvious oversights, courts are cautious before dismissing for failure to define a relevant market." *Id.*

None of the three other groups of products Apple claims must be included in the Mail Client Markets—apps written for other OSes, webmail interfaces, or non-App Store mail clients—change the analysis in any real way. The first two are clearly not reasonably interchangeable with MacOS or iOS mail clients, and the third Blix does not exclude from the market definitions.

### 1. Apps written for another OS are not reasonably interchangeable with MacOS or iOS apps

Apple's primary argument against the Mail Client Market definitions (at 26-27) is that mail client apps for other OSes have similar functionality as MacOS and iOS mail apps, so must also be included in the relevant market. This argument fails because it fundamentally misapplies the concept of reasonable interchangeability, ignores basic economics and long-held law, and tries to argue against the clear inferences arising from the complaint's factual allegations.

OSes are, of course, competitive products. Apple has successfully argued that exact point in past cases.[6] As the Complaint alleges, one of the ways OS manufacturers compete is by encouraging and advertising a robust market of apps written for that OS. *See, e.g.*, FAC ¶¶ 17, 69-73. This is because, as the Complaint also alleges, consumers have a strong preference for choice regarding the apps they use on their computing devices. *Id.* ¶ 69.[7]

Where Apple missteps is to confuse reasonable interchangeability at the ***OS level*** with reasonable interchangeability at the ***app level***. For an OS consumer, it is certainly relevant for them to know whether and to what extent there are, *inter alia*, mail client apps available on each OS, because it could lead the consumer to choose one OS over another. However, once a consumer

---

[6] *See, e.g.*, *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (finding that MacOS competes with other OSes). As *Psystar* notes, OSes and computing devices running those OSes are in separate relevant markets. *Id.* This underscores the dichotomy between OSes and apps, discussed further below.

[7] Indeed, in the government's famous antitrust case against Microsoft, the D.C. Circuit found that, in the late 1990s, MacOS was "less appealing to consumers because it costs considerably more and ***supports fewer applications***," thereby putting it outside the then-existent relevant market for Intel-compatible PC operating systems. *See United States v. Microsoft*, 253 F.3d 34, 52 (D.C. Cir. 2001) (en banc) (per curiam) (emphasis added). Apple obviously learned the lesson from that era and more recently encouraged at least the appearance of a competitive market for apps on its devices. FAC ¶¶ 69, 120, 161-62, 243, 274, . This was not some benevolent expansion of output, as Apple alleges, but rather a recognition that, without at least the perception of a variety of apps for MacOS and iOS devices, those devices would be at a decided disadvantage vis-à-vis other competitors.

chooses their OS, they are locked in—at least, on the device utilizing that OS. *Id.* ¶ 81. At that point, only apps written for the consumer's chosen OS are substitutes for each other, because apps written for another OS will not work on the computing device in question. *Id.* No amount of price increases would convince a consumer to switch away from apps written for their OS, because they literally have no other option. *Id.*; *see also Microsoft*, 253 F.3d at 52 (noting that consumers would not reasonably switch to a different OS due to the costs of obtaining new hardware *and new applications*). Apps written for MacOS or iOS therefore operate in their own relevant markets.[8]

Even if Apple were correct that consumers' initial OS choice should be considered when assessing relevant market definition, that factual argument does not change the plausibility of the alleged relevant app markets here. In economic terms, OSes and apps are "complements," because they are used together, but are not substitutes for each other. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2295–96 (2018) (Breyer, J., dissenting). "Grouping complementary goods into the same market" is "economic nonsense," and would "undermin[e] the rationale for the policy against monopolization or collusion in the first place." *Id.* (quoting 2B Areeda & Hovenkamp ¶ 565a, at 431). The Supreme Court itself has noted that "computers and software" are separate markets, even though they are "functionally linked." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992).

But, even if OSes and apps are, as a factual matter, more intimately linked in the way Apple argues, all Apple has identified (as it concedes) is a scenario involving a relevant aftermarket. The Supreme Court's decision in *Kodak* helps demonstrate this point. There, Kodak sold copiers in competition with other companies. All such companies offered proprietary replacement parts and

---

[8]  *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 380-81 (1956) ("interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities").

repair services for their respective copiers. 504 U.S. at 457. Kodak copier replacement parts therefore constituted their own aftermarket, because they were the only option for consumers of Kodak copiers. *Id.* at 482. Subsequent cases have routinely reached the same conclusion for aftermarkets,[9] and none of Apple's citations hold otherwise.[10] Contrary to Apple's assertions (at 26), the Complaint is replete with allegations that users are locked into a specific OS's apps once they purchase a computing device running that OS. FAC ¶¶ 81, 101, 277.

No matter how the Court assesses the alleged markets—whether as standalone markets for apps written for a specific OS, or as aftermarkets of apps for MacOS or iOS devices—the case law is clear that, even taking consumers' decisions about OS into account, the app markets Blix alleges are not implausible simply due to that initial step in choosing a computing device.

### 2.   Mail client apps are complements to webmail services, not substitutes, and therefore are not in the same relevant market

Apple's next tack is to argue that "web-based email software" must be included in each

---

[9]  *See, e.g., Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 383 (3d Cir. 2005) (finding that "primary balloon market is distinct from the [hot air balloon] fabric aftermarket"); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1049 (9th Cir. 2008) (aftermarket for "replacement equipment and lease-end services" that was "wholly derivative from and dependent on" primary market for office equipment and the lease-end service contracts); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 980-981 (N.D. Cal. 2010) (Xbox accessories and add-ons, which only worked on Xbox gaming systems, constituted a relevant aftermarket).

[10]  In *Queen City Pizza*, the Third Circuit found that, although pizza franchisees agreed to only purchase pizza supplies from their franchisor (Domino's), that did not constitute a separate, Domino's-only aftermarket because such supplies were reasonably interchangeable across manufacturers; the only reason franchisees were obligated to purchase Domino's pizza supplies is because they contractually agreed to do so. 124 F.3d 430, 440 (3d Cir. 1997). That is inherently different than here, where apps written for MacOS or iOS indisputably work ***only*** on those respective OSes, and consumers do not agree to purchase only Apple-developed apps. As for *Psystar*, Apple actively misleads with its description of that case (at 26). There, the court rejected a MacOS market, ***not*** a "MacOS software market." *See* 586 F. Supp. 2d at 1200. The court noted that MacOS competed against Windows and other OSes, *id.*, but clearly made no findings that apps developed for MacOS were reasonably interchangeable with Windows apps. Finally, *Harrison Aire*, as noted above, supports Blix's allegations, not refutes them.

Mail Client Market. In making this argument, however, Apple once again commits the error of mistaking complements and substitutes. Only the latter are included in a single market.

As the Complaint alleges, a mail client is useless without an email service it can use to send/receive emails. *See* FAC ¶ 158. The Complaint quotes Apple itself for this fact, where it noted that mail client apps can connect to multiple different email services for emailing purposes, including, *inter alia*, Gmail and Yahoo, which are "web-based email software." *Id.*

Once again, the Supreme Court has already weighed in on market definition in such situations. Where a product, such as a mail client, is "functionally linked" to another product, such as an email service, but is "useless without the other [product]," they are in separate product markets for antitrust purposes. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 19 n.30 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ("We have often found arrangements involving functionally linked products ***at least one of which is useless without the other*** to be prohibited tying devices.") (emphasis added). It would be "economic nonsense" to include these two separate types of product in the same relevant market. *Am. Express*, 138 S. Ct. at 2295-96.

To the extent Apple nevertheless argues that web-based email software has some mail client-like functionality and should be included in the same relevant market, that argument proceeds by ignoring the complaint's non-conclusory fact allegations and reasonable inferences. Mail clients have dramatically broader functionality than web-based email interfaces, and can be operated offline, whereas webmail interfaces can only be operated online. FAC ¶¶ 153, 155. Consumers of mail clients desire and need that added functionality, which is why they consume those products rather than use stock web interfaces. *Id.* To the extent Apple believes otherwise, its disagreement is factual in nature and improper for a motion to dismiss. *See, e.g., Broadcom*, 501

F.3d at 315 (finding that complaint adequately alleged market definition despite defendant's arguments that other technologies should be included in the market).

### 3. Apple confuses allegations regarding its monopoly power over MacOS apps with relevant market definition

Apple's final relevant market argument (at 28) confuses allegations about Apple's monopoly power over MacOS and iOS applications with relevant market definition. To be clear, Blix concedes that MacOS and iOS mail client apps downloaded through means other than the App Store are part of the Mail Client Markets. However, the Complaint alleges that such downloads are *de minimis* since (a) iOS users can *only* obtain apps through the iOS App Store, and (b) MacOS users can practically only do so through the Mac App Store. FAC ¶¶ 77, 138-52. The allegation Apple cites in support of this argument (FAC ¶ 142) is from a section of the Complaint detailing Apple's efforts to preclude any other distribution channel than its App Stores, which has led to unchecked monopoly power. *Id.* ¶¶ 135-152; *see also* Section II.B, *infra*.

### B. Apple, as the Purveyor of the App Stores, Has Absolute Dominance Over MacOS and iOS Apps

"Monopoly power is defined as 'the power to control prices *or exclude competition*.'" *Harrison Aire*, 423 F.3d at 380 (emphasis added) (quoting *du Pont*, 351 U.S. at 391). "Such power may be proven through evidence of specific conduct undertaken by the defendant that indicates he has the power to affect price or exclude competition." *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003).

A defendant who dominates a market's distribution channels has monopoly power. *See, e.g.*, *Microsoft*, 253 F.3d at 70 ("by closing to rivals a substantial percentage of the available opportunities for browser distribution, Microsoft managed to preserve its monopoly in the market for operating systems"); *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1346 (9th Cir. 1984) (reversing a district court's judgment n.o.v. because there was evidence of monopoly power over

a product when the defendant had "control of distribution channels"); *see also Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 316 (4th Cir. 2007) (holding that a plaintiff could sue a defendant for "foreclos[ing] the distribution channels for [the plaintiff's] applications").

The Complaint alleges Apple has "100% control" over which applications are permitted on the respective App Stores, FAC ¶¶ 139, 273, and that the App Stores are the dominant distribution channels for each OS's apps. *Id.* ¶¶ 18, 77, 138-52. This control gives Apple the "ability to exclude competition in each Mail Client Market, *id.* ¶¶ 235, 270, because software developers have no actual alternatives to the iOS App Store, *id.* ¶ 77, and no practical alternatives to the MacOS App Store. *Id.* ¶¶ 139-149. Because "a significant portion of users are unwilling to disregard Apple's security warnings" and other efforts to dissuade non-Mac App Store downloads/purchases, "the majority of users do not and cannot obtain MacOS applications except through the MacOS App Store." *Id.* ¶ 150. Apple does not contest the plausibility or accuracy of these allegations.

Instead of addressing these allegations substantively, Apple contends (at 22) that "restricted output and supracompetitive prices" are supposedly the only forms of direct evidence of monopoly power. Nevertheless, Blix alleges both types of evidence. First, it is unquestioned Apple has literal power to exclude competitors from its App Stores—*i.e.*, restrict output. Next, Blix alleges that Apple prices its devices and default apps supracompetitively, which it sustains by "thwarting competition from cross-platform interoperable services" in the App Stores to "reduce user demand for Apple's ecosystems." FAC ¶ 290; *see also id.* ¶¶ 292, 259, 261. Blix thus meets Apple's own standard on both counts and Apple offers no substantive response.

Apple also ignores that pricing inquiries focus on whether the defendant has "the *power* to extract supracompetitive prices," not whether it has actually done so. *Broadcom*, 501 F.3d at 315

(emphasis added). For both App Stores, Blix alleges—and Apple does not contest—that Apple retains the "power to impose[] [] monetary requirements on [] app developers that allow it to control price and output for [] applications." FAC ¶ 139. This power comes from its undisputed control over both stores, and by extension, its chokehold over all competing iOS and MacOS software apps. This creates a high barrier to entry as Apple has veto power over all competition. *See, e.g.*, *id.* ¶ 242 ("No competitors can enter the MacOS Email Client Market and effectively compete with Apple without access to the MacOS App Store…."). This in turn constitutes further evidence that Apple has "restricted output," which Apple concedes is evidence of monopoly power.

To the extent Apple contends that Blix must also allege Apple's market share for mail client apps in order to establish monopoly power, that is also incorrect. "Monopoly power can be demonstrated with *either* direct evidence … or with structural evidence of a monopolized market," only the latter of which includes allegations of market share. *Harrison Aire*, 423 F.3d at 381. Unlike Apple, none of the defendants in Apple's cited cases (at 23-24) had veto power over ***all*** market competition. *See*, *e.g.*, *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998) (electricity provider was "sole provider … to certain customers," but there were no allegations it had ability to exclude competitors); *Abid v. Google LLC*, 2018 WL 3458546, at *5 (N.D. Cal. July 18, 2018) (pro se plaintiff failed to oppose motion to dismiss, and, in any event, alleged that Google did not have power to exclude competition from competing online advertisers).[11]

---

[11]     Apple's other case citations regarding market share were all decided at summary judgment or after, and therefore inapposite at the motion to dismiss phase. *See Harrison Aire*, 423 F.3d at 381-85 (summary judgment based on an extensive factual review); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201 (3d Cir. 1992) (reviewing judgment n.o.v. after trial); *Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pennsylvania,* 745 F.2d 248, 252 (3d Cir. 1984) (summary judgment). By contrast, the Third Circuit, in *Broadcom*, explicitly held that allegations

### C.   Apple's Efforts to Dominate the Mail Client Markets Constitute Illegal Anticompetitive Conduct

Apple's telling approach to its arguments regarding anticompetitive conduct is to try to reframe everything as a unilateral refusal to deal. Apple's closed garden approach to its devices, however, does not exempt it from permitting real competition for apps on those devices, and does not make every complaint about its anticompetitive conduct akin to a refusal to deal.

Put simply, Apple's exclusionary and predatory conduct is illegal under multiple, well-accepted liability theories. It is anticompetitive to exclude rivals from key distribution channels into a market, deny access to an essential facility, exclude rivals based on monopoly power over locked-in consumers, and leverage monopoly power from one market into another. It is also, of course, illegal to refuse to deal with competitors under the facts of this case.

### 1.   Abusing power over key distribution channels in order to maintain monopoly power is anticompetitive

Far from contesting its control over the key distribution channels into each Mail Client Market (the App Stores), Apple takes the opposite tack and argues that it may do anything it wants with those channels. *See* Mot. at 32, 35. The law is clear, however, that using one's power over a necessary distribution channel to exclude rivals from the market that channel supplies is illegal.

For example, in *LePage's Inc. v. 3M*, the Third Circuit found that bundling practices that "cut [the plaintiff] off from key retail pipelines necessary to permit it to compete profitably" violated the Sherman Act. 324 F.3d 141, 160 (3d Cir. 2003) (en banc). Similarly, in *Microsoft*, the

---

a defendant "had the power to extract supracompetitive prices," "possessed a dominant market share," "and [that] the market had entry barriers" plausibly established "monopoly power." 501 F.3d at 315. On this procedural posture, Blix's allegations more than suffice. *See, e.g.*, FAC ¶¶ 22, 261, (alleging that Apple "artificially set and increased prices and decreased output for applications," "capture[d] additional market share for its own offerings," and "raised significant barriers to entry").

D.C. Circuit held that exclusive deals locking up all of the primary distributors for OSes was similarly anticompetitive. *Microsoft*, 253 F.3d at 70-71. As the *LePage's* Court later observed, "[t]he Microsoft court treated exclusionary conduct by a monopolist as ***more likely*** to be anticompetitive than ordinary § 1 exclusionary conduct." *LePage's*, 324 F.3d at 159 (emphasis added).

The Complaint indisputably alleges that Apple abused its power over the respective App Stores to harm competition (and Blix personally), first by locking BlueMail out of the MacOS Mail Client Market. FAC ¶¶ 239-49, 271-80, 283. Apple also designed the iOS App Store's search algorithm so the highest-quality apps are essentially invisible to consumers looking for alternatives to Apple's default apps. *Id.* ¶¶ 106, 113, 120-21, 278. This was effectively the same as locking those competitors out of the bulk of the markets. *Id.* ¶¶ 279, 281. Therefore, the Complaint plausibly alleges that Apple anticompetitively abused distribution channel access. *See Microsoft*, 253 F.3d at 70-71 (illegal to preserve monopoly power by foreclosing competitors' "opportunities for browser [application] distribution"); *Novell*, 505 F.3d at 316 (anticompetitive for a defendant to "foreclose the distribution channels for [the plaintiff's] applications"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) (anticompetitive for manufacturer to impose exclusivity on third-party dealers because it is "impracticable for a [competing] manufacturer" to circumvent dealers' distribution networks); *LePage's*, 324 F.3d at 157–58.

## 2.     Denying access to an essential facility is anticompetitive conduct

In reply to the previous Section, Apple will likely argue that it gets to decide whatever it wants with respect to its "ecosystem," including the distribution channels into that ecosystem. But that is not how the law works, as described above. Furthermore, for all its sound and fury in stating "This is mine; I can do whatever I want," if the economic reality is that apps constitute their own

relevant market (as the Complaint plausibly alleges), Apple may not erect itself as gatekeeper over the essential pathway into that market without facing antitrust scrutiny.

This "essential facilities" doctrine is, contrary to Apple's insinuations (at 33-34), alive and well in this Circuit. The elements include "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir. 1996); *see also Kerwin v. Parx Casino*, 2019 WL 1098949, at *7-8 (E.D. Pa. Mar. 8, 2019) (assessing essential facilities claim, although dismissing for failure to allege key element). "To be essential, a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants." *In re Air Passenger Comput. Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1451 (C.D. Cal. 1988), *aff'd sub nom. Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991) (internal citations omitted).

Through its power, Apple has made the respective App Stores a necessary channel for distributing apps to consumers using Macs or iPhones. The iOS App Store is the only way to obtain apps for iOS devices, and Apple has made it so the Mac App Store is the only real choice for Mac apps. FAC ¶¶ 79-80, 139-152. App developers cannot replicate these marketplaces. FAC ¶¶ 85, 140. There is thus no real question on this motion that Apple controls an essential facility for each Mail Client Market. There is also no real dispute that it is feasible for Apple to provide its competitors access to its facility in a legal, competitive way.

As the Complaint alleges, Apple has nevertheless denied competitors (including Blix) access to these essential facilities for anticompetitive purposes. FAC ¶¶ 251-54, 283-86. This clearly qualifies as illegal conduct. *See*, *e.g.*, *Apartment Source of Penn., L.P. v. Philadelphia*

*Newspapers, Inc.*, 1999 WL 191649 (E.D. Pa. 1999) (upholding claim on summary judgment that dominant city newspapers were essential facility and anticompetitively refused to advertise plaintiff's apartment locator service because they ran their own competing service); *Xtreme Caged Combat v. Cage Fury Fighting Championships*, 2015 WL 3444274, at *8 (E.D. Pa. May 29, 2015) ("Under the 'essential facilities' or 'bottleneck' doctrine, 'a business or group of businesses which controls a scarce facility has an obligation to give competitors reasonable access to it.") (internal citations omitted).

It is no defense for Apple to say that, after it was sued for antitrust violations, it let BlueMail back onto the MacOS App Store. Apple did deny BlueMail access to its essential facilities in the past after first allowing allow that app onto the Stores and it unquestionably has the power—and apparent willingness—to do so again. FAC ¶¶ 201-02, 264, 295. There is no question then that Blix has alleged and thus properly alleged past damages. Furthermore, a Damoclean sword hanging over Blix's (and competition's) head clearly establishes standing to sue for future injunctive relief under an essential facilities theory. *See*, *e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 310 (3d Cir. 2008) ("[V]oluntary cessation does not moot a case or controversy unless subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur….") (internal citation omitted).

### 3. Changing aftermarket policies over locked-in consumers in order to maintain monopoly power is illegal

Yet another well-accepted theory under which Apple's conduct is anticompetitive is the *Kodak* aftermarket monopolization doctrine. Pursuant to that doctrine, if a defendant lures consumers into an initial purchase such that they are "locked-in" to a subsequent aftermarket based on that purchase, changes in policies following lock-in to dominate the aftermarket constitute illegal, anticompetitive conduct. *See generally Kodak*, 504 U.S. 451.

The Complaint alleges more than sufficient facts to support this theory. First, regarding lock-in, the Complaint alleges, *inter alia*, that:  Mac and iPhone consumers typically make a long-term purchase decision with high, after-the-fact switching costs, FAC ¶ 76; once they choose their computing device, purchasers cannot choose or use apps written for any other OS, *id.* ¶ 74; Apple actively prevents purchasers from using any other distribution channel than the OS-specific App Stores, *id.* ¶ 79; Apple purchasers have an informational disadvantage regarding the total cost of their device, because Apple advertises robust markets for apps by a variety of third party developers, but actively works behind the scenes to negate the competitiveness of those markets, *id.* ¶¶ 19, 72-73, 292. These are the key hallmarks of "lock-in" under a *Kodak*-style aftermarket monopoly claim. *See Kodak*, 504 U.S. at 477-478 (noting that customers were "locked-in" where they made an expensive primary purchase (of a copier machine) and faced "high information costs" regarding subsequent prices and choices between proprietary repair parts and services).

Apple's efforts to undermine competition in the Mail Client Markets satisfies the other key requirement for a *Kodak*-style claim. Although it—quite successfully—advertises the supposedly diverse and competitive app markets on its devices, Apple in fact hinders competition to its own advantage and power at every step. FAC ¶ 70. Thus, consumers who have been locked-in to Apple devices due to its misleading claims they will have real choice between many apps are actually subject to its undisclosed whims with respect to which apps will appear for those consumers. This is anticompetitive, because it artificially reduces choice for locked-in consumers and prevents real competition with Apple's default apps. *See*, *e.g.*, *Kodak*, 504 U.S. at 477-479 (changes in policy for locked-in consumers for purposes of maintaining monopoly power were illegal); *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 399 (3d Cir. 2016) ("[L]iability may exist in an aftermarket where the seller can exploit customers who have already purchased the equipment and

cannot easily shift to another brand.");[12] *Ward v. Apple Inc.*, 2017 WL 1075049, at *7 (N.D. Cal. Mar. 22, 2017) (ruling that consumers who, by virtue of iPhone purchase, were locked in to particular cell phone network, had raised question of fact as to antitrust liability).

### 4. Leveraging monopoly power via anticompetitive acts is illegal

Under a monopoly leveraging theory, it is illegal if "a party has a monopoly in one area, uses unlawful acts to leverage that monopoly into another area, and achieves or is likely to achieve that second monopoly." *Simon & Simon, PC v. Align Tech., Inc.*, 2019 WL 5191068, at *9 (D. Del. Oct. 15, 2019) (quoting *IQVIA Inc. v. Veeva Sys., Inc.*, 2018 WL 4815547, at *4 (D.N.J. Oct. 3, 2018)). Apple does not contest that Blix plausibly alleges it has monopoly power in MacOS and iOS application distribution. *See* Mot. at 21 n.13. Blix also plausibly alleges Apple possesses monopoly power in the separate Mail Client Markets. *See* Section II.A, *supra*. As discussed herein, Apple also has committed anticompetitive acts under multiple different theories. Accordingly, Blix has plausibly alleged monopoly leveraging. *See IQVIA*, 2018 WL 4815547, at *4 (denying motion to dismiss where plaintiff alleged all elements of monopoly leveraging claim).

### 5. Refusing to deal with competitors under the facts alleged in the Complaint is illegal

For the above reasons, Apple's conduct fits into multiple, interlocking categories that courts have routinely found anticompetitive. As a result, Apple is wrong to try to argue (at 29-34) that the only applicable liability theory in this case is the refusal to deal doctrine. *See Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir.), *cert. denied*, 139 S. Ct. 211 (2018) (courts view anticompetitive conduct "as a whole rather than considering each aspect in isolation").

---

[12]   *See also id.* at 404 ("[W]e interpret *Kodak* as standing for two propositions: (1) that firms operating in a competitive primary market are not thereby categorically insulated from antitrust liability for their conduct in related aftermarkets; and (2) that exploitation of locked-in customers is one theory that courts will recognize to justify such liability.").

Even under Apple's constricted framing, however, the Complaint plausibly alleges anticompetitive conduct. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the Supreme Court enumerated several factors to consider when assessing whether a monopolist's unilateral refusal to deal is anticompetitive. "[N]o factor is always decisive," and thus courts consider the *Aspen Skiing* factors "as a whole" with "case-by-case assessments" of the facts alleged. *Viamedia, Inc. v. Comcast Corp.*, 2020 WL 879396, at *21 (7th Cir. Feb. 24, 2020). "Balancing anticompetitive effects [of refusals to deal] against hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings…." *Id.* at *22. A "plaintiff [] alleg[ing] conduct similar to that in *Aspen Skiing*" thus makes "a *prima facie* case of monopolization" sufficient to survive a motion to dismiss. *Id.* Blix meets this pleading burden.

*First*, contrary to Apple's contentions (at 31), Blix alleges "an abrupt termination of a business relationship as in *Aspen Skiing*." Apple published Blix's BlueMail app on the MacOS App Store in early May 2019, where it quickly became "one of the top-ranked email clients for MacOS." FAC ¶¶ 168-69. One month later, only days after Apple announced its infringing "Sign In With Apple" service, Apple removed BlueMail from the MacOS App Store." *Id.* ¶ 189. Apple's "decision to cease participation in a cooperative venture" carries "significance." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004); *see also Broadcom*, 501 F.3d at 316 (3d Cir. 2007) (distinguishing *Trinko* on this ground). That it earlier listed BlueMail in both App Stores "supports a presumption that the joint arrangement was efficient and profitable," and thus that Apple's later decision to remove BlueMail from the MacOS App Store "disturb[ed] optimal distribution patterns." *Viamedia*, 2020 WL 879396, at *20 (quoting *Aspen Skiing*, 472 U.S. at 604 n.31). This case is thus nothing like "alleged insufficient assistance in the provision of service to rivals" (Mot. at 31) or the right use "infrastructure … uniquely suited

32

to service [its] customers" (Mot. at 32), because Apple "voluntarily engaged in a course of dealing with its rivals" before breaking off that dealing. *Trinko*, 504 U.S. at 407, 409; *cf. In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (cited Mot. at 31) (affirming dismissal because the defendant "did not terminate any prior course of dealing").

*Second*, Blix alleged that similarly-situated device manufacturers have not engaged in similar conduct to Apple, *see*, *e.g.*, FAC ¶¶ 79, 95 (no similar conduct in the Android or Windows app marketplaces), and that Apple has allowed only "low-quality" apps full visibility and access to the App Stores, in order "to give consumers the illusion that only low-quality applications were available as substitutes." *Id.* ¶¶ 162, 163. Under *Aspen Skiing*, this shows that it is not only feasible to allow real competition for apps, but also that Apple's unique refusal against its highest-quality competitors is anticompetitive in nature and effect. *See* 472 U.S. at 603 (defendant's decision to stop offering ski tickets to competitor was anticompetitive because "tickets are used in other [markets] which apparently are competitive"); *Viamedia*, 2020 WL 879396, at *20 (same).

*Third*, Blix alleges that Apple "decided to forgo profitable transactions" when it removed BlueMail from the MacOS App Store. *Aspen Skiing*, 472 U.S. at 608; *accord* FAC ¶ 255. Allegations establishing this factor include those that show dealing with competitors "would have entailed no cost to [Apple] itself, would have provided it with immediate benefits, and would have satisfied its potential customers." 472 U.S. at 610. This is exactly what the Complaint alleges, FAC ¶ 255, including that Apple's customers were *less* satisfied due to their inability to obtain BlueMail on their Mac devices. *Id.* ¶¶ 112, 243; *see also, e.g.*, *Viamedia*, 2020 WL 879396, at *21 (holding that a refusal to deal violated § 2 in light of "[u]nhappy customers").

At bare minimum, the reasonable inference is that Apple decided to forego profitable transactions. Because of BlueMail's success in the Android market, it is "appropriate to infer" that

listing BlueMail on app stores without engaging in anticompetitive conduct "satisf[ies] consumer demand in free competitive markets." *Aspen Skiing*, 472 U.S. at 603 (holding that this inference is appropriate at the pleading stage as a matter of law). And, under *Trinko*, any "unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end." 540 U.S. at 409. Like *Aspen Skiing*, Apple "refus[ed] to permit Blix to distribute BlueMail, or other distinct software … even if Blix provides full price for distribution of the applications or any in-app purchases." FAC ¶ 253; *see also Trinko*, 540 U.S. at 409 ("In *Aspen Skiing*, the defendant turned down a proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher.").

Apple's response to these allegations are improper at the motion to dismiss phase and, in any event, incorrect. First, Apple wrongly asserts that Blix has to offer "proof" now that Apple's decision to exclude BlueMail from the MacOS App Store is "irrational but for its anticompetitive effect." Mot. at 32 (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013)). This, however, puts the cart before the horse. Once, as here, a plaintiff has "successfully establish[ed] a prima facie case [of] … anticompetitive effect, then [the defendant] may offer a 'procompetitive justification." *Viamedia*, 2020 WL 879396, at *25 (quoting *Microsoft*, 253 F.3d at 59). Courts do not resolve these competing assertions "on the pleadings, at least where the plaintiff has alleged conduct similar to that in *Aspen Skiing*." *Id.* at *22. That is because "balancing anticompetitive effects against hypothesized justifications depends on evidence." *Id.* Accordingly, a defendant's argument "that its refusal to deal was economically justified [] depends upon a question of fact and therefore is not cognizable in support of a motion to dismiss." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005).

Apple's cited cases (at 32-33) were decided long after the pleadings; indeed, mostly after trial. [13] Furthermore, the Complaint directly refutes Apple's supposed business reasons for removing BlueMail from the MacOS App Store—*i.e.*, that the incredibly popular mail client was "spam" or redundant with an already-removed app. Those never made any sense, and Apple dropped its objections shortly before filing its motion to dismiss. *See generally* FAC ¶¶ 168-197. Accordingly, even to the extent the Court considers Apple's supposed business justifications, those contentions must be viewed in light of the allegations and all reasonable inferences afforded to Blix, which are that Apple's refusal was anticompetitive in nature and effect.

## III.    Apple Cannot Meet Its Burden On Reply

As explained above, Apple's motion failed to carry Apple's burden.  Apple cannot remedy that failure in its reply brief; parties "are not permitted to reserve material for a reply brief that could and should have been included in their opening brief."  *Fed. Election Comm'n v. O'Donnell*, 209 F. Supp. 3d 727, 737 (D. Del. 2016); *LG Display Co. v. AU Optronics Corp.*, 2010 WL 5463305, at *4 (D. Del. Dec. 29, 2010) (same); D. Del. L.R. 7.1.3(c)(2) (party "shall not reserve material for the reply brief which should have been included in a full and fair opening brief.").

## CONCLUSION

For the foregoing reasons, the Court should deny Apple's Motion to Dismiss in its entirety.

---

[13]    *See Viamedia*, 2020 WL 879396, at *22 (distinguishing these cases because *Aspen Skiing* "was reviewing a jury verdict," *Novell* was "based on an eight-week trial," and *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986), followed a six-week trial); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1174 (9th Cir. 2016) (summary judgment).

Respectfully submitted,

*/s/ David M. Fry*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Plaintiff*

OF COUNSEL:
Steven C. Cherny
Stephen R. Neuwirth
Patrick D. Curran
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, New York 10010
(212) 849-7000

Adam Wolfson
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
 865 S Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Dated: March 11, 2020

**Appendix A**

| Claim 17: "Representative" | Claim 1: Multiple Unique Limitations |
|---|---|
| A method of performing **controlled pre-interaction**, between a first party and at least one second party, said method comprises: | A method of performing **controlled reciprocating communication, wherein said controlled reciprocating communication comprises an incoming and outgoing communication,** between a first party and at least one second party, said method comprises: |
| Providing at least one private interaction address of said first party; | Providing at least one private interaction address of said first party; |
| Defining at least one manageable public interaction address for said first party; | Defining at least one manageable public interaction address for said first party; |
| Forming a record, wherein said manageable public interaction address is associated with said private interaction address for said first party; | Forming a record, wherein said manageable public interaction address is associated with said private interaction address for said first party; |
| | **Receiving an incoming communication, said incoming communication comprises a communication from said second party to said first party; wherein said incoming communication is initiated by said second party to said manageable public interaction address of said first party;** |
| | **Identifying that said incoming communication was received to said manageable public interaction address;** |
| | **Accessing said record and performing at least one step selected from the group consisting of:** |
| | **Determining said respective identity associated with said manageable public interaction address identified in said incoming communication, and Determining said private interaction address of said first party associated at said record with said manageable public interaction address identified in said incoming communication;** |
| Said method is characterized by: | Said method is characterized by: |
| Generating a reverse list, wherein an interaction address of said second party is associated at least with said manageable public interaction address of said first party; | Generating at least one reverse list entry, wherein an interaction address of said second party is associated at least with said manageable public interaction address of said first party; |
| Performing at least one pre-interaction act, said pre-interaction act comprises: Accessing said reverse list; Identifying said interaction address of said second party in said reverse list | Performing a pre-interaction act, said pre-interaction act comprises: Accessing said reverse list; Identifying said interaction address of said second party in said reverse list; Determining that said manageable public interaction address of said first party is associated at said reverse list, with said interaction address of said second party; |
| Determining that said manageable public interaction address of said first party is associated at said reverse list, with said interaction address of said second party; wherein said interaction address of said second party is obtainable from a third party or external services provider, wherein said at least one reverse list entry is formed by synchronizing said interaction address of | **Performing an outgoing communication, said outgoing communication comprises a communication from said first party to said second party, said outgoing communication is initiated by said first party;** |

| Claim 17: "Representative" | Claim 1: Multiple Unique Limitations |
|---|---|
| said second party with said manageable public interaction address. | |
| | **Said outgoing communication is characterized by that said outgoing communication, to said interaction address of said second party, is performed from said manageable public interaction address of said first party;** |
| | **Wherein upon performing said outgoing communication, said second party is exposed merely to said manageable public interaction address of said first party;** Wherein said interaction address of said second party is obtainable from a third party or external services provider, wherein said at least one reverse list entry is formed by synchronizing said interaction address of said second party with said manageable public interaction address. |

**Appendix B**

| Claim Language (’284 patent) | Apple’s Oversimplified Description (Mot. at 20) | What Apple Ignores |
| --- | --- | --- |
| 3. The method of performing controlled reciprocating communication as set forth in claim 2, wherein said step of determining further comprises determining that said interaction address selected from said second party is associated, at said reverse list, with said respective identity of said first party. | “requires the second party address also be ‘associated’ with the first’s *identity*” | Claim 3 does not simply require association between the second party’s address and the first party’s identity. Rather, this claim recites a machine-implemented step with a particular data structure. Claim 3 is necessarily rooted in communications network technology. |
| 5. The method of performing controlled reciprocating communication, as set forth in claim 1, wherein said interaction address selected from the group consisting of: a line telephone number, line facsimile number, cellular/mobile phone number, instant messaging (IM) name, e-mail address, presence screen name, service handle, universal resource identifier (URI), universal resource name (URN), universal resource locator (URL), extensive resource identifier (XRI), SIP identifier, any type of user identifier for sharing or and any type of user identifier communication. | “requires addresses to be in a conventional form like a phone number or email” | Claim 5 does not simply require addresses to be in a “conventional” form. The claim language adds particular details about particular forms of communication. This claim is directed to types of communications networks; it is plainly not abstract. |
| 6. The method of performing controlled reciprocating communication as set forth in claim 1, wherein said interaction address is a partial interaction address, comprising a portion of said string of characters or a sub-string thereof or wherein said string is defined as including at least one wildcard, representing more than one participant having identical portions in their interaction addresses. | “requires ‘wildcards’ to cover multiple individuals with related addresses” | Claim 6 does not simply require a “wildcard.” The claim language on its face plainly focuses on a “partial interaction address,” and a “wildcard” is simply an option for one or more characters in that partial interaction address. |
| 11. The method of performing controlled reciprocating communication, as set forth in claim 1, wherein said interaction address of said second party is unavailable to said first party, wherein at least a portion of said reverse list entry is confidential to said first party. | “requires the ‘reverse list’ to contain some confidential information” | Claim 11 does not simply require that the reverse list contains some confidential information. The claim further limits independent claim 1 by requiring that the interaction address of the second party is *unavailable* to the first party. |
| 13. The method of performing controlled reciprocating communication, as set forth in claim 1, further comprises performing at least one predefined rule, said rule comprises at least one instruction for a predefined response, wherein said response selected from the group consisting of: rejecting a communication; recording a communication; converting a communication to another format; forwarding a communication to said private interaction address of said first party. | “require[s] responses be performed by ‘at least one predefined rule’” | Claim 13 does not simply require that responses are performed by “at least one predefined rule.” This claim is directed to automated communication using rules. |
| 29. The system for performing a controlled pre-interaction, as set forth in claim 27, further comprises a networking terminal configured to receive said incoming communication, wherein said receiving of said incoming communication is performed by at | “adds generic, abstract functional requirements of | Claim 29 does not simply add “generic, abstract functional requirements” of the network terminal. The claim further limits the system of claim 27 by requiring a “network terminal.” The term “network |

| Claim Language ('284 patent) | Apple's Oversimplified Description (Mot. at 20) | What Apple Ignores |
|---|---|---|
| least one networking terminal selected from the group consisting of: (a) a networking terminal configured for receiving said incoming communication from said second party to said first party; wherein said incoming communication is initiated by said second party to said manageable public interaction address of said first party; (b) a networking terminal configured identifying that said incoming communication was received to said manageable public interaction address; (c) a networking terminal configured accessing said record and determining said respective identity associated with said manageable public interaction address identified with said means of identifying. | the network terminal" | terminal" is not even recited in claim 27; the closest thing to it is "computer networking terminal," which is not even a required limitation in claim 27. *See* '284 Patent at 25:62-64, 25:66-26:1 ("at least one member selected from the group consisting of: a graphical user interface, input device and computer networking terminal . . ."). |