**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BLIX INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 19-1869-LPS |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| APPLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS FURTHER MOTION TO DISMISS
PLAINTIFF'S PATENT INFRINGEMENT CLAIM UNDER FED. R. CIV. P. 12(b)(6)**

OF COUNSEL:

Daniel G. Swanson
Jason C. Lo
Jennifer J. Rho
Raymond A. LaMagna
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Tel:  (213) 229-7000

Cynthia E. Richman
Amalia Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Tel:  (202) 995-8500

H. Mark Lyon
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
Tel:  (650) 849-5300

Chris Whittaker
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612
Tel:  (949) 451-3800

David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Defendant Apple Inc.*

Dated:  January 22, 2021
7012034 / 49651

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     NATURE AND STAGE OF THE PROCEEDINGS ......................................................... 1

II.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 1

III.   STATEMENT OF FACTS AND PATENT BACKGROUND ........................................ 2

IV.   LEGAL STANDARDS ................................................................................................... 3

V.    ARGUMENT .................................................................................................................... 4

       A.     Independent System Claim 27 of the '284 Patent Is Patent Ineligible ................. 5

       B.     Dependent Claims to Claim 17, and Parallel System Claims, Are Ineligible........ 7

       C.     Independent Claim 1 of the '284 Patent Is Patent Ineligible .............................. 11

       D.     The Asserted Dependent Claims to Claim 1 Also Are Patent Ineligible............. 14

VI.   CONCLUSION............................................................................................................... 20

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016)..................................................................................6, 14

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)..................................................................................... *passim*

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019)....................................................................................3

*Elec. Power Grp. v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)...................................................................................4

*Intellectual Ventures I LLC v. Capital One Bank*,
    792 F.3d 1363 (Fed. Cir. 2015)...................................................................................5

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017)...................................................................................4

*Intellectual Ventures I LLC v. Symantec Corp.*,
    234 F. Supp. 3d 601 (D. Del. 2017)....................................................................... *passim*

*Intellectual Ventures I LLC v. Symantec Corp.*,
    100 F. Supp. 3d 371 (D. Del. 2015)............................................................................5

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016)..............................................................................5, 13

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012)..................................................................................................14

*Mortg. Grader, Inc. v. First Choice Loan Servs.*,
    811 F.3d 1314 (Fed. Cir. 2016)..............................................................................5, 13

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)....................................................................................6

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)..................................................................................14

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
    793 F.3d 1306 (Fed. Cir. 2015)..............................................................................4, 14

*Walker Digital, LLC v. Google*,
   66 F. Supp. 3d 501 (D. Del. 2014)......................................................................................5, 13

**Statutes**

35 U.S.C. § 101 ...................................................................................................... *passim*

## I.     NATURE AND STAGE OF THE PROCEEDINGS

On November 30, 2020, the Court granted in part Apple's motion to dismiss, including by ruling that claim 17 of U.S. Patent 9,749,284 (the "'284 patent")[1] was drawn to patent-ineligible subject matter.  (*E.g.*, D.I. 42 at 15.)  The Court directed the parties to confer as to which other claims of the '284 patent Blix still asserts against Apple.  (D.I. 43, 47.)  Blix now purports to assert 26 claims of the '284 patent, nos. 1–5, 7–11, 13–15, 18, 21–24, 28–30, 33–37.[2]  Apple hereby moves to additionally dismiss each of those claims as patent ineligible.

## II.     INTRODUCTION AND SUMMARY OF ARGUMENT

The Court correctly found that claim 17 is directed to the abstract idea of using a proxy to facilitate anonymous communications, that it lacks any added inventive concept, and that it is patent ineligible.  Stripped of their verbose technical jargon, each of Blix's 26 other asserted patent claims merely recites the same age-old abstract idea—a routine process in human communication that can be easily performed by a human being using pen and paper.  And, like claim 17, these asserted claims do not add elements that convey any inventive concept, do not add any new or unconventional features, and do not solve a *technological* problem in the prior art.  Rather, each of them recites existing conventional elements and defines limitations by reference to the known art.  And in other cases, the dependent claims require little more than that the abstract idea be placed into use.  Of course, merely adding language to "do it on a computer" to otherwise ineligible abstract subject matter does not render it patent eligible.  Blix's patent infringement claim should therefore be dismissed entirely and with prejudice.

---

[1]  A copy of the '284 patent is attached as Exhibit 3 to Blix's Amended Complaint (D.I. 13).

[2]  Claims 11, 14, 15, 23, 24, and 35 were not identified in Blix's Amended Complaint (*see* D.I. 13, ¶ 207) and are thus newly added to this litigation by Blix.

### III.    STATEMENT OF FACTS AND PATENT BACKGROUND

As described in detail below, the additional claims challenged in this motion suffer from the same shortcomings that rendered claim 17 ineligible.  Those claims fall into three categories.

First, Blix now asserts a number of claims (nos. 18, and 21–24) that are dependent on claim 17 that the Court found ineligible.  Whereas claim 17 claimed the abstract idea of using a proxy to facilitate anonymous communications, these dependent claims merely describe scenarios in which the proxy is put to use or specify a conventional and obvious step one would usually take in facilitating communications.  For example, dependent claim 18 merely states that, after the proxy of claim 17 is setup, it is "not followed by a communication"—the proxy is established but never used.  And conversely, claim 22 covers that, when the method of claim 17 is performed, the system further performs a rule to use one of the addresses already described in claim 17:  the "private interaction address of said first party" (the user), the "public interaction address of said first party," or the "interaction address of second party."  Given that the point of an anonymous proxy facilitator is to forward communications to the "private" address of the party who wishes to remain anonymous, these limitations hardly disclose anything novel or inventive.  Similarly, claim 23 covers just adding "a communication preference" to one of those addresses, which again is something one would do anyway as a proxy (and has long been done).

Second, Blix asserts dependent claims (nos. 28–30, and 33–37) to independent claim 27.  But those claims merely recite *systems* for performing the "controlled pre-interaction" method of claim 17.  In other words, these claims merely state that generic elements such as a "user interface, input device, [or] computer networking terminal," "storage memory," and a "microprocessor" can be "configured" to perform the abstract tasks recited in claim 17.  *Id.* 25:59–26:28.  Thus, these claims restate the first category, but drafted in "system" form.

Third, Blix asserts independent claim 1 and asserted dependent claims 2–5, 7–11, and 13–15.  Claim 1 is nearly twice the length of claim 17, but upon closer reading, half of claim 1 merely mirrors the elements of ineligible claim 17 that prepare for the communication via a proxy, and the other half of claim 1 recites *using* that proxy (e.g., "receiving an incoming communication" and then "performing an outgoing communication").  *See* '284 patent at 21:31–47, 21:62–22:6.  Thus, similar to the other dependent claims described above, claim 1 recites the abstract proxy communication of claim 17, and then states that the proxy is actually put into use.

In sum, and as described in further detail below, all of the '284 patent claims rely on and include at their core the same abstract idea and elements this Court has held patent ineligible.

## IV.    LEGAL STANDARDS

A two-step "framework" distinguishes patents that claim ineligible abstract ideas under 35 U.S.C. § 101.  *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).  At step one, the Court determines if claims are directed to an abstract idea.  *Id.*  If so, at step two, the Court determines if the claims contain an "inventive concept" that "transform[s] the nature of the claim" to be patent-eligible.  *Id.*  To succeed, this concept must be "sufficient to ensure that the patent in practice amounts to significantly more than a patent" on just the abstract idea.  *Id.* at 217–18.  This concept must be more than "well-understood, routine, conventional activities."  *Id.* at 225.  "Simply appending conventional steps, specified at a high level of generality, [is] not *enough* to supply an inventive concept."  *Id.* at 222 (quotes omitted, emphasis in original).

Section 101 eligibility of patent claims can be decided on a motion to dismiss when, as here, "there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law."  *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019).

## V.     ARGUMENT

The Court already has held that the claim at the core of the '284 patent "is directed to the abstract idea of using a proxy to facilitate anonymous communications."  (D.I. 42 at 8.)  And the idea and elements of the "controlled pre-interaction" of claim 17 are at the heart of each of '284 patent's other asserted claims, each of which is directed to the same abstract idea.  Thus, the issue for the Court now is whether these claims include any material additional limitations, and if so, whether the ***additional*** limitations change that underlying idea (i.e., so that the claim is no longer directed to the abstract idea of using a proxy to facilitate anonymous communications) or add an "inventive concept" that "transforms" it to be patent-eligible.  *E.g.*, *Alice*, 573 U.S. at 217.

Tellingly, neither the '284 patent nor its file history ever identify what problem in the prior art is solved by its claims.  Rather, the claims recite (albeit in jargon) conventional elements typically used to relay messages by proxy.  *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017) (courts "evaluate the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed" to an abstract idea); *Intellectual Ventures I LLC v. Symantec*, 234 F. Supp. 3d 601, 607 (D. Del. 2017) (claims omit "concrete details that limit the claimed invention to a specific solution to [a] problem").

Nor do these claims "require a new source or type of information or new techniques for analyzing it."  *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016).  And none of the claims purport to "improve some existing technological process or solve some technological problem."  *See Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1334 (Fed. Cir. 2015).  Nor do the limitations, "taken individually or in combination" recite "specific programming, tailored software, or meaningful guidance for implementing the abstract combination."  *See Capital One*, 850 F.3d at 1342.

Rather, "entry of data into a computer database, the breakdown and organization of that entered data according to some criteria . . . and the transmission of information derived from that entered data . . . all through the use of conventional computer components such as a database and processors, operating in a conventional manner" do not "confer patent eligibility." *Intellectual Ventures I LLC v. Capital One Bank*, 792 F.3d 1363, 1371 (Fed. Cir. 2015) (quotes omitted).

In sum, while the asserted '284 patent claims may be drafted to sound technical, they are each directed to the same abstract idea as ineligible claim 17 and lack any added inventive concept. These claims are little different from those this Court and the Federal Circuit have held ineligible. *See, e.g.*, *Walker Digital, LLC v. Google*, 66 F. Supp. 3d 501, 504, 507–09 (D. Del. 2014) (claims to rules to "facilitate an exchange" between "two anonymous parties" ineligible); *Mortg. Grader, Inc. v. First Choice Loan Servs.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (relaying "anonymous" communications was abstract); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313–17 (Fed. Cir. 2016) (same for filtering and distributing email); *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 385, 391 (D. Del. 2015) (ruling same claims were abstract), *aff'd in part*, 838 F.3d 1307; D.I. 17 at 13 & n.10 (citing further cases).

## A.    Independent System Claim 27 of the '284 Patent Is Patent Ineligible

Independent **claim 27** is no more than ineligible claim 17 redrafted into *system* form. Claim 27 is directed to the same abstract idea as ineligible method claim 17 and shares *every* limitation of that ineligible claim (see blue below). Claim 27 only adds only generic, conventional system components like a "user interface," "input device," "networking terminal," "storage memory," and "microprocessor" (see green below). As the Supreme Court has held, however, neither redrafting as a system claim nor adding conventional, "purely functional and generic" hardware can lift a claim from the abstract. *Alice*, 573 U.S. at 226.

5

| | |
|---|---|
| 17.    A method of performing controlled pre-interaction, between a first party and at least one second party, said method comprises:<br>(a) providing at least one private interaction address of said first party;<br>(b) defining at least one manageable public interaction address for said first party;<br>(c) forming a record, wherein said manageable public interaction address is associated with said private inter-action address for said first party;<br>said method is characterized by:<br>(d) generating a reverse list, wherein an interaction address of said second party is associated at least with said manageable public interaction address of said first party;<br>(e) performing at least one pre-interaction act, said pre-interaction act comprises:<br>  (I)  accessing said reverse list;<br>  (II) identifying said interaction address of said second party in said reverse list;<br>(f) determining that said manageable public interaction address of said first party is associated, at said reverse list, with said interaction address of said second party; wherein said interaction address of said second party is obtainable from a third party or external services provider, wherein said at least one reverse list entry is formed by synchronizing said interaction address of said second party with said manageable public inter-action address. | 27.    A system for performing a controlled pre-interaction, between a first party and at least one second party, said system comprises:<br>(a) at least one member selected from the group consisting of: a graphical user interface, input device and computer networking terminal, configured for providing at least one private interaction address of said first party;<br>(b) at least one member selected from the group consisting of: a graphical user interface, input device and computer networking terminal, configured for defining at least one manageable public interaction address for said first party;<br>(c) at least one non-transitory computer storage memory configured for forming and storing a record, wherein said manageable public interaction address is associated with said private interaction address for said first party;<br>(d) at least one computer non-transitory storage memory configured for forming and storing at least one reverse list entry, wherein an interaction address of said second party is associated at least with said manageable public interaction address of said first party;<br>(e) at least one microprocessor configured for accessing said reverse list;<br>(f) at least one microprocessor configured for identifying said interaction address of said second party in said reverse list; and<br>(g) at least one microprocessor configured for determining whether said manageable public interaction address of said first party is associated, at said reverse list, with said interaction address of said second party;<br>wherein said interaction address of said second party is obtainable from a third party or external services provider, wherein said at least one reverse list entry is formed by synchronizing said interaction address of said second party with said manageable public interaction address. |

Where, as here, "the system claims recite a handful of generic computer components configured to implement the same [abstract] idea" then "they too are patent ineligible under § 101." *Alice*, 573 U.S. at 226–27. Here, claim 27 as shown above describes the system "in purely functional terms" with "tangible components" merely "a conduit for the abstract idea." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016); *see also Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) (claims "written in largely

functional terms" were abstract); *Symantec*, 234 F. Supp. 3d at 607 ("The claims simply rely on functional language . . . ."). Claim 27 is thus ineligible for the same reason as claim 17. (*See* D.I. 42 at 8; D.I. 17 at 14 (addressing elements shared with claim 17).)

### B. Dependent Claims to Claim 17, and Parallel System Claims, Are Ineligible

Blix now asserts five dependent claims of claim 17 (nos. 18, 21–24) and eight dependent claims from parallel system claim 27 (nos. 28–30, 33–37). But none of these claims add inventive concepts or change the ineligible abstract idea to which claims 17 and 27 are directed.[3]

**Claims 18 and 30** depend from method claim 17 and system claim 27 respectively, and each adds the same limitation that the pre-interaction "is not followed by a communication." '284 patent at 24:60–61, 26:58–59. That is, the claimed setup work is done, but for whatever reason, the anonymous communication never occurs. If setting up a proxy for anonymous communication per claim 17 is not patent-eligible, then it cannot be that setting up a proxy for communication and then not using it somehow *is* patent eligible. In the real-world terms the Court cited (D.I. 42 at 8), a prospective buyer could decide not to call a seller's agent, or a prospective tenant might never email a landlord. A failure to communicate is not an "inventive concept" and does not here change the underlying abstract idea or elevate it to eligibility.

**Claims 21 and 33**—this pair of dependent claims take the same idea as claims 17 and 27, but adds a "rule" requiring a "predefined response" of "recording a communication; converting a communication to another format; [or] forwarding a communication to said private interaction

---

[3]  For each pair of claims below, the system claims that depend from claim 27 (e.g., claims 33–35, 37) each contain the same added limitation as their method counterpart (e.g., claims 21–24), except they also add "a microprocessor" or "memory" "configured" to perform the added limitation. These "purely functional and generic" hardware components cannot, of course, lift a claim from the abstract, for the reason discussed above. *Alice*, 573 U.S. at 226.

address of said first party." '284 patent at 25:7–13, 27:5–10.[4]  Parsing through the jargon,[5] these dependent claims do little to limit the scope of the independent claims beyond requiring that the proxy system of claim 17 be actually *put into use*.  That is, if the proxy were pressed into service to forward a message to a private address, the initial message would likely be "recorded" (for how else can it be forwarded?), likely "converted" to another format (from the original message to the one that is received at the private address), and also likely "forwarded" (from the public address to the private one).  Given the Court's ruling as to Claim 17, claims that simply require that the proxy be placed into service cannot be said to add "inventive concepts."  After all, if ineligible subject matter can transform into being eligible simply by adding a limitation to "do" or "carry out" the ineligible subject matter, Section 101 would lose all meaning.

    **Claims 22 and 34**—this pair of claims also is directed to the same idea as claim 17 and covers requiring that the public or private addresses identified in claim 17 be used in some way.  Specifically, the claims add "performing at least one predefined rule" with respect to the user's "private interaction address," a user's "public interaction address," or the "address" of a "second" party with whom the user will communicate.  '284 patent at 25:15–22, 27:13–21.  Here too, the claims' jargon ("performing . . . predefined rule") is just a confusing way of saying that, in response to a message, the system should do something (and it does not matter what) with the private, public, or second-party address.  Of course, if the ineligible proxy method of claim 17

---

[4]  An "interaction address," although sounding technical, is defined in the patent as just a phone number, email address, or other conventional address.  '284 patent at 2:1–26.  Naturally, a "private interaction address" is one that the user wishes to keep private or only "controllably" (i.e., selectively) disclose, while a "public interaction address" is one "the user may distribute or publish" to others.  *Id*. at 2:21–26.

[5]  As an initial matter, the claim's "rule" and "predefined response" jargon is merely a confusing way of saying that the proxy is configured such that "when one thing happens (i.e., a message is received), another thing (i.e., recording a communication, converting the communication format, or forwarding a communication) should happen as result."

were actually used, this "rule" necessarily would be performed.  For example, requiring that mail be forwarded to the private address, forwarding only messages from addresses "on the list" defined in claim 17, or allowing only contacts that meet certain criteria to be "on the list," etc. would all appear to satisfy this claim.  At bottom, these claims thus simply cover carrying out claim 17 in the most obvious way possible.  And, per the above, simply saying "now do it" or "add a rule" cannot transform a claim from ineligible and abstract to non-abstract and inventive.

  **Claims 23 and 35**—Ineligible claim 17 broadly described using a proxy to facilitate anonymous communications by forwarding to a private address communications sent to a public one.  Claims 23 and 35 describe the entirely unoriginal concept that a user of this proxy system might want to designate *how* the communications should be sent.  Stated in terms of the patent's jargon, claims 23 and 35 merely require adding a "communication preference" or "alternative" communication preference with respect to the private, public, or "second party" addresses.  '284 patent at 25:25–34, 27:24–28:2.  Of course, it is hardly new or inventive to indicate how one prefers to communicate—people have been doing so for millennia.  For example, a university professor who resides in one location during much of the year, and a different location in the summer, may designate different communication instructions for the summer.  Or one user may prefer a phone call while another prefers messages in writing.  Blix did not invent selecting a communication preference, nor does doing so change or transform this abstract idea.

  **Claims 24 and 37**—like the prior pair of claims, this pair also adds a "communication preference," this time specifically related to a user's "public interaction address," which is determined during the "pre-interaction" process of claim 17.  '284 patent at 25:36–40, 28:4–9. For example, the university professor above could indicate which public address to use (a P.O. box, or a university or home address).  Thus, for the same reason a "communication preference"

in claims 23 and 35 neither changes the abstract idea of claim 17 nor adds an inventive concept, adding a "communication preference" here to one's public address does not transform the claims.

And the result is the same with the other asserted dependent system claims for which there is no exact matching asserted analog dependent "method" claim—the added claim elements do not add any inventive concept or change that these claims remain "directed to the abstract idea of using a proxy to facilitate anonymous communications" (*see* D.I. 42 at 8).

**Claim 28**—Whereas independent claim 27 covers a system "for performing a controlled pre-interaction between a first party and at least one second party" (i.e., the method of ineligible claim 17 as discussed above), claim 28 adds being able to *send* an actual communication. '284 patent at 26:30–38. Specifically, as stated in the patent's jargon, claim 28 adds "a networking terminal configured for performing a controlled outgoing communication … from said first party to said second party" using the addresses identified for anonymous communication above. *Id.* Of course, the claim is still "directed to the abstract idea of using a proxy to facilitate anonymous communications" (D.I. 42 at 8). And adding conventional means of sending an outgoing communication is not inventive—people have been communicating since the dawn of humanity. Surely with the "pre-interaction" setup accomplished that the Court has held to be abstract and patent ineligible, adding the ability to "also send out a message" does not convey eligibility.

**Claim 29** is directed to the same ineligible idea as claim 17, but adds conventional components to facilitate actually *receiving* a communication. That is, it is similar to claim 28 above except it adds "a networking terminal configured to *receive*" an incoming communication (versus to *send* one). '284 patent at 26:40–42. While claim 29 specifies options for the "networking terminal," *id.* at 26:44–56, these are all merely generic, functional descriptions of what communication terminals conventionally do. For example, being "configured for receiving

said incoming communication" or to "identify[] that said incoming communication was received" or to "access[]" the related address records.  *See id*.  But the Supreme Court is clear—mere recitation of generic computer components "cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  *Alice*, 573 U.S. at 223.  Reciting "specific hardware" in "purely functional and generic terms" as in claims 28 and 29 "add nothing of substance to the underlying abstract idea."  *Id*. at 226–227.  Thus, claim 29 adds nothing inventive.

**Claim 36** is also directed to the same abstract idea of facilitating proxy communications, but also fails to add any inventive concept.  It adds only "computer storage memory" configured to store "a notification" that can be sent to, for example, recipients of messages.  '284 patent at 28:5–10.  These "notifications" can be text, data, audio, video, etc.—all conventional formats.  *Id*.  But, as with claims 28 and 29 above, adding a generic computer component like "storage memory," recited in functional terms to perform its conventional role does not convey patent eligibility.  *Alice*, 573 U.S. at 223, 226–227.  And of course, having and storing a preset notice was well known even before AOL popularized "You've got mail!" in 1989, 25 years before the '284 patent was filed.  Blix hardly invented the out-of-office message or answering machine.

In sum, despite added limitations, each of the above dependent method and system claims remain, "directed to the abstract idea of using a proxy to facilitate anonymous communications" (D.I. 42 at 8) without reciting any inventive concept.  They are therefore patent ineligible.

## C.  Independent Claim 1 of the '284 Patent Is Patent Ineligible

Independent **claim 1** recites a "method of performing [the] controlled reciprocating communication" itself—i.e., the communication for which ineligible claim 17 is the setup. As shown below (in blue), claim 1 recites *every* element of ineligible claim 17 (the "pre-interaction"), only adding elements for the "interaction" itself—e.g., "receiving an incoming

communication" and then "performing an outgoing communication." '284 patent at 21:31–47, 21:62–22:6.[6]  As such, claim 1 is "directed to the [same] abstract idea of using a proxy to facilitate anonymous communications" (D.I. 42 at 8), it merely adds the "communications."

| Pre-interaction Method | Method with Communication Added |
|---|---|
| 17.      A method of performing controlled pre-interaction, between a first party and at least one second party, said method comprises:<br>(a) providing at least one private interaction address of said first party;<br>(b) defining at least one manageable public interaction address for said first party;<br>(c) forming a record, wherein said manageable public interaction address is associated with said private inter-action address for said first party;<br>said method is characterized by:<br>(d) generating a reverse list, wherein an interaction address of said second party is associated at least with said manageable public interaction address of said first party;<br>(e) performing at least one pre-interaction act, said pre-interaction act comprises:<br> (I)   accessing said reverse list;<br> (II)  identifying said interaction address of said second party in said reverse list;<br>(f) determining that said manageable public interaction address of said first party is | 1.      A method of performing controlled reciprocating communication, wherein said controlled reciprocating communication comprises an incoming and outgoing communications, between a first party and at least one second party, said method comprises:<br>(a) providing at least one private interaction address of said first party;<br>(b) defining at least one manageable public interaction address for said first party;<br>(c) forming a record, wherein said manageable public interaction address is associated with said private inter-action address for said first party;<br>(d) receiving an incoming communication, said incoming communication comprises a communication from said second party to said first party; wherein said incoming communication is initiated by said second party to said manageable public interaction address of said first party;<br>(e) identifying that said incoming communication was received to said manageable public interaction address;<br>(f) accessing said record and performing at least one step selected from the group consisting of:<br> (I)   determining said respective identity associated with said manageable public interaction address identified in said incoming communication, and<br> (II)  determining said private interaction address of said first party associated at said record with said manageable public interaction address identified in said incoming communication;<br>said method is characterized by:<br>(g) generating at least one reverse list entry, wherein an interaction address of said second party is associated at least with said manageable public interaction address of said first party;<br>(h) performing a pre-interaction act, said pre-interaction act comprises:<br> (I)   accessing said reverse list; |

---

[6]  The "communications" covered by the patent's claims are equally conventional, including, for example, phone calls, email, texts, etc. '284 patent at 1:47–67.  And a "controlled communication" is merely one "performed from a particular selectable public interaction address"—that is, a communication sent from a user's public address.  *Id*. at 2:27–31.

| | |
|---|---|
| associated, at said reverse list, with said interaction address of said second party; wherein said interaction address of said second party is obtainable from a third party or external services provider, wherein said at least one reverse list entry is formed by synchronizing said interaction address of said second party with said manageable public inter-action address. | (II) identifying said interaction address of said second party in said reverse list;<br>(III) determining that said manageable public interaction address of said first party is associated, at said reverse list, with said interaction address of said second party;<br>(i) performing an outgoing communication, said outgoing communication comprises a communication from said first party to said second party, said outgoing communication is initiated by said first party;<br>(j) said outgoing communication is characterized by that said outgoing communication, to said interaction address of said second party, is performed from said manageable public interaction address of said first party;<br>wherein upon performing said outgoing communication, said second party is exposed merely to said manageable public interaction address of said first party;<br>wherein said interaction address of said second party is obtainable from a third party or external services provider,<br>wherein said at least one reverse list entry is formed by synchronizing said interaction address of said second party with said manageable public interaction address. |

The steps added to claim 1 over claim 17 (processing a communication, shown in green above) can "could all be performed by humans without a computer." *Mortg. Grader*, 811 F.3d at 1324.[7] As the Court held for claim 17 (D.I. 42 at 8), a human could:

- "receiv[e] an incoming communication" to a client's public address (claim 1, part (d));

- "identify[] that [it] was received" at that address (*id*., part (e));

- "access[]" their records to identity the client and the client's private address (*id*., part (f));

- "perform[] an outgoing communication" for the client back to the sender (*id*., part (i));

- where "said outgoing communication" is from the client's public address (*id*., part (j)).

And, neither claim 1 nor these steps added over ineligible claim 17 "are directed to an

---

[7]  *See also Symantec*, 838 F.3d at 1318 (claims may be abstract if, "with the exception of computer-implemented steps," they can be "performed by a human, mentally or with pen and paper"); *Symantec*, 100 F. Supp. 3d at 383–84, 391–93; *Walker Digital*, 66 F. Supp. 3d at 508–10 ("the basic concept of controlled exchange of information" is an abstract idea that has long been practiced by, for example, "matchmakers and [job] headhunters").  As for the elements shared between claims 1 and 17, *see* D.I. 17 at 15–16.

improvement in the functioning of a computer" but instead merely add conventional components "to well-known business practices."  *E.g.*, *Affinity Labs.*, 838 F.3d at 1270 (quotes omitted).  As with the patent in *Alice*, nowhere does claim 1 "purport to improve the functioning of [a] computer" versus reciting an abstract idea of using "a generic computer to perform generic computer functions."  573 U.S. at 225; *see also, e.g.*, *Symantec*, 234 F. Supp. 3d at 607.

Nor is appending to ineligible claim 17 the above "conventional steps" specified "at a high level of generality" enough to convey eligibility.  *E.g.*, *Alice*, 573 U.S. at 222.  The above steps added to ineligible claim 17—"receiving" a communication, "identifying" it was received, "accessing" records," and "performing an outgoing communication" from a specified address— are nothing more than "'well-understood, routine, conventional activit[ies]'" that do not render a patent claim eligible.  *Id.* at 225 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 73 (2012)).  Claim 1 presents only a "conventional ordering of steps" with only "conventional technology," which is insufficient.  *E.g.*, *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017).  The combination of claim 1 thus recites nothing more than the abstract idea itself and "add[s] nothing that is not already present when the steps are considered separately."  *Versata*, 793 F.3d at 1334; *Alice*, 573 U.S. at 225.

Claim 1 thus contains nothing inventive over claim 17, which the Court already held lacks an "inventive concept" and "merely recites the conventional steps of gathering, categorizing, organizing, and comparing data."  (D.I. 42 at 9–10.)  Claim 1 is thus ineligible.

### D.      The Asserted Dependent Claims to Claim 1 Also Are Patent Ineligible

As for the dependent claims to claim 1, the added limitations in those claims each also fail to add any inventive concept or otherwise transform an ineligible idea to patent eligibility.

**Claim 2** is directed to the same abstract idea as claim 17, and simply adds that the user's

identity should be kept with the record of the user's address.  In the jargon of the patent, this is stated as "defining" the identity of the user (the "first party") and making a "record" associating it with the user's public address.  '284 patent at 22:13–20.  For example, "Mary Shelley" would be noted with her private user address "frankensteinauthor@gmail.com" (or in 19th-century terms, "24 Chester Square, Belgravia, London").  But noting and recording a user's identity is hardly inventive or unconventional—agents have long known the confidential identity of clients, and people have long written their names in their address books.  Claim 2 remains "directed to the abstract idea of using a proxy to facilitate anonymous communications" (D.I. 42 at 8).

**Claim 3** adds to claim 2 also checking the user's address book to see that the other party's address is in it, a task done with paper address books for centuries.  In the patent's jargon, the step is stated as "determining" that the address of the outside "second party is associated" in the "reverse list" (i.e., the address book)[8] with the user's own identity.  '284 patent at 22:21–25. This is true, of course, for any conventional paper address book where the owner has his or her name in it—the owner's identity is "associated" in the address book with the various address entries.  Claim 3 thus does not change or transform the abstract idea of claims 1 and 17, and no inventive or unconventional or even remotely technical element has been added.[9]

---

[8]  As defined in the patent, a "reverse list" is the address book that records "at least one interaction address of a [second party] participant alongside a public interaction address of the [first party] user, as well as association there between."  *Id*. at 2:41–47; *see also id*. 21:49–52, 24:41–44, 26:9–14.  That is, it lists addressees with whom a user wants to communicate along with the user's own public address.  According to the patent, a "reverse list" can be kept as "any entry in a database, row and/or column in a table or any other type of record for this matter."  *Id*. at 2:41–47.  Thus, according to the patent, a "reverse list" could be kept as two columns on an Excel table, or even on a sheet of paper.  *Id*.

[9]  Moreover, claim 3 does not add any real limitation over claim 2.  Claim 1 already requires "determining" that the first-party user's *address* is associated with the second party's *address* in the "reverse list" address book.  '284 patent at 21:58–61.  And claim 2 requires "forming a record associating" the user's *identity* with their *address*.  Thus, if a user's identity is in the address book, it would already be "associated" with the outside addresses as claim 3 requires.

15

**Claim 4** takes the same ineligible abstract idea of claims 1 and 17 and merely adds that the communication must be "attempted," "incomplete," "rejected," interrupted," or "aborted." *Id*. at 22:27–31.  Yet, attempted, incomplete, rejected, interrupted, or aborted communications have existed for millennia, a point Shakespeare exploited repeatedly 400 years ago.  Again, the abstract idea remains the same, with no inventive concept added or technical problem solved. The Court has already held that the proxy set up of claim 17 was patent ineligible—adding that one might engage in a failed communication attempt using that set up does not transform the ineligible claim into a patent eligible one.  Communication failures are not inventive.

**Claim 5** takes the same ineligible abstract idea of claims 1 and 17 and merely adds that the type of address used must be one from a list of conventional and previously known types, including a "phone number, instant messaging (IM) name, e-mail address," etc.  *Id*. at 22:33–41. Of course, stating that an address must be of a conventional type known in the art cannot qualify as adding something unconventional or inventive to the claim.  The '284 patent does not purport to invent the "phone number, instant messaging (IM) name, e-mail address," etc.  The claim remains directed to the abstract idea of anonymous communications without anything inventive.

**Claim 7** takes the same ineligible abstract idea of claims 1 and 17 and requires that "one step" extra be added to the method from a list of options.  Namely, claim 7 requires that *one of* the following steps must be added: (a) "forwarding" the message to the user's private address, (b) forwarding "information regarding" the message, (c) "presenting" the public address "to which said incoming communication was received" (i.e., telling the user which account the message was sent to), (d) instead "presenting" (i.e., telling the user) the public name, related metadata, or public identity of the address that received the message, (e) "applying a notification rule" to the incoming message (e.g., "forward by email" or "send 'You've got mail' notice"), *or*

16

(f) "selecting contents for said notification." *Id*. at 22:50–23:7.  While cloaked in jargon, this hodgepodge of options adds nothing more than what one would conventionally do if one were acting as a proxy for anonymous communications—forward the message or information about it, identify for the user which account or address name the message was sent to, and/or apply a rule for a notification per the client's instruction.  To practice the proxy method that the Court already held to be ineligible, one would already expect to forward messages or notifications.  Nothing material is added here, much less something unconventional or inventive—these are all conventional steps one might already take as a proxy for anonymous communication.  And none of these steps solves a problem unique to computers, or changes the abstract idea here.

**Claim 8** is directed to the same abstract idea as claims 1 and 17, adding only that the "reverse" address list must include one extra piece of information.  Namely, claim 8 requires that this address book include *one of* the following: the name or "public identity " or other data assigned to the user's public address (e.g., a user name, or a public identity like "Marilyn Monroe" for Norma Jeane Baker); a rule for notifying the user of messages or content for that notice; a user's default communication preference or alternative preference; *or* "personal information" or other "contact information" for the a "second party" with whom the user will communicate.  *Id*. at 23:11–19.  While long-winded, none of these items are unconventional or inventive.  Information about one's identity, user name, or contacts are common features in any ordinary paper address book.  Indeed, it is difficult to imagine a conventional address book that does not include "personal information" or other "contact information" (e.g., birthdates, street addresses, phone numbers, etc.) for contacts.  Likewise, it is difficult to imagine a proxy agent that does not know the "communication preference" of their client or what type of "notification" to send if a message comes in.  Nothing in the claim's jumble of jargon changes or transforms

17

the underlying abstract idea of a proxy facilitating anonymous communication.  Nothing inventive or unconventional is added, and no technological problem of any type is solved.

**Claim 9** is directed to the same abstract idea of anonymous proxy communication as above; it merely adds a requirement for *who* can create the "reverse" address book of the permitted contacts.  Specifically, claim 9 adds that the "reverse" address list must be generated by the "first party" user, another system user or "operator," "a third party" to the system, *or* "external services providers."  *Id*. at 23:21–29.  But this just covers the universe of who might ordinarily draft address lists—the client, the agent, third parties, or other service providers.  To practice the proxy method that the Court already held to be ineligible, *someone* would have to create the address list recited in claims 1 and 17.  That the user, proxy agent, or others would do so is hardly remarkable, much less a requirement directed to some *technological* problem in the field. Claim 9 thus remains "directed to the abstract idea of using a proxy to facilitate anonymous communications" (D.I. 42 at 8) as the options above are neither inventive nor unconventional.

**Claim 10** is also directed to the same abstract idea for anonymous proxy communication as above, but, similar to claim 9, it merely adds a requirement for *how* the "reverse" address book of the permitted contacts can be generated.  Specifically, claim 10 adds that the "reverse list entry is generated … manually by inputting" addresses, *or* "upon receiving" a message, *or* upon responding with an "outgoing" message, *or* by "external service providers."  '284 patent at 23:31–27.  Like claim 9, while a jumble of options, each just states obvious, conventional ways address entries are recorded—manually, when you receive a message (like with a letter), when you send one out, or by others (e.g., "service providers").  As with claim 9, to practice the proxy method that the Court already held to be ineligible, the address list recited in claims 1 and 17 would have to be created *somehow*.  That it is required to be done "manually" or "upon receiving

said incoming communication" etc. is hardly remarkable, much less a requirement directed to a *technological* problem in the field.   Claim 10 thus remains "directed to the abstract idea of using a proxy to facilitate anonymous communications" (D.I. 42 at 8) and nothing inventive is added.

**Claim 11** is also directed to the same abstract idea for anonymous proxy communication as above, but just adds that the address of the outside party with whom a user is communicating not be disclosed to the user (or that "at least a portion" of the address entry be kept confidential). *Id*. at 23:39–42.  Of course, maintaining the confidentiality of communication partners is not new, as anyone knows who has observed, for example, anonymous bidding at an auction (or who has been passed a note from a "secret admirer").  The abstract idea of claims 1 and 17 remains unchanged, nothing inventive or unconventional is added, and no technical problems are solved.

**Claim 13** also is directed to the same abstract idea, but adds the limitations also found in claims 21 and 33 above—and is ineligible for the same reasons.  Namely, claim 13 adds a "rule" requiring a "predefined response" of either "rejecting a communication," "recording" it; "converting" it "to another format," [or] forwarding it to the "first party" user's private address. *Id*. at 23:55–62.  Of course, recording a message, converting it in format, rejecting it, or forwarding it to its intended recipient are hardly inventive.  Messages have long been rejected or forwarded, memorialized or transcribed.  If the proxy of ineligible claim 17 were pressed into service so as to forward a public communication to a private address, the initial communication would likely be "recorded" (how else can it be forwarded?), "converted" to another format (from the original message to the one that is received at the private address), and "forwarded" (from the public address to the private address).  Given the Court's ruling as to Claim 17, additional claims that simply require that the proxy be placed into service cannot be said to contain "inventive concepts."  Nothing inventive, unconventional, or technical is added here.

**Claim 14** also is directed to the same abstract idea for anonymous proxy communication, but instead adds the limitations from claim 23 and 35—and it is ineligible for the same reasons. Namely, claim 14 adds that a user can designate *how* communications should be sent. Stated in terms of the patent's jargon, claim 14 requires adding a default "communication preference" or "alternative" preference to (a) a user's "private" address, (b) a user's "public" address, or (c) the "interaction address" of a second party with whom the user communicates. *Id*. at 23:64–24:9. As with claims 23 and 35, it is not inventive to indicate how one prefers to communicate. Saying "forward mail to my lake house in July" or "text me if my phone does not pick up" is not inventive or unconventional, and it does not solve any technical problem in the field.

**Claim 15** also is directed to the same abstract idea for anonymous proxy communication, but instead adds the limitations from claims 24 and 37—and it too is ineligible for the same reasons. Namely, like claim 14 (and 23 and 35 above), claim 15 adds a default "communication preference," this time related only to a user's "public interaction address" (which is determined during the "pre-interaction" process above). *Id*. at 24:11–17. Having a communication preference for one's address (e.g., saying "send my response by letter" or some other choice), is neither inventive nor unconventional, nor does it solve a technical problem unique to the field, and it certainly does not transform or change the abstract idea of using a communication proxy.

In sum, all of the asserted claims are directed to the same "abstract idea of using a proxy to facilitate anonymous communications" that the Court held patent ineligible (D.I. 42 at 8–10), and none of them add any inventive concept to convey eligibility. They are all patent ineligible.

## VI.    CONCLUSION

For the foregoing reasons, Blix's infringement claim should be dismissed in its entirety.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Daniel G. Swanson
Jason C. Lo
Jennifer J. Rho
Raymond A. LaMagna
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Tel:  (213) 229-7000

Cynthia E. Richman
Amalia Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Tel:  (202) 995-8500

H. Mark Lyon
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
Tel:  (650) 849-5300

Chris Whittaker
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612
Tel:  (949) 451-3800

Dated:  January 22, 2021
7012034 / 49651

By:  */s/ Bindu A. Palapura*
     David E. Moore (#3983)
     Bindu A. Palapura (#5370)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Tel:  (302) 984-6000
     dmoore@potteranderson.com
     bpalapura@potteranderson.com

*Attorneys for Defendant Apple Inc.*

21