IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BLIX INC.,                                )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )        C.A. No. 19-1869-LPS
                                          )
APPLE, INC.,                              )
                                          )
                    Defendant.            )
                                          )
                                          )

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
FURTHER MOTION TO DISMISS PLAINTIFF'S PATENT INFRINGEMENT
<u>CLAIM UNDER FED. R. CIV. P. 12(b)(6)</u>**

*Of Counsel:*

Mark C. Rifkin
Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue, 9th Floor
New York, NY 10016
(212) 545-4600

Daniel J. Melman
Guy Yonay
Sarah Benowich
Shaoul Sussman
PEARL COHEN ZEDEK LATZER BARATZ LLP
Times Square Tower
7 Times Square, 19th Floor
New York, NY 10036
(646) 878-0800

Dated:  February 12, 2021

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiff*

{01661450;v1 }

**TABLE OF CONTENTS**

Page

I.    **The Nature and Stage of the Proceedings**............................................................... 1

II.    **Summary of the Argument** ............................................................................... 1

III.    **Statement of Facts**............................................................................................. 3

IV.    **Argument** ........................................................................................................... 6

        a.    Legal Standard ........................................................................................ 6

        b.    Apple Has Not Shown the Claims are Ineligible Under 35 U.S.C. § 101 .............. 7

                i.    *Step One – The Asserted Claims are not Abstract Ideas* ................................. 8

                ii.    *Step Two – The Asserted Claims Provide an Inventive Concept* ................... 14

V.    **Conclusion** ....................................................................................................... 20

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018) .................................................................................... 7, 14, 17

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ................................................................................................................ 6, 7

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ................................................................................................. 7

*CardioNet, LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020) ................................................................................................. 7

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) ........................................................................................ 14, 15

*DDR Holdings, LLC v. Hotels Com.*,
773 F.3d 1245 (Fed. Cir. 2014) ........................................................................................ 15, 16

*DivX, LLC v. Netflix, Inc.*,
2019 U.S. Dist. LEXIS 227426 (C.D. Cal. Nov. 4, 2019) ...................................................... 18

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ................................................................................................. 6

*MAZ Encryption Techs. LLC v. Blackberry Corp.*,
2016 U.S. Dist. LEXIS 134000 (D. Del. Sept. 29, 2016) ......................................................... 9

*McRo Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ............................................................................................... 12

*Natera, Inc. v. ArcherDX, Inc.*,
2020 U.S. Dist. LEXIS 188945 (D. Del. Oct. 13, 2020)......................................................... 12

*Network Congestion Sol'ns., LLC v. U.S. Cellular Corp.*,
170 F. Supp. 3d 695 (D. Del. Mar. 22, 2016) ......................................................................... 17

*Packet Intelligence LLC v. NetScout Sys.*,
965 F.3d 1299 (Fed. Cir. 2020) ............................................................................................. 6, 7

*Paone v. Broadcom Corp.*,
2015 U.S. Dist. LEXIS 209725 (E.D.N.Y. Aug. 19, 2015) .................................................... 17

*Personalized Media Commc'ns., LLC v. Netflix Inc.*,
2020 U.S. Dist. LEXIS 134312 (S.D.N.Y. July 28, 2020)...................................................... 18

*Securenet Sols. Grp., LLC v. Senstar Corp.*,
2020 U.S. Dist. LEXIS 88637 (D. Colo. May 20, 2020) ........................................................ 18

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019) ............................................................................................ 6, 12

*TecSec Inc. v. Adobe Inc.*,
  978 F.3d 1278 (Fed. Cir. 2020) ............................................................................................. 9, 11

*TQP Dev. LLC v. Intuit Inc.*,
  2014 U.S. Dist. LEXIS 20077 (E.D. Tex. Feb. 19, 2014) ............................................... 8, 13, 14

*Walker LLC v. Google*,
  66 F. Supp. 3d 501 (D. Del. Sept. 3, 2014) ................................................................................ 9

**Statutes**

35 U.S.C. § 101 ...................................................................................................................... 7, 14, 18

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 1, 14

Plaintiff Blix Inc. ("Blix") respectfully submits this memorandum of law in opposition to Defendant Apple Inc.'s ("Apple") Further Motion to Dismiss Plaintiff's Patent Infringement Claim Under Fed. R. Civ. P. 12(b)(6). (D.I. 51.)

## I.      The Nature and Stage of the Proceedings

Blix's original Complaint (D.I. 1) against Apple asserted infringement of U.S. Patent No. 9,749,284 (D.I. 13-3, the " '284 Patent"), and illegal monopolization. Blix's First Amended Complaint (D.I. 13, the "FAC"), added monopolization as to the iOS App Store. Regarding Section 101, the Court granted Apple's motion to dismiss, only as to claim 17 (which it declined to find representative of all claims) (D.I. 42). Blix subsequently advised Apple that it intends to assert claims 1-5, 7-11, 13-15, 18, 21-24, 28-30, 33-37 (the "Asserted Claims").[1] Apple has moved to dismiss the Asserted Claims as patent ineligible.

## II.     Summary of the Argument

The patented system is a technological platform enabling parties to seamlessly communicate confidentially and transparently. Rather than undertake to analyze the claims *as a whole*, Apple artificially splices and analyzes individual limitations in isolation, and entirely misunderstands and oversimplifies the '284 Patent claims, overlooking the technical problem the patent solves. At its core, the '284 Patent discloses and claims an innovative way to facilitate communication, while protecting privacy and promoting efficiency, in a way that humans never could. Other systems that hide a caller's private phone number address security by using flexible aliases – i.e., a different number for every interaction; however, these sacrifice transparency, because the recipient is unable to recognize the caller at all. One technical benefit of the '284 Patent's manageable aliases is permitting security and caller recognition, which is required for

---

[1]        Blix reserves all rights to appeal the Court's ruling on claim 17.

certain technological functions, such as caller-ID and call screening. Accordingly, the '284 Patent addresses a technical problem.

Further, the '284 Patent solves the above problem of alias confusion using technological means, by creating a new data structure: the "reverse list" (see, e.g., claim 1(g)). The reverse list is a persistent memory tracking associating aliases (first party manageable public addresses) with actual contact details (second party interaction address), so the confidential party knows from which alias to route outgoing communications, thereby making it recognizable to recipients (see, e.g., claim 1(h), (j)). This solution reconciles the opposing demands of flexible addressing and caller recognition, a problem unsolved until the '284 Patent (by conventional or technical means).

Apple's oversimplified analogies misses the reality of the patented system. Indeed, those very analogies demonstrate that the patented system is *not* conventional: those analogies and other conceivable methods, such as the prior art cited during prosecution, do not route outgoing communications based on aliases using a reverse list, and thus, do not address the conflicting needs of flexible addressing and caller recognition. Therefore, the does not preempt every method of implementing an abstract idea. Contrary to Apple's argument, the '284 Patent's system of alias management and routing is not something that humans have been doing for years, translated into a computer context. Rather, the '284 Patent passes both steps of the *Alice* analysis.

*First*, addressing *Alice* step 1, the invention is directed to solving a technological problem of "controlled reciprocating communication" using "manageable" public addresses ('284 Patent, title, abstract, technical field 1:14-21, 3:26-28, Figure 1). What Apple ignores, at its peril, is that the claimed system is inextricably linked to technology. Apple's analogies all aim to show that a human being using pen and paper could perform the invention. However, a human intermediary

2

managing the full list of aliases and private addresses would vitiate its anonymity and undermine the very purpose of the invention. Human exposure to private addresses and their aliases, by its nature, exposes those aliases and compromises their confidentiality. Accordingly, the computer in this instance is not a mere tool in the invention, but provides qualitatively different functionality than a human – e.g., providing privacy by eliminating (or reducing) human exposure to secret data. Therefore, the patent is not merely directed to automating a human endeavor, but rather, is an innately technological tool. *Second*, concerning *Alice* step 2, the '284 Patent claims a specific innovative element, namely, routing outgoing communications from manageable aliases determined at the reverse list (claim 1(h)(III), (j)). This solves the problem of alias confusion by reconciling alias flexibility and caller recognition. None of Apple's human examples analogizes this reverse list or addresses this particular problem.

Accordingly, the '284 Patent claims functionality that humans could not perform, improves the security and flexibility of computer aliasing, and resolves an unsolved problem, thereby providing something more than an abstract idea.

## III. Statement of Facts

Apple's analogies to Mary Shelley, Norma Jean Baker, an anonymous bidder, and a university professor, all fall short. These hypothetical examples all describe a *fixed* alias scenario, in which the confidential party's public address does not change. As is commonly understood, fixed privacy details are a security risk, as they accumulate patterns and reveal behavior over time. This is why many programs require users to periodically change their passwords. The invention, on the other hand, provides flexible aliasing ("*manageable* public interaction address," as stated in all Asserted Claims). Flexible aliasing has many benefits, e.g., enabling users to rename a compromised alias, revoke an alias that is no longer needed, and use

3

different aliases for different contacts, which allows independent revocation of one alias without resetting all others, etc. ('284 Patent, 5:3-16, 18:53-61, 18:65-19:10).

But this flexibility poses a new problem when initiating outgoing communications (e.g., claim 1(i)), to wit, alias confusion. When a confidential party changes its public alias, e.g., from "eagle@abc.com" to "falcon@abc.com," the other users who formerly communicated with "eagle@abc.com" will no longer recognize outgoing communications from the new address "falcon@abc.com." The reverse list of the patent solves this problem by providing a persistent memory tracking of which alias (first party manageable public address) is associated with which contact (second party interaction address). Using the reverse list, the confidential party knows which identity to use when initiating outgoing communication, so it can be recognized by its contacts (e.g., claim 1(h)-(j)). Claim 1, therefore, seamlessly integrates the "reverse list" into a communication platform that accesses it to look up which aliases are associated with the recipient of an "outgoing communication" (e.g., claim 1(h)(I)-(III), claim 1(j)). This provides an efficient user experience, whereby a confidential party can originate outgoing communications to its contacts using an alias that is both flexible ("manageable" public address) and recognizable (known by, and associated with, the contact in the "reverse list").

Apple's analogies essentially state that a person could create an alias, which is known to some human intermediary. However, this is flawed on two levels. *First*, as discussed above a human intermediary knowing the user's true identity violates the very privacy the invention aims to achieve. Such a "conventional" alias system – one that relies on a trusted human intermediary who is privy to the private identities of the correspondents – may shield some parties from secret data, but not all parties, since the secret data is exposed at least to the human intermediary itself. *Second*, more critically, none of these analogies addresses the problem of alias confusion – that

4

is, the problem of determining which alias to associate with which contact – and certainly do not analogize the "reverse list" for allowing outgoing communications to be recognized by the receiving contact. In the "conventional" examples provided by Apple, a person's private identity is matched with one single public identity (say, Norma Jean with Marilyn Monroe) for *all* communications with the public. Not only is this different than manageable aliases, it's also less secure. For one thing, fixed identity information reveals behavior over time and, so, is inherently less secure than manageable aliases. Additionally, using the same fixed alias for all recipients risks those recipients cross-referencing their respective data to reveal identifying information about the confidential party. In anticipation of any argument by Apple that the "conventional" system could simply be replicated using a new alias for every interaction, like Google Voice's random phone numbers, this scenario cannot generate aliases that are recognizable by the recipient. Apple fails to address the convergence of manageable aliasing and caller recognition.

It is the use of the reverse list (e.g., claim 1) that allows the patented system to suspend, rename, or revoke, a first party's manageable alias, e.g., periodically, when compromised, for different contacts, or at will. Outbound routing from manageable aliases (e.g., claim 1(j)) improves security by reducing the risk of recipients cross-referencing data to reveal private identities; and increases efficiency by seamlessly integrating the reverse list into a communication platform to look up addresses for outbound routing that is both confidential and recognizable to the recipient (e.g., claim 1(h)(I)-(III), 1(j)).

In addition, claim 11 adds a "double-blind" limitation, in which the recipient ("second party") can also communicate in return without risking their own security or privacy, by isolating portions of the reverse list. None of Apple's analogies to "conventional" systems includes this feature, i.e., that *neither* correspondent knows the other's private identity.

Accordingly, the invention is not merely a conventional system performed better or faster by using a computer. Rather, the '284 Patent can only be performed by computers (as human performance obviates privacy) and solves a qualitatively different problem (reconciling manageable aliasing and caller recognition) by integrating the reverse list as the alias source in an outbound router (e.g., claims 1(h), 1(j)). Apple's analogies gloss over the complexities of the '284 Patent and urge the Court to ignore the claim limitations (which it derides as "jargon"), rather than address the merits of the technical limitations that provide real technical benefits of improved security and increased efficiency.

## IV.    Argument

### a.    Legal Standard

The legal standard governing patent eligibility is well-established. "To determine whether a patent claims ineligible subject matter, the Supreme Court has established a two-step framework. First, [the court] must determine whether the claims at issue are directed to a patent-ineligible concept such as an abstract idea." *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019) (citing *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014)). Claims are not drawn to abstract ideas when they are focused on "an improvement to computer functionality itself". *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016). "[S]oftware-based innovations can make 'non-abstract improvements to computer technology' and be deemed patent-eligible subject matter at step 1." *Packet Intelligence LLC v. NetScout Sys.*, 965 F.3d 1299, 1309 (Fed. Cir. 2020) (internal citations and quotations omitted).

If the court finds the claims are not drawn to abstract ideas, then the inquiry stops there. At step two, however, even if claims *are* drawn to abstract ideas, they can still be patent eligible where the claims, individually and as ordered, "transform the nature of the claim" through an

6

inventive concept." *See Alice*, 573 U.S. at 217. At this stage, the district court must construe all facts and draw all reasonable inferences in favor of […] the non-moving party." *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020) (internal citations omitted.) In the "eligibility analysis, [the court must] consider the claim as a whole, […] and read it in light of the specification." *Packet Intelligence*, 965 F.3d at 1309.

While the issue of eligibility is a legal determination "like many legal questions, there can be subsidiary fact questions which must be resolved *en route* to the ultimate legal determination." *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). "Any fact [. . .] that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence" because patents enjoy a presumption of eligibility. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

b.   Apple Has Not Shown the Claims are Ineligible Under 35 U.S.C. § 101

As discussed below, Apple's argument fails to consider, as it must, each claim *as a whole*, i.e., as an ordered combination of all its elements. Rather, Apple dissects each claim, and argues that each component taken in isolation is generic, but that is not the correct legal standard. Therefore, Apple has not borne its burden to show the claims, read as a whole, are directed to abstract subject matter (*Alice* step 1), or that it lacks any additional elements that (individually or in combination) provide an inventive concept (*Alice* step 2). On the contrary, the Asserted Claims are directed to actions that humans could not take, but rather represent a tangible improvement to computer functionality. Even should they be found to be directed to an abstract idea, the Asserted Claims disclose an inventive concept that set forth more than an abstract idea.

### i. Step One – The Asserted Claims are not Abstract Ideas

The Asserted Claims represent technological improvements to computer functionality. Apple's proffered abstract idea – "communications via a proxy" – overgeneralizes the Asserted Claims and lays bare the problem solved by the '284 Patent: that prior to the '284 Patent, there was no way – conventional or otherwise – to efficiently provide secure reciprocal communications using an alias that is both flexible ("manageable public interaction address") and recognizable (known by the contacts in the "reverse list").

### 1. The Asserted Claims are not Directed Towards Abstract Subject Matter Because Humans Could Not Perform the Disclosed Steps

The Asserted Claims are directed to functions that humans could not accomplish conventionally. First, introducing human eyes at the intermediary level would vitiate privacy, and undermine efficiency. Second, the human mind, as a practical matter, could not perform these tasks because it requires coordination of multiple parties who are not allowed to know each other. Including even one human link in the chain bridging public and private identities would breach confidentiality. This alone fundamentally distinguishes the Asserted Claims from Apple's human analogy. As a matter of common sense, a human intermediary could not be involved anywhere along the chain of communication without breaching privacy. However, even if there is a dispute of fact, the motion should be denied at the Rule 12(b) stage in order to allow discovery. *See TQP Dev. LLC v. Intuit Inc.*, 2014 U.S. Dist. LEXIS 20077, at *15 (E.D. Tex. Feb. 19, 2014) (Bryson, J.) (the possibility for human performance of a multi-step encrypted communication system required findings of fact because "except perhaps in its most simplistic form, [the claimed invention] could not conceivably be performed in the human mind or with pencil and paper.")

8

This Court has also recognized that eliminating the need for human action, thereby supporting security and privacy, may suffice to demonstrate that a patent is not directed to abstract subject matter. In *MAZ Encryption Techs. LLC v. Blackberry Corp.*, 2016 U.S. Dist. LEXIS 134000, at *22 (D. Del. Sept. 29, 2016), this Court found that the disclosed method of creating a transparent encryption system was a technological improvement because it obviated "the need for user input, eliminating interruption and inefficiency – as well as human action – in a technology process." *See also TecSec Inc. v. Adobe Inc.*, 978 F.3d 1278, 1296 (Fed. Cir. 2020) (claims were not abstract because they were "[d]irected to [solving] a problem humans cannot solve, and something computers were previously unable to solve.") The Asserted Claims likewise solve a problem that humans cannot solve by privately routing communications without the need for "human action." In this regard, there is no meaningful difference between the Asserted Claims and the *Maz* claims, insofar as Blix's invention solves a similar technological gap in the prior art of improving security, privacy, and efficiency in a system that requires entities to communicate anonymously, manageably, and with transparency.

Apple's misguided reliance on *Walker LLC v. Google*, 66 F. Supp. 3d 501 (D. Del. Sept. 3, 2014) and overly simplistic analogies ignores that the elimination of the need for human involvement is a difference of nature, not merely a matter of degree. In *Walker*, this Court held that claims directed to an online job headhunter function were not patent eligible because they were simply transmutations of the role of the headhunter or matchmaker to a computer context. *Id*. at 509. As Apple's examples show, the '284 Patent is distinguishable because it is directed to making possible functions that humans could never accomplish in the same way. First, Apple poses the analogy that claim 8 is directed to abstract subject matter because Norma Jean Baker could publicly assume the pseudonym of Marilyn Monroe. Of course, the fact that Marilyn

9

Monroe's real identity is a matter of common knowledge dramatically distinguishes this from – and shows the need for – the methods disclosed in Patent '284. At the outset, Ms. Monroe had to rely on her business manager Inez Melson, exposing her identity to a human intermediary, who in turn had the knowledge to expose her true identity to the press and others. Ms. Monroe's stage name was also fixed, and therefore less secure, because once her identity became known, she could not change her stage name. That is, Ms. Monroe did not have a *manageable* public alias with the flexibility to be revoked, renamed or reassigned. More than that, Ms. Monroe would have had to eschew her trademark platinum hair and adopt a new voice and physical appearance for each new identity to avoid the issue of others cross-referencing her, recognizing her, and unmasking her true identity. Finally, Ms. Melson was privy to the most intimate details of her life, undermining Ms. Monroe's privacy. While identity permanence is desirable for a celebrity, it is not for most smartphone users, such as Apple users, who demand the utmost security for their personal data.

Apple's subsequent analogies similarly fail to capture the Asserted Claims' details and the transformative effect of eliminating the need for human intervention. Apple's Mary Shelley example, whose true identity allegedly disqualifies claim 2, also fails for its inherent reliance on a trusted human agent to preserve her anonymity and to coordinate communications with others, who would have no way of directly communicating with her regarding edits, publication, or fees, without destroying her anonymity. For claims 23 and 35, Apple's university professor again chooses and expressly discloses various addresses in the hopes that her students will contact her – providing either the students or a university coordinator greater insight into where she is and when, and with whom and how she prefers to communicate.

10

Finally, Apple's argument directed to claim 11, e.g., a secret admirer, fails. A secret admirer necessarily knows the identity of admired crush. And, as a matter of common sense, the person who passes a note between a secret admirer and their crush knows the identity of both sides, the very opposite of the claim 11's double-blind privacy. Cumulatively, Apple's examples show precisely that it is near impossible for humans to carry out the secure and efficient communications claimed in the Asserted Claims using conventional means.

2. The Asserted Claims are not Directed Towards Abstract Subject Matter Because They Disclose Improvements to Computer Functionality

Like the many patents which the Federal Circuit and this Court have recently found to be eligible, the Asserted Claims are not directed to abstract subject matter because they solve "a problem specifically arising in the realm of computer networks or computers" and they identify "specific" improvements to computer functionality. *See TecSec*, 978 F.3d at 1293 (collecting cases). The Asserted Claims here are particularly analogous to the claims in *TecSec, supra* (encryption mechanisms), as they are likewise directed to privacy, which like encryption, prevents human exposure to secret data. As in *TecSec*, the claims here provide secure reciprocal communications without any human intermediary knowing, controlling, or otherwise routing, the confidential information. Indeed, the record and reverse list in the Asserted Claims function similarly to the "secure labelling technique" which provided the manageability to independently control access to different information based on "having the correct key" in the *TecSec* claims (analogous to both associations in the record and reverse list that unlock identities). Not only does this provide secure communications, but it does so from a recognizable identity, where the dissonance between secrecy and recognizability is a problem endemic only to the computer setting. *See also, Packet Intelligence*, 965 F.3d at 1309 (claims were not directed to abstract subject matter where they "purport[ed] to meet a challenge unique to computer networks,

11

identifying disjointed connection flows in a network environment"); *McRo Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (claims were not abstract where they disclosed specific steps for improving the "existing technological process" of "computer animation" unsolved by the prior art). At the very least, Blix has sufficiently pleaded an unconventional improvement to the field and prior art to require fact finding on the issue.

In *SRI*, *supra,* the Federal Circuit affirmed the district court's finding of eligibility. There, the claims were "directed to using a specific technique—using a plurality of network monitors that each analyze specific types of data on the network and integrating reports from the monitors—to solve a technological problem arising in computer networks: identifying hackers or potential intruders into the network." *Id.* at 1303. The Asserted Claims here follow this paradigm: they are directed to using a specific technique (using the record and reverse list to create secure, manageable, reciprocal communications) to solve a technological problem arising in computer networks (managing and routing reciprocal communications in an anonymous and recognizable manner). A comparison of Blix's claim 1 and *SRI*'s claim 1 reveal strong similarities, and indeed, Blix's claim 1 includes more specific and numerous steps.

The Asserted Claims are also analogous to those this Court recently held to be directed to nonabstract subject matter in *Natera, Inc. v. ArcherDX, Inc.*, 2020 U.S. Dist. LEXIS 188945 (D. Del. Oct. 13, 2020) (ruling on *VMware Inc. v Cirba Inc.*, Case No. 1:20-cv-0027). "[C]onsistent [with] *Enfish* and *Finjan* and their progeny" and based on claim 1, the asserted patent was:

> directed to patent-eligible subject matter because it is directed to an improvement in computer functionality itself. That is, designing an improved computer environment. The patent claim, the representative claim that is, recites specific steps to accomplish the desired result, that being intelligent placement of source systems on target system[s], and the claims solve the technological problem arising in the computer context.

*See id*. The Asserted Claims here are similar: they are designed to improve the functionality and security of network communications and recite specific steps to enable such secure communications. They solve a problem only computers could solve.

Another instructive case recognizing as patent eligible claims that improve computer security and functionality is Judge Bryson's decision in *TQP, supra*. Although predating *Alice*, Judge Bryson held that the patented "encrypted communication system, of functionally identical pseudo-random number generators to generate the key value used for encryption and decryption" was not invalid as abstract. *TQP*, 2014 U.S. Dist. LEXIS 20077 at *12. Read as a whole, the claims were directed to systems and methods that changed data to make computer communications more secure. *Id*. Judge Bryson rejected arguments that such encryption mechanisms were abstract as being capable of being performed by humans. More generally, in *TQP*, Judge Bryson similarly recognized that "[i]f an inventor can get a patent on a method that makes information more readily understood or recognized, then there is no reason an inventor cannot obtain a patent on the opposite—a method that makes information less readily understood or recognized" to particular users. *See id.* at *20. This is the solution of the Asserted Claims.

Beyond the question of whether the Asserted Claims could be accomplished by a human, which, as this Court has recognized is nondispositive, the Asserted Claims, as in *TQP*, are directed to nonabstract subject matter because they involve:

> *a way of making computer communication itself more effective by making that communication more secure*. The disputed claim does not involve a method of doing business that happens to be implemented on a computer; instead, it involves a method for *changing data* in a way that will *affect the communication system itself, by making it more secure*. Thus, although the invention in this case does not result in the physical transformation of matter of the sort involved, for example, in *Diamond v. Diehr*, 450 U.S. 175, 101 S. Ct. 1048, 67 L. Ed. 2d 155 (1981) (method for curing rubber), it involves a specific system for *modifying data that has equally concrete and valuable effects in the field of electronic communications*.

13

*Id*. at *24 (emphasis added). *See Ultramercial, Inc. v. Hulu, LLC* 772 F.3d 709, 716 (Fed. Cir. 2014) (machine-or-transformation test can provide a "useful clue" in the patentable subject matter inquiry) (citations omitted). For the same reasons that Judge Bryson held the *TQP* claims were directed to a technological development of "making computer communication itself more effective by making that communication more secure", the Asserted Claims do so through an innovative solution that was so transformative that Apple introduced it into its ecosystem.

### ii.   Step Two – The Asserted Claims Provide an Inventive Concept

Even assuming, *arguendo*, that the Asserted Claims are found to be directed to an abstract idea, they provide a sufficient inventive concept such that the Asserted Claims are patent-eligible pursuant to 35 U.S.C. § 101. The Asserted Claims provide an "inventive concept" i.e., an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice, supra*.

### 1.   The First Amended Complaint Raised Issues of Fact

*Alice*'s step two inquiry is particularly susceptible to factual determinations, which in this case require denial of Rule 12(b) motion. *See Aatrix, Inc.*, 882 F.3d at 1128 ("Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact.")

In *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1315-18 (Fed. Cir. 2019), the Federal Circuit held that even where the asserted claims were "drawn to the [abstract] idea of capturing and transmitting data from one device to another", the patentee had sufficiently alleged the claims were unconventional inventive improvements over the prior art such that dismissal was inappropriate at the Fed. R. Civ. P. 12(b)(6) stage. Notably, the Court reiterated that "allegations in the *complaint*" were sufficient to support plausible inferences that the limitations "were potentially inventive". *Id*. at 1317; *see also Aatrix*, 882 F.3d at 1128 (Fed. Cir. 2018) (vacating

14

the district court's dismissal where "factual allegations in the [operative] complaint, which when accepted as true" stated that "individual elements and the claimed combination [were] not well-understood, routine, or conventional"). Here, the limitations in claim 1 are particularly analogous to those in claim 1 of *Cellspin*'s U.S. Pat. No. 8,738,794. The claim limitations are supported by statements in the specifications and in the complaint that these limitations and elements represented an inventive concept. For example, "[t]he claims of the '284 Patent describe an innovative improvement to the operation of communications networks, and specifically, to the ability to manage interactions on communications networks, including a specific architecture to manage interactions employing both private and public interaction addresses. […] This improves the ability of prior art communications systems to facilitate anonymous and easy-to-manage methods of communication." (FAC at ¶46). Similarly, "users would often create a host of false, hard-to-manage public interaction addresses to protect their privacy." (FAC at ¶53). Indeed, "Apple touted this 'Hide my Email' and 'Private Relay' system as a significant step forward in protecting user's privacy, while still enabling easy-to-manage electronic communications." (FAC at ¶55); *see also* (FAC at ¶2 ("allowing electronic communication without widespread dissemination of private address information.")) Taking these allegations as true as is required at this stage, there is at least a question of fact that requires discovery.[2]

2.    The Asserted Claims Provide an Inventive Concept

In *DDR Holdings, LLC v. Hotels Com.*, 773 F.3d 1245, 1258-59 (Fed. Cir. 2014), the claims at issue were directed towards a "store within a store" concept, which had specific elements that, together, "over[rode] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." Critically, in *DDR*, and as here, the claims and pleadings

---

[2]    The Second Amended Complaint, filed concurrently herewith, raises the same issues of fact.

15

alleged specific steps to achieve the desired result. Not only were these steps an unconventional mechanism to achieve that result, but they also narrowed the scope of the invention such that the entire field of online shopping, for example, was not claimed, but rather narrowed to the specific use of these unconventional steps to achieve the combined look and feel of a host website with embedded third-party merchant content. *Id*. at 1248. Similarly, here, the claim language includes specific steps which limit the invention to a narrow use of the particular steps: (a) rendering the public addresses manageable (as opposed to conventional fixed) provides a security feature that prevents cross-correlating identity patterns to expose parties (all Asserted Claims); (b) routing incoming communication via addresses found in the "record" provides privacy (claim 1(a)-(f)); *see also*, claims 7, 29); and (c) routing outgoing communication via aliases associated in the reverse list provides privacy (obfuscating private addresses) as well as caller recognition (a recognizable alias associated with the contact) (claim 1(g)-(j); *see also*, claims 10, 28).

These specific limitations resolve a previously unsolved problem of alias confusion, reconciling privacy and caller recognition, which were formerly at odds. The result is a marked technological improvement in the functioning of computers used for communications. The patent provides improvement to routing privacy: it was an unsolved problem that public aliases, like those provided by Google Voice's random telephone numbers, were unrecognizable. Part of security, as well as usability, is recognizing a caller. All call screening list, caller ID and other standard communication platforms, would fail. The Asserted Claims solve this problem by creating an alias that is manageable (a security improvement feature), while creating a tracking scheme via the "reverse list" to recall recognizable aliases in outbound routing (claim 1(h)-(j)). The patent also improves computer function: outbound routing integrates the reverse list by accessing it to look up addresses/aliases for seamless computer efficiency (claims 1(h), (j)). A

16

user would simply send an outgoing communication, and the reverse list would interject the recipient-recognizable alias – a one-step process, without creating a bottleneck workflow, waiting for address input from a human intermediary, that interrupts the computer's efficiency.

Apple has "shown no proper basis for rejecting those allegations as a factual matter." *See Aatrix*, 882 F.3d at 1128. And, there has been no fact discovery or averments indicating that these steps are only conventional or well-understood methods. *See also Network Congestion Sol'ns., LLC v. U.S. Cellular Corp.*, 170 F. Supp. 3d 695, 705 (D. Del. Mar. 22, 2016) (declining "to dismiss on this record" where, at step two, "the claim as a whole […] provides the requisite degree of specificity.") Comparing the operative claim language in the '284 Patent and the patent at issue in *Network Congestion* (U.S. Patent No. 6,826,620) underscores that the claim provides extensive structure and specificity for obtaining a desired technical result. Whereas the *Network Congestion* claim at issue only disclosed a method comprising the steps of "monitoring data flows […]" and "controlling the data rate of at least one end user device in response to said congestion indications", Blix's claim 1 recites manifold steps by which the first user's private identity is matched with a public interaction address for a particular second user. *See* claim 1 (1(a)-1(j)). These factual allegations cannot be easily discounted, particularly without further fact finding and Apple carrying its burden of proof by clear and convincing evidence. *See also Paone v. Broadcom Corp.*, 2015 U.S. Dist. LEXIS 209725, at *20 (E.D.N.Y. Aug. 19, 2015) ("it is of no moment that '[e]ncryption, in general, represents a basic building block of human ingenuity that has been used for hundreds, if not thousands, of years.' That is because the [asserted] patent does not claim a process that can or does involve the encryption of data for some purpose that is otherwise abstract. Rather, it claims a specific method of doing so.")

17

Apple provides no information as to whether the specific steps, in the particular ordered combination, "was routine, conventional, and well-understood at the time the patent was filed." *See DivX, LLC v. Netflix, Inc*., 2019 U.S. Dist. LEXIS 227426 (C.D. Cal. Nov. 4, 2019) (denying motion to dismiss pursuant to 35 U.S.C. § 101 for partial frame encryption used for streaming services where claims allegedly disclosed specific encryption system); *see also Personalized Media Commc'ns., LLC v. Netflix Inc*., 2020 U.S. Dist. LEXIS 134312, at *15-16 (S.D.N.Y. July 28, 2020) (allegations that the "patent allowed for 'fully automated updates to receiver station software,' which prior technology did not" were "adequate to survive this motion for judgment on the pleadings."); *Securenet Sols. Grp., LLC v. Senstar Corp*., 2020 U.S. Dist. LEXIS 88637, at *37 (D. Colo. May 20, 2020) ("while the issue of patent eligibility is ultimately a question of law… I cannot conclude at this early stage that there is no inventive concept present...")

The '284 Patent explains that its novel techniques improved on known forms of electronic communications, pointing to several prior art references that described the state of the art. *See* '284 Patent at 1:23-40; 12:17-18; *see, e.g.*, Ex. A at 1:50-62 (explaining that a need exists to protect privacy in electronic voice communication, such as to ensure the caller's privacy when calling from certain locations); Ex. B at 1:8-38 (explaining the need "for preventing a leakage of personal information such as a telephone number while establishing a telephone call quickly and efficiently," including when using "a provisional telephone number corresponding to a regular telephone number"); Ex. C at 1:20-23 (explaining "[t]here are particular situations wherein a person would like to make their private phone number available to the other party for only a limited time, or reserve the ability to block future phone calls from a specific person altogether")*; see, e.g.*, Ex. D (May 5, 2016 Office Action) (identifying 24 patents and patent applications the Examiner considered as prior art). The prior art included Sprint patents "for

masquerading the identity of a communication device returning a missed call" (*id*. at 5-6, discussing U.S. Patent No. 7,995,730 to Zhang) and Fujitsu patents for managing "a provisional telephone number corresponding to the regular telephone number" (*id*., discussing U.S. Patent App. Pub. No. 2006/0233551 to Oshika, discussed *infra*).

### 3.  The Asserted Claims Do Not Preempt Every Solution to The Problem of Private Communications

One prism through which to view the question of patent eligibility is preemption. As the Supreme Court held, where a patent would preempt use of "basic tools of scientific and technological work," i.e., "[l]aws of nature, natural phenomena, and abstract ideas," the patent would "impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *See Alice*, 573 U.S. at 216. That is certainly not the case here. One could easily envision methods of providing confidential communications without using the reverse list. One such example is the one-to-one alias described in Apple's analogies. Indeed, this method – i.e., the conventional method of aliasing – is described in U.S. Pat. No. 7,436,943 (Oshika), which is cited as prior art in the background of the '284 Patent. According to the Oshika patent, a single provisional (i.e., public) telephone number is associated with a regular (i.e., private) telephone number (Col. 1, lines 45-57). However, that one-to-one correspondence is not the solution of the '284 Patent. Rather, the '284 Patent claims that the public interaction address is independently associated with each correspondent of a user, i.e., "generating at least one reverse list entry, wherein an interaction address of said second party is associated at least with said manageable public interaction address of said first party… " (claim 1). By ignoring this limitation of the reverse list, Apple fails to address the merits of the patent.

Apple cannot argue that the Asserted Claims preempt all forms of confidential communication, because any number of other systems could be used that do not use an alias list

19

of any sort. *First*, a system could perform a transformation function on the private address that would be used as the public address (e.g., abc@domain.com is converted to bcd@domain.com) or some more sophisticated transformation. Such a system could recreate the private address from the public address by performing the inverse transformation, and not require an alias list. *Second*, a system can assign ad hoc aliases which would not need to be stored (e.g., Google Voice's randomized telephone numbers), rather than persistent aliases.

Rather, the '284 Patent solves the alias confusion problem by integrating the data structure (the reverse list) to route outbound communications (e.g., claim 1(g)-(j)). The reverse list provides persistent memory tracking of which alias (first party manageable public address) to associate with which contacts (second party interaction address), so the confidential party knows which of its identities to use in order to be recognizable to other parties. This provides a technical solution or inventive step that reconciles the opposing forces of flexible addressing and caller recognition, a problem unsolved until the '284 Patent. The above inventive steps are manifested in the claims of the '284 Patent, particularly claim 1(g)-(j).

Accordingly, the '284 Patent claims do not preempt all (or nearly all) confidential communication systems, but are limited to the patented "manageable" aliasing of the invention, using the data structure of the reverse list, which stores a public interaction address associated with the identities of both participants, thereby reconciling the security of manageable aliases, while allowing recognizability of contacts. Using this reverse list as a data structure to manage the aliases is more than merely an abstract idea – it is precisely the sort of innovation that provides the inventive step in the *Alice* analysis.

## V.    Conclusion

For the foregoing reasons, Apple's motion to dismiss should be denied in its entirety.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

*Of Counsel:*

John G. Day (#2403)
Andrew C. Mayo (#5207)

Mark C. Rifkin
Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue, 9th Floor
New York, NY 10016
(212) 545-4600

500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

Daniel J. Melman
Guy Yonay
Sarah Benowich
Shaoul Sussman
PEARL COHEN ZEDEK LATZER BARATZ LLP
Times Square Tower
7 Times Square, 19th Floor
New York, NY 10036
(646) 878-0800

*Attorneys for Plaintiff*

Dated:  February 12, 2021

21