**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CONTENT SQUARE SAS and<br>CONTENT SQUARE ISRAEL LIMITED<br>(f/k/a Clicktale Limited), | : |
| Plaintiffs, | : |
| v. | :   C.A. No. 20-832-LPS |
| QUANTUM METRIC, INC., | : |
| Defendant. | : |
| MOXCHANGE LLC, | : |
| Plaintiff, | : |
| v. | :   C.A. No. 20-1123-LPS |
| ALE USA INC., | : |
| Defendant. | : |
| MOXCHANGE LLC, | : |
| Plaintiff, | : |
| v. | :   C.A. No. 20-1440-LPS |
| AVIGILON USA CORPORATION, | : |
| Defendant. | : |
| BLIX INC., | : |
| Plaintiff, | : |
| v. | :   C.A. No. 19-1869-LPS |
| APPLE INC., | : |
| Defendant. | : |

1

## MEMORANDUM ORDER

At Wilmington, this **18th** day of **March, 2021**:

WHEREAS, Defendants in the above-listed cases filed Rule 12 motions to dispose of patent infringement claims on the bases that certain patent claims are invalid under 35 U.S.C. § 101, because they are allegedly directed to patent ineligible subject matter;

WHEREAS, the above-listed cases brought by Content Square SAS and Content Square Israel Limited (together, "Content Square"), Moxchange LLC ("Moxchange"), and Blix Inc. ("Blix") are unrelated to one other;

WHEREAS, the Court heard oral argument in all of the above-listed cases on March 12, 2021, and has considered the parties' respective briefs and related filings;[1]

WHEREAS, the Court continues to find that its experimental procedure of addressing multiple Section 101 motions from separate cases in one hearing is an efficient use of judicial resources and a beneficial tool for resolving the merits of Section 101 motions;

**NOW, THEREFORE, IT IS HEREBY ORDERED** that, with respect to the above-listed Content Square case, Defendant's Rule 12 motion (C.A. No. 20-832 D.I. 11) is GRANTED IN PART and DENIED IN PART, and Defendant's motion to stay pending *inter partes* review (D.I. 22) is DENIED;

**IT IS FURTHER ORDERED** that, with respect to the above-listed Moxchange cases, Defendants' Rule 12 motions (C.A. No. 20-1123 D.I. 8; C.A. No. 20-1440 D.I. 11) are DENIED; and

---

[1] Chief Judge Leonard P. Stark and Magistrate Judge Sherry R. Fallon jointly presided throughout the argument.  The Court adopts the full bench ruling.

**IT IS FURTHER ORDERED** that, with respect to the above-listed Blix case,

Defendant's Rule 12 motion (C.A. No. 19-1869 D.I. 50) is GRANTED.

The Court's Order is consistent with the bench ruling announced at the hearing on March

12, 2021, pertinent excerpts of which follow:

> Initially, let me note, all of the motions today present Section 101 patent eligibility issues arising in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. I have, of course, applied the well-known standard applicable to Rule 12(b)(6) motions, which is not disputed in any of the cases argued today.

> I've also, of course, applied the now very familiar two-step framework for patent eligibility under Section 101. That is set out by the Supreme court in *Alice*. . . .[2]

> In brief, under Section 101, an invention directed to laws of nature, physical phenomena, or abstract ideas is not patentable. To determine if an invention is patent ineligible, the Court must first determine if claims are directed to a patent ineligible concept. If the claim is directed to a patent ineligible concept, then the Court will look for an element or a combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself. If, but only if, the defendant prevails at both Steps 1 and 2, the Court may declare the patent not eligible for patenting and dismiss the patent infringement claim.

> Because the legal standards are not in dispute, for simplicity, the Court incorporates by reference the legal standards outlined in previous decisions, such as my *DiStefano Patent Trust* decision,[3] . . . which the Federal Circuit summarily affirmed in 2019, as well as the legal standards as set out in the motion to dismiss opinion in the *Blix v. Apple* case, one of the cases argued today. . . .[4]

> The Court also incorporates by reference the legal standards for Section 101 and motions to dismiss under Rule 12(b)(6) as outlined in the Federal Circuit's recent decision in *Simio v. FlexSim* . . . .[5] That was from last year as well.

> . . .

---

2 *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

3 *DiStefano Patent Trust III, LLC v. LinkedIn Corp.*, 346 F. Supp. 3d 616, 620-23 (D. Del. 2018), *aff'd*, 784 F. App'x 785 (Fed. Cir. 2019).

4 *Blix Inc. v. Apple, Inc.*, 2020 WL 7027494, at *1-3 (D. Del. Nov. 30, 2020).

5 *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1358-59 (Fed. Cir. 2020).

I'm going to go through the cases in the order they were argued. So, first is *Content Square v. Quantum Metric.* The defendant, Quantum Metric, moves to dismiss all of the asserted claims, which are claims 1 and 15 of the '525 patent,[6] claims 1, 6, and 10 of the '081 patent,[7] claims 1, 12, and 13 of the '365 patent,[8] claims 1 and 16 of the '645 patent,[9] and claims 1 and 12 of the '737 patent.[10]

The Court agrees with the parties that claim 1 of each of these five patents is representative of all of the asserted claims of that particular patent. So the Court will address the patentability of just claim 1 of each of the five patents. But the decisions I'm announcing apply [only] to . . . the asserted claims for each of the patents I am discussing. I am not making any decisions about the patentability of any unasserted claim.

To simplify and shorten the discussion, I will group the patents into three categories, as the parties have.

I will first discuss what has been referred to as the "heat map patents." These are the '737 and '645 patents. Generally, these patents relate to visual displays known as "heat maps." With respect to these, the asserted claims of the heat map patents, Quantum Metric's motion is granted.

Let me go through the *Alice* Step 1 and Step 2 analysis to explain how I reached this conclusion.

At Step 1, the Court agrees with Quantum Metric that the '737 patent is directed to gathering, processing, and simultaneously displaying website browsing data. The Court further agrees with Quantum Metric that the '645 patent is directed to receiving and processing a user's webpage browsing data for display.

In other words, the Court also agrees with Quantum Metric that both of the heat map patents are directed to the collection, processing, and display of web browsing data. These are fair characterizations of the claims and do not improperly oversimplify them.

The Federal Circuit has repeatedly held that claims directed to the collection, analysis, and display of data are abstract.

---

[6] U.S. Patent No. 7,941,525.

[7] U.S. Patent No. 9,508,081.

[8] U.S. Patent No. 9,792,365.

[9] U.S. Patent No. 10,063,645.

[10] U.S. Patent No. 10,079,737.

*Trading Technologies II*[11] is instructive on these points. The heat maps in the '737 and '645 patents are similar to the graphical user interfaces in that case. Even if the heat maps process the displayed information, they are still abstract.

The *Electric Power* case[12] provides further support for the conclusion that the collection, analysis, and display of data is abstract.

These patents do not include specific details for how the visual displays are scaled. The claims are result-focused and functional, which . . . provides further support for the Court's conclusion that they are directed to an abstract idea.[13]

To the extent that the '645 patent discloses a simple algorithm for calculating the salience for the page view, such a calculation can also be performed mentally or by hand and is abstract.

Contrary to Plaintiffs' argument, these patents are not similar to the patents involved in *Core Wireless*,[14] in which the claims were directed to improved user interfaces. The '737 and '645 claims are not directed to interfaces.

Again, the Federal Circuit has stated that "the collection, organization, and display of two sets of information on a generic display device is abstract." That is from *Trading Techs. I*,[15] . . . [a]nd I believe that that fairly characterizes these claims at Step 1.

Because Defendant has met its burden at Step 1, the Court moves on to Step 2. At Step 2, the Court considers whether the claims as a whole contain an element, elements, or an ordered combination that ensures that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.

The representative claims of the '737 and '645 patents merely recite the abstract ideas themselves. And the case law is clear that an abstract idea itself cannot be the inventive concept required at Step 2.[16]

For example, Plaintiffs point to the "generating" steps, but those steps are abstract and cannot provide the inventive concept.

---

[11] *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378 (Fed. Cir. 2019).

[12] *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016).

[13] *See, e.g., Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016).

[14] *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018).

[15] *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019) (quoting *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018)).

[16] *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369 (Fed. Cir. 2016).

Nor does the ordered combination of the steps in the claimed method provide an inventive concept because that order is conventional. Data must be collected before it is analyzed, and it must be analyzed before it can be displayed in its processed form. That is the order in which the claims here are practiced. And among other cases, *Two-Way Media*[17] shows that this is conventional.

In reaching the conclusion that the asserted claims of the '645 patent are ineligible for patenting, the Court has determined that Plaintiffs' proposed claim construction for the '645 patent does not alter the analysis. I have assumed, for purposes of the motion, that the proposed construction that the plaintiffs identified is plausible and will be adopted. But even doing so, the claims fail at both Step 1 and 2.

Plaintiffs did not raise any potentially dispositive claim construction disputes for the '737 patent.

. . . Let me turn next to the "multivariate testing patent," the '365, which involves creating multiple versions of a website to determine users' preferences. With respect to the asserted claims of this patent, Quantum Metric's motion is denied.

There is at least a factual dispute at Step 2 as to whether the ordered combination of claim limitations in the representative claim is conventional, routine, and well understood.

At *Alice* Step 1, the Court does agree with Quantum Metric . . . that the '365 patent is directed to gathering data, analyzing that data to recognize a subset of data, and storing that data. This is not, in my view, an oversimplification of the representative claim. The claim does not involve substantially more than the collection, analysis, and storage of data.

We know from cases like *Content Extraction*[18] that collecting data, recognizing a subset of the data, and storing the recognized data is an abstract idea.

Plaintiffs' analogy to *SRI International*[19] is unpersuasive. That case involved improvements to computer security, but it does not seem that this is what we have in the '365 patent.

Plaintiffs' allegation that this claim is directed to a technical improvement [and] solving [a] computer-specific problem is, in the context of Section 101, a legal conclusion which the Court need not take as true.

---

17 *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017).

18 *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014).

19 *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295 (Fed. Cir. 2019).

It is here, as well, unpersuasive.  The representative claim of the '365 patent does not appear to be directed to a specific technique for solving a computer-specific problem.

. . . At Step 2, the defendant has failed to meet its burden to show by clear and convincing evidence that claim 1 of the '365 patent does not capture an inventive concept.

The Court is not persuaded at this stage that the claim is nothing more than a claim to the abstract idea, or is merely a claim to practicing the abstract idea using . . . conventional computer components and conventional computer techniques . . . .

While Defendant may ultimately prove that the web crawling limitation could be practiced using conventional web crawling techniques, which is at a minimum suggested in the specification, for instance, at column 4, lines 43 to 47, I am unable to find today, on the very limited record, that the claimed web crawling was conventional, well understood, and routine.

The Court does not view the web crawling technique in the '365 patent as analogous to the scanner in *Content Extraction*.  There was a real-world comparison to the claims there, while no persuasive comparison has similarly been identified here as of yet.

Further, the representative claim of the '365 contains other limitations, including the "analyzing" limitation.   Those other limitations may themselves be not conventional . . . not well understood and not routine, and there is at minimum a factual question about that.  And the same factual questions arise about the ordered combination of the claim limitations.

Plaintiffs propose a claim construction here as well, which, if adopted, would seem to raise the possibility of additional . . . fact disputes.

So for all these reasons, Defendant's motion is denied with respect to the '365 patent.

The other Content Square patents that were argued are the "user tracking patents," that is the '081 and the '525 patents, which generally relate to methods for tracking users' web browsing activity, which Plaintiffs call "session replay."   On these patents, Quantum Metric's motion is denied. . . .

The Court believes it is fair to address both of these patents together, that is, the '081 and the '525, and I find for both of them that Defendant has failed at both Steps 1 and 2.

At Step 1, Quantum Metric argues that the '081 and '525 patents are directed to collecting data regarding a website and the user's activities and combining this data

to create user activity information that allows for compensating for display differences. That's the articulation from the brief.

This is not, in my view, a fair characterization of what the claims are directed to. The representative claims recite numerous steps, and Quantum Metric's proposal improperly oversimplifies them.

Quantum Metric compared this case to *Digitech*,[20] but there the claims were significantly more limited to the manipulation of data.

. . . The *McRO* decision,[21] . . . provides a better comparison. Like the claimed methods in *McRO*, which related to automatically animating lip synchronization and facial expressions for 3D characters, the methods here involve a process specifically designed to achieve an improved technological result in conventional industry practice.

While not dispositive, it is noteworthy that Defendant has also failed to persuade the Court that the methods of the user tracking patents were previously accomplished by humans.

I will move on to *Alice* Step 2, even though Defendant has failed at Step 1. Defendant has, in any event, failed at Step 2 as well, as it has not shown that the representative claims lack an inventive concept.

In particular, the '525 patent claims a non-linear transformation that involves converting each associated element of the portion of the webpage in a piece-wise linear fashion. Although claim 1 of the '081 patent is not as specific, it also requires compensating for differences in visual displays.

To me, that means there is at least a factual dispute as to whether the "transformation" and "compensating" steps were conventional, well understood, and routine at the pertinent date. There is also a factual dispute as to whether the ordered combination of the method steps might be inventive.

Further, to the extent claim construction is necessary, and as Content Square points to a couple of terms that it believes need to be construed prior to resolving the 101 issue, this would provide yet another reason that the motion should be denied with respect to the user tracking patents.

So in sum, the Quantum Metric motion to dismiss is granted in part and denied in part.

---

[20] *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014).

[21] *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016).

It is granted to the extent that . . . the patent infringement claims based on the asserted claims of the heat map patents, the '737 and '645, . . . are dismissed because the patent claims are directed to non-patentable subject matter.

Now, I recognize that Plaintiffs have requested leave to amend with respect to any patents that the Court might find to be non-patentable.

It seems possible that, given my conclusions about the heat map patents, amendment might be futile, but there has been no briefing and no argument to date on that point.

Therefore, if Plaintiffs believe that amendment would not be futile and believe that amendment would not otherwise be unwarranted, Plaintiffs may, in a timely manner, file a motion for leave to amend, attaching the proposed amended complaint accompanied by a three-page letter brief. That is, if Plaintiffs choose to pursue amendment, we will follow the letter briefing procedure that I often use for motions to amend and motions to strike.

In all other respects, Defendant's motion is denied.

Defendant has not met its burden to show that the multivariate testing patent, that is, the '365, or the user tracking patents, the '525 and '081, are non-patentable.

. . . Quantum Metric's motion to dismiss Content Square SAS as a plaintiff for lack of standing is denied.

This denial is without prejudice to renew should Defendant develop evidence it believes would give the Court a basis to find that Content Square SAS lacks standing.

. . . Finally, in this case, there is the motion for a stay pending IPR. . . . That motion is also denied, and that denial also is without prejudice.

. . . Defendant may renew its motion and submit briefing on it if any of the IPRs are actually instituted and if, after meeting and conferring with Plaintiffs, the parties do not agree on whether this case should be stayed.

I do further direct that the parties meet and confer and submit a joint status report a week from today.

. . . That's it on the first case.

Let me now move on to the second set of cases, the Moxchange cases.

Here, we have two different defendants, ALE and Avigilon, both of which filed their own 12(b)(6) motions to dismiss claims that they infringed the claims of three U.S. patents: The '254, the '664 and the '232.[22]

Generally, the '254 and '232 patents are directed to a method of generating new encryption keys from a data record and a previous encryption key.

The '664 patent generally discloses a method of authentication between wireless communication network nodes in which the nodes synchronously regenerate authentication keys based on an initial authentication key.

While the motions were briefed separately, they were efficiently argued together today. They present similar and pretty much identical arguments. Both involved Section 101 challenges to the patentability of the same claim[s] of the same three patents, so I will address both motions together.

Having conducted the necessary analysis, and for the reasons I will explain, I have decided that both ALE's motion to dismiss and Avigilon's motion to dismiss will be denied.

The Court limits its analysis to just claim 1 of each of the three patents just as the parties have. The motion was not directed to any other claims, no other claims have been briefed or argued, and my decision does not reach those claims.

One other preliminary point. I, of course, carefully considered the cases cited by the parties, and particularly those each identified as most applicable . . . . [F]or Plaintiff [that] is *TecSec*[23] and for Defendants it is *Digitech*.[24]  But given my analysis of the motion, as you will see, I do not find it necessary to expressly address either of those cases. . . .

Because I find a fact dispute at Step 2 and find the defendants have not met their burden at Step 2, I am not making a decision today at Step 1 as to whether the claims at issue in this case are directed to an abstract idea.

As I will explain in a moment at Step 2, I also believe claim construction is necessary before the 101 decision can be made on these patents.  That makes it prudent, at least in this case, not to make a determination at Step 1 until after claim construction.

I recognize that Plaintiff's operative complaint makes allegations about what the claims are directed to, and I recognize that Defendants agree that this is what the

---

22 U.S. Patent Nos. 7,860,254; 7,376,232; and 7,233,664.

23 *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed. Cir. 2020).

24 *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014).

claims are directed to, and, arguably, the Court could make a legal determination at this point whether the claims are directed to an abstract idea, but for the reasons I have just noted, I'm going to defer ruling on Step 1 and will only do so if, after claim construction, at some appropriate point, I am asked again to consider the 101 issue.

So I'll turn to Step 2. And here, I conclude . . . the defendants have failed to meet their burden for at least the reason that claim construction is necessary before the Court can complete the Step 2 analysis.

In the briefing, Plaintiff stated, though admittedly without any detail or sustained argument . . . that claim construction would be necessary before the 101 issues could be decided. In the recent checklist letter, Moxchange identified three claim terms it believed need to be construed before patentability could be determined.

Most importantly, Plaintiff proposes construing the term "regenerating" to mean "performing automated continuous key modification." The Court is unable to say at this stage that Plaintiff's . . . proposed claim construction[] is implausible or frivolous.

If the Court assumes without deciding that it will adopt Plaintiff's construction of "regenerating," then it appears to follow that there is at minimum a fact dispute as to whether what may be an inventive concept, the continuous nature of key regeneration, would be captured by the claim language.

There is, in the specification, extensive discussion of the purported benefits of practicing the claims of the Moxchange patents. But the real dispute in this case, as I see it, is whether those benefits, such as improved data security, quicker systems operation, encryption keys having very short lifetime . . . are captured in the claim. If I am persuaded in the claim construction process to adopt Plaintiff's proposed constructions, it may follow that those benefits are captured in the claim.

At this stage, drawing all reasonable factual inferences in favor of Plaintiff, and assuming without deciding that the Court will adopt Plaintiff's proposed construction of "regenerating," there is a factual dispute as to whether continuous regeneration of keys, which would seem to be on this construction, captured in the claim . . . would have been well understood, routine, or conventional at the time of the patent.

As to the conventionality of regenerating keys, Defendants point to what appears to be an impressive amount of evidence to support their position. But Plaintiff also point[s] to some evidence, including from the prosecution history, to support its contrary position. And Plaintiff is correct that just because what is now purported to be inventive may have been referenced in prior art, that does not prove that something was conventional, well understood, and routine. Although here, the Defendants cite more than just one place, including . . . the specification and file

history where the purported inventive concept may have been identified and described as non-inventive. . . .

[U]ltimately, this is a motion to dismiss. I am bound to draw all reasonable inferences in Plaintiff's favor, and the record also contains some evidence in the plaintiff's favor. So on the whole, I cannot find on this record clear and convincing evidence that the purported inventive concept[s] of these patents were all conventional, well understood, and routine. Therefore, the Court will deny Defendants' motions to dismiss.

I do believe that this case is ready for scheduling, and I direct the parties to meet and confer and to submit within two weeks their proposal for a schedule. Given my conclusions regarding Section 101, as well as concerns that have been raised about novelty and possibly even issues that might arise under Sections 102 and 103, I invite the parties as they are meeting and conferring and formulating their scheduling proposals to consider whether to propose a schedule that would get us to claim construction early, perhaps even before much or any discovery, and to further consider whether we might efficiently benefit from another round of motions practice after claim construction. I'm not agreeing that I will do any of these things, but I am willing to consider them, and I do invite the parties to consider whether they want to propose any of that and whether they think any of it logically follows from what I said today in denying the 101 motion.

That's all I had to say on the Moxchange cases, so let me finally turn to *Blix vs. Apple*.

Apple has moved to dismiss the remaining asserted claims of Blix's '284 patent.[25] For the reasons I will explain, Apple's motion is granted.

In this case, I have already ruled on a previous motion to dismiss the claim brought by Blix against Apple for infringement of the same '284 patent. I issued an opinion last November, in which I held that claim 17 is not representative. I also held that claim 17 was directed to non-patentable subject matter under Section 101 and, therefore, I granted Apple's motion to dismiss with respect to claim 17.[26]

In doing so, I held that claim 17 was directed to an abstract idea at Step 1, specifically, facilitating anonymous communication using a proxy. At Step 2, I found that claim 17 did not capture any inventive concept, explaining claim 17's method for controlling pre-interaction merely recites the conventional steps of gathering, categorizing, organizing, and comparing data . . . . [I] added that the ordered combination of limitations consists of performing conventional steps with conventional computer components.

---

[25] U.S. Patent No. 9,749,284.

[26] *Blix*, 2020 WL 7027494.

After some further consultation with the parties, I held that Blix could file an amended complaint if it wished to assert infringement of claims other than claim 17, and, of course, Apple would then have an opportunity to move to dismiss any additional asserted claims; and that is what has happened.

The operative complaint is now Blix's second amended complaint, and I view today's motion as directed to the second amended complaint. . . .

. . . The briefing on the motion cites 26 claims.  [And] the parties agree today that the motion is directed to 26 claims.  So my ruling goes to all 26 of them, so my finding is that all 26 of them are not patentable.  To be precise, the claims that are ruled on today are 1 through 5, 7 through 11, 13 through 15, 18, 21 to 24, 28 to 30, and 33 to 37.

There is a somewhat tricky matter as to representative claims . . . .  [I]n the November opinion[,] based on the briefing I had before me at that time[,] I found that claim 17 was not representative.  I see no reason to reevaluate that decision today.

In the briefing for today, Apple briefed all 26 remaining asserted claims but Blix did not.  Its brief is limited pretty much to claims 1 and 11.  But Blix did not agree that these claims are representative of any other claims.  Blix is correct that it's Defendant's burden to show by clear and convincing evidence that each of these 26 claims is not patentable.  So, technically, I suppose Blix is correct that it does not have to respond to Apple's arguments on all of the claims.  However, of course, it would have been helpful if Blix had responded on each of the claims it was still asserting and defending the validity of.

But more importantly, I do find, as I will further explain, that Apple has met its burden on all 26 claims. . . .  I was persuaded by and agree with all of the arguments that Apple has made on all 26 claims with respect to Steps 1 and Step 2.

Turning to Step 1.  In the November opinion I held, as I have already mentioned, that claim 17 was directed to the abstract idea of facilitating anonymous communication using a proxy.  Blix has identified no material difference in any of the other 26 remaining asserted claims that would lead to a conclusion that any of them are directed to something other than that same abstract idea that I found claim 17 to be directed to.

Blix asserts that the remaining asserted claims are directed to a solution uniquely implementable in computers, such that it improves computer efficiency, relying on, for example, *TecSec*.[27]  The Court already rejected this argument with respect to claim 17, and it fares no better in connection with the remaining asserted claims. In considering claim 17 as a whole, I found that it was directed to an abstract idea

---

[27] *TecSec,* 978 F.3d at 1278.

that invoked computers as a tool, claiming only desirable results rather than improving the performance of a computer. The Court's conclusion is the same with respect to the remaining asserted 26 claims.

Let me turn to those 26 claims. They can be categorized into three categories. . . .

[A]t Step 1, the first category I have considered are those claims that depend from claim 17. Those are claims 18, 21, 22, 23, and 24; the second category [are] those claims that depend from claim 27, that is, 28, 29, 30, 34, 35, 36 and 37. And the final category is claim 1, and those that depend from claim 1, that is, claims 2, 3, 4, 5, 7, 8, 9,10, 11, 13, 14, and 15.

I see nothing in any of them, and I have considered them all, that changes the abstract idea analysis. And Plaintiff provides no persuasive argument to the contrary. So Apple has met its burden at Step 1 with respect to all of the remaining asserted claims.

Turning to Step 2, again, as mentioned, in November I found that claim 17 is not transformative and recites the merely conventional step[s] of gathering, categorizing, organizing, and comparing data. The Court reaches the same conclusion for all of the remaining 26 dependent claims.

Blix's efforts to persuade the Court that some or all of the remaining dependent claims are transformative under Step 2 fail. The purported inventive concepts are not in the claim[s]. The remaining asserted claims are not directed to anything more than the abstract idea and the conventional steps of communicating, that is, including gathering, categorizing, organizing, and comparing data. I'm going to now run through the limitations of the 26 claims, highlighting how they may differ from claim 17, but, again, I have found that none of these limitations make a difference in Step 2. The additional limitations are results-oriented and functional; they are not specific to computers.

None of these claims, taken as a whole and as an ordered combination, claim anything other than the conventional steps of communication and the abstract ideas I have identified.

The first category of those claims depending from claim 17 add only one of the following limitations:

- In claim 18, it's the method of claim 17 wherein that method is not followed by a communication.

- In claim 21, a predefined rule is performed, to include a predefined response, such as recording, converting, or forwarding a communication.

14

- Claim 22, a predefined rule is performed to include assignment to a private interaction address, a manageable public interaction address, or a reverse list.

- Claim 23 adds use of a communication preference with respect to the various interaction addresses.

- Claim 24 adds, where a different communication preference allows the display of the public interaction address.

None of these additional limitations make a difference, in my view, at Step 2.

The second category is claim 27 (which itself is not asserted) and the claims that depend from it. Claim 27 has the same limitations as claim 17, but it is in a system format. It uses generic computer components merely as a tool. And the claims depending from claim 27 add nothing to render them directed to anything other than the same abstract idea I have already identified.

- Claim 28 is the system of claim 27, wherein there is initiation of communication from a manageable public interaction address.

- Claim 29 adds to 27, wherein a networking terminal is configured to receive, identify, and associate the incoming communication with the public interaction address.

- Claim 30 adds to 27, wherein the system's use is not followed by a communication.

- Claim 33 adds to 27, a microprocessor that can execute a predefined rule, such as recording, converting, or forwarding a communication.

- Claim 34 adds to 27, a microprocessor that executes a predefined rule to include assignment to a private or manageable public interaction address or a reverse list.

- Claim 35 adds to 27, computer parts capable of enabling a default computer preference assigned to the various interaction addresses.

- Claim 36 adds to 27, use of a computer storage memory that presents content, such as text, data, audio, or video files, graphics, or links.

- Claim 37 adds to 27, computer storage memory configured to store a default communication preference which qualifies the means of pre-interaction.

Again, none of these, in my view, make a difference at Step 2.

And the same conclusion follows from the third and final category of remaining asserted claims, independent claim 1 and its dependent claims. These claims, too, are directed to the abstract idea of facilitating anonymous communication using a proxy, and they do not succeed at Step 2.

Claim 1 claims each of the same limitations as claim 17 with the addition that there be an incoming and outgoing communication, that these communications are initiated and received by various parties, and that those communications are identified and categorized. None of those additional limitations specify a problem uniquely related to computers and do not solve such a problem. Instead, they merely invoke the abstract idea of communication in which computers are used as a tool.

Blix asserts that claim 1 is directed to the ability to seamlessly communicate confidentially and transparently, which permits security and caller recognition for caller ID and screening. I conclude this is just another way of saying that the patent is directed to anonymous communication using the proxy.

Blix further argues that claim 1 claims a method that cannot be performed by humans without a computer, and that this is a significant clue that the claim is not directed to an abstract idea. Whether a human could perform the method is merely a clue and is not dispositive of any issue in a 101 analysis. But in any case, this clue detracts from Blix's position because, in my view, a human [can] perform the method of claim 1. For example, a human landlord can perform controlled reciprocal communications by putting an ad in a newspaper for a tenant. The tenant could perform the same by keeping himself or herself anonymous from the landlord by use of a reverse list, or a popular person could use telephone screening to remain anonymous while still remaining in communication with those they desire to communicate with. And these are examples for which you could find support in the '284 patent, for instance, at Columns 18 and 19.[28]

The claims depending from claim 1 add no limitations that change this analysis.

- Claim 2 is the method of claim 1 with the additional limitation that an identity of a communicator be identified and associated to that party.

- Claim 3 requires the additional limitation of associating an interaction address with the reverse list.

- Claim 4 requires the additional limitation that a communication be rejected, attempted, interrupted, incomplete, or abrupted.

- Claim 5 requires that an interaction address be associated with a telephone number, screen name, or other indicia of identity.

---

[28] *See* '284 Patent at 18:65-19:48.

- Claim 7 requires the forwarding of communications or information or presentation of communication or manageable public addresses.

- Claim 8 requires further the use of a reverse list to associate a name to addresses, identities, rules, or data.

- Claim 9 requires generation of a reverse list by specified entities.

- Claim 10 requires generation of a reverse list by further specified means, such as manual input.

- Claim 13 requires further performance of a predefined rule, such as rejection of, recording of, or converting a communication.

- Claim 14 further requires controlled reciprocating communication with the additional performance of a default communication preference or an alternative with respect to the interaction addresses.

I skipped claim 11. I'll come back to it just briefly. It is one of . . . only two of the remaining asserted claims that Blix really briefed. Claim 11 claims methods of controlled reciprocating communication or the interaction address and at least a portion of a reverse list entry are unavailable to a first party. Essentially, then, claim 11 claims methods of two-way communication where anonymity of a party is ensured. Claim 11, then, in my view is still directed to the abstract idea of anonymous communicating using a proxy.

And here, at Step 2, I find no basis in the record to conclude anything other than that claim 11 is using conventional methods to keep data confidential. Again, for all of the remaining asserted claims, each of the additional limitations relate to a result-oriented aspect of communication, not a computer-oriented solution or problem. I agree, then, with Apple, that the claims are not a computer-centric solution to a computer-centric problem. They are, instead, claims to the use of a generic computer as a tool, as a solution to a human problem. So Apple has met its burden at Step 2.

I'll just briefly address a few additional arguments that Blix has made. First, the cases relied on by Blix do not alter the outcome. All, or nearly all, of those cases are ones I already considered in connection with the decision on claim 17. They are all also distinguishable for at least the reasons Apple has given.

Second, Blix points out that during prosecution, the Examiner found the patent novel over the prior art. But novelty is not the same as 101, and the Court is not bound, of course, to agree with the Examiner. The appropriate deference is recognized by the clear and convincing burden of proof that rests on Defendant, and which here, for the reasons I have explained, Defendant has met.

Blix contends that its patent does not preempt all communication or even all anonymous communication. But even assuming that is true, it's not dispositive. If, as I have found, a patent claim fails both steps of the *Alice* test, that claim is not patent eligible and no separate preemption analysis is required.[29] . . .

And, finally, Blix's allegations about statements Apple made about Apple's own products and Apple's problems do not plausibly support a finding that Blix's claims are patentable. So, again, the 101 motion from Apple is granted.

There is one other dispute between Blix and Apple that I want to take a moment to briefly address. . . . I'm going to now set out the schedule and page limits for Apple's forthcoming motion to dismiss the amended antitrust claim.

. . .

- Apple's opening brief will be due on April 15th and can be up to 30 pages.

- Blix's answering brief is due on May 15th, and also can be up to 30 pages.

- Apple's reply brief will be due on May 28th and can be up to 15 pages.

And I am scheduling oral argument for June 8th at 1:00 p.m. Each side will have up to one hour, and I am tentatively and optimistically and hopefully scheduling the June 8th hearing to be in court. That will be subject to further review by me and by the parties. If, as June 8th approaches, any party believes it would be a hardship or in any way wrong for us to meet together in court, just let me know that and we can, of course, easily convert it to a remote hearing.

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE

---

[29] *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 752 (Fed. Cir. 2019) ("Preemption is sufficient to render a claim ineligible under § 101, but it is not necessary.").